694 S.E.2d 815 (2010)
Lenora PERRINE; Carolyn Holbert; Waunona Messinger Crouser; Rebeccah Morlock; Anthony Beezel; Mary Montgomery; Mary Luzader; Truman R. Desist; Larry Beezel; and Joseph Bradshaw; individuals residing in West Virginia, on behalf of themselves and all others similarly situated, Plaintiffs below, Appellants in no. 34333, Appellees in nos. 34334 and 34335,
v.
E.I. DU PONT DE NEMOURS AND COMPANY, a Delaware corporation doing business in West Virginia; Meadowbrook Corporation, a dissolved West Virginia corporation; Matthiessen & Hegeler Zinc Company, Inc., a dissolved Illinois corporation formerly doing business in West Virginia; and T.L. Diamond & Company, Inc., a New York corporation doing business in West Virginia, Defendants below,
E.I. du Pont de Nemours and Company, Appellee in no. 34333, Appellant in nos. 34344 and 34335.
Nos. 34333, 34334, 34335.
Supreme Court of Appeals of West Virginia.
Submitted April 7, 2009.
Decided March 26, 2010.
Petition for Rehearing Filed June 2, 2010.
*827 R. Edison Hill, Hill, Peterson, Carper, Bee & Deitzler, PLLC, Charleston, WV, Gary W. Rich, Law Office of Gary W. Rich, LC, Morgantown, WV, Perry B. Jones, Jerald E. Jones, West & Jones, Clarksburg, WV, J. Farrest Taylor, Pro Hac Vice, Cochran, Cherry, Givens, Smith, Lane & Taylor, PC, Dothan, AL, for Plaintiffs, Lenora Perrine, et al.
*828 Richard W. Gallagher, Mary E. Snead, Robinson & McElwee, Clarksburg, WV, William K. Dodds, Pro Hac Vice, Dechert, LLP, New York, NY, for T.L. Diamond & Company, Inc.
David B. Thomas, James S. Arnold, Stephanie D. Thacker, Allen, Guthrie & Thomas, PLLC, Charleston, WV, Jeffrey A. Hall, Pro Hac Vice, Bartlit, Beck, Herman, Palenchar & Scott, LLP, Chicago, IL, for Defendant, E.I. du Pont de Nemours and Company.
Carte P. Goodwin, Jonathan S. Deem, Office of the Governor, Charleston, WV, for Amicus Curiae, The Hon. Joe Manchin, III, Governor.
Michele Grinberg, J. Dustin Dillard, Flaherty, Sensabaugh & Bonasso, PLLC, Charleston, WV, Tillman J. Breckenridge, Pro Hac Vice, Fulbright & Jaworski, LLP, Washington, District of Columbia, for Amicus Curiae, The West Virginia State Medical Association.
Thomas W. Rodd, The Calwell Practice, Charleston, WV, for Amicus Curiae, The West Virginia Citizen Action Group.
ALAN D. MOATS, Judge:
This environmental class action is before this Court upon three separate appeals seeking review of a series of jury verdicts, orders, and rulings by the Circuit Court of Harrison County, West Virginia. In the underlying class action, E.I. du Pont de Nemours and Company, a defendant below (hereinafter referred to as "DuPont"), was found to be liable to class members in the approximate amount of $381,737,522 for off-site arsenic, cadmium, and lead contamination which emanated from DuPont's zinc smelter facility in Spelter, West Virginia. The class consists of a property class and an overlapping medical monitoring class. The $381,737,522 amount includes the following: (1) $55,537,522 for soil and structural remediation, (2) an estimated cost of $130,000,000 for medical monitoring, and (3) $196,200,000 in punitive damages.
On September 25, 2008, this Court granted the three appeals and ordered that they be consolidated for purposes of argument, consideration, and decision.[1] This Court has heard the oral arguments of the parties to this appeal, and has before it their briefs, all matters of record, and amicus curiae briefs from the West Virginia State Medical Association, the West Virginia Citizen Action Group, and the Honorable Joe Manchin, III, Governor of the State of West Virginia.[2]
In Supreme Court appeal no. 34334, DuPont appeals from orders of the circuit court entered on February 25, 2008, denying DuPont's motions for judgment as a matter of law or, in the alternative, to decertify the class; for a new trial; for relief concerning the scope, duration and cost of the medical monitoring plan; and to vacate or reduce the award of punitive damages. Specifically, DuPont contends that the circuit court erred by (1) granting summary judgment in favor of the Plaintiffs on the issue of the statute of limitations; (2) certifying this case as a class action; (3) admitting certain evidence pursuant to Rule 404(b) of the West Virginia Rules of Evidence; (4) qualifying Dr. Kirk Brown as an expert witness for the Plaintiffs and allowing his testimony; (5) adopting a verdict form and allowing certain instructions that permitted the jury to apply inaccurate standards of law; (6) accepting a medical monitoring verdict that was not supported by the evidence; and (7) awarding punitive damages. After thorough consideration of these issues, we conclude that the circuit court's order on the issue of the statute of limitations is reversed; however, the verdict (as modified by this opinion) is conditionally affirmed, *829 and this case is remanded with directions to the circuit court to hold a jury trial on the sole issue of when the Plaintiffs possessed the requisite knowledge to trigger the running of the statute of limitations.[3] Should the statute of limitations issue be resolved in favor of the Plaintiffs on remand, the remaining issues pertaining to liability and compensatory relief are affirmed, but we reverse the punitive damages award. With regard to the punitive damages award, we first conclude that punitive damages are not proper in connection with a claim for medical monitoring and therefore reduce the punitive damages award by forty percent. In addition, we find that mitigating circumstances warranted a reduction in the punitive damages award. Accordingly, we reverse the punitive damages award and remand the case with directions that the trial court give the Plaintiffs a period of thirty days from the issuance of this Court's mandate to decide whether they will accept a punitive damages remittitur in the amount of $20,000,000, resulting in a total punitive damages verdict of $97,720,000, or submit to a new trial on punitive damages only.
In a separate appeal, no. 34335, DuPont challenges the September 14, 2007, order of the circuit court holding that, pursuant to the terms of an October 29, 2001, agreement between DuPont and T.L. Diamond & Company, Inc., an interim owner of the smelter facility, DuPont is obligated to indemnify Diamond for its costs and expenses incurred in defending this action. Based upon the 2001 agreement, the circuit court entered a subsequent order on February 15, 2008, holding that Diamond is entitled to reimbursement from DuPont in the amount of $814,949.37. After careful review, these two orders by the circuit court are affirmed.
Finally, in appeal no. 34333, certain individual plaintiffs appeal from orders entered by the circuit court on September 14, 2007, and on September 20, 2007,[4] which barred their property damage claims (but not their claims for medical monitoring), because their predecessors-in-title executed deeds granting the Grasselli Chemical Company, the original owner and operator of the zinc smelter, and Grasselli's successors, releases and easements with regard to emissions from the facility. After thorough review of this issue, we affirm.
Due to the length of this opinion and the number of issues involved, we set out the following table of contents for the reader's convenience.

 I. FACTUAL AND PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 830
 A. Historical Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 830
 B. Regulatory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 832
 C. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 834
 1. Pre-Trial Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 834
 2. Trial and Post-Trial Matters . . . . . . . . . . . . . . . . . . . . . . . . . . 837
 II. STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 838
III. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 838
 A. Summary Judgment Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 839
 1. Indemnification of Diamond . . . . . . . . . . . . . . . . . . . . . . . . . . 839
 2. The Grasselli Deeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 842
 3. The Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . 849
 B. Class Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 853
 1. Certification Requirements Under Rule 23(a) . . . . . . . . . . . . . . . . . 855
 a. Numerosity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 855
 b. Commonality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 856
 c. Typicality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 857
 d. Adequacy of Representation . . . . . . . . . . . . . . . . . . . . . . . 857

*830
 2. Certification Requirements Under Rule 23(b) . . . . . . . . . . . . . . . . . 858
 a. Predominance Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . 859
 b. Superiority Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . 860
 c. Additional 23(b)(3) Factors to Be Considered . . . . . . . . . . . . . . . 860
 C. 404(b) Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 862
 1. General Liability Phase: Videotape Deposition Testimony of Plaintiffs'
 Witness Kathleen Forte . . . . . . . . . . . . . . . . . . . . . . . . . . . . 863
 2. Punitive Damages Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . 865
 D. Expert Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 866
 E. Verdict Form and Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . 871
 1. Verdict Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 872
 2. Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 873
 F. Sufficiency of the Medical Monitoring Evidence . . . . . . . . . . . . . . . . . . 873
 G. Punitive Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 875
 1. Dissimilar Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 876
 2. Comments by the Plaintiffs' Counsel . . . . . . . . . . . . . . . . . . . . . 877
 3. Punitive Damages for Medical Monitoring Claims . . . . . . . . . . . . . . . . 879
 4. Propriety and Excessiveness of Punitive Damages . . . . . . . . . . . . . . . 881
 a. Propriety of Punitive Damages Under Mayer v. Frobe . . . . . . . . . . . 883
 b. Excessiveness of Punitive Damages Under Garnes v. Fleming Landfill,
 Inc. and TXO Production Corp. v. Alliance Resources Corp. . . . . . . . 885
 (i). Garnes Aggravating Factors . . . . . . . . . . . . . . . . . . . . 887
 (ii). Ratio Determination Under TXO Production Corp. v. Alliance
 Resources Corp. . . . . . . . . . . . . . . . . . . . . . . . . . 889
 (iii). Garnes Mitigating Factors . . . . . . . . . . . . . . . . . . . . 891
 c. Federal Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . 894
 (i). BMW of North America, Inc. v. Gore . . . . . . . . . . . . . . . . 894
 (ii). State Farm Mutual Automobile Insurance Co. v. Campbell . . . . . . 895
 IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 896

I.

FACTUAL AND PROCEDURAL HISTORY
Due to the lengthy and complex history of this case, the historical facts, regulatory history, and procedural facts will each be presented in a separate section in order to assist the reader. Additional facts that are relevant to particular issues raised in this appeal will be set out in the discussion of the issues to which they pertain.

A. Historical Facts
This action concerns the operation of what was once one of the largest zinc smelter facilities in the United States. The plant was located in the town of Spelter, in Harrison County, West Virginia, about seven miles north of Clarksburg. From 1911, when operations began, until 1972, the plant's primary product was elemental or slab zinc. From 1972 until the plant's closure in 2001, its primary product was zinc dust or powder. The total production of the smelter facility during its years of operation can be measured in the billions of pounds.
The facility, adjacent to the West Fork River and a part of the Spelter community, was surrounded by residential, small commercial, open, and wooded areas. There was also a nearby recreational trail and playground. The community was moderately populated. The smelter facility occupied 112 to 116 acres, fifty acres of which were devoted to the open depositing of waste material, including "zinc tailings."[5] At one point, the waste pile, consisting of continuously smoldering residue, reached a height of 100 feet.
The pyrometallurgical process employed in the smelting of zinc results in the release of potentially harmful by-products, including, at issue in this action, the elements arsenic, cadmium, and lead. According to the Plaintiffs, their cause of action resulted from their continuous exposure, and the continuous exposure of their properties, to arsenic, cadmium, *831 and lead, emanating off-site from the smelter facility in the form of discharges from the fifty-acre waste pile and airborne dust.
The history set forth below is relevant to the three consolidated appeals before this Court.
In 1910, construction began on the zinc smelter facility by the Grasselli Chemical Company, and the production of zinc from zinc ore commenced in 1911. Grasselli began the practice of depositing the residue, or zinc tailings, in a pile that ultimately covered the fifty acres. During the Grasselli years, local farmers complained about a decline in crop and livestock productivity and filed a number of actions seeking recovery of damages caused by "fumes, gases and dust" emitted from the smelter.[6]
In the meantime, the Grasselli Chemical Company commissioned a 1919 investigation and report concerning "Conditions Affecting the Growth of Plants and Animals" in the vicinity of the smelter. That report, known as the Bear and Morgan Report, concluded that dust and fumes from the smelter had negatively impacted plants and livestock in the Spelter community. The report, however, was not dispositive with regard to the specific impact of arsenic, cadmium, and lead in the area. Nor did the Report resolve questions regarding human health.[7]
The smelter facility was acquired by DuPont in 1928, and the plant's operations were upgraded. The horizontal retorts[8] or furnaces used for the extraction of zinc by Grasselli, for example, were replaced with more efficient vertical retorts. In addition, DuPont and Grasselli settled the remaining claims and actions concerning emissions from the plant. As part of the settlement, certain predecessors-in-title to a number of the Plaintiffs in this action executed deeds in the 1930s granting Grasselli, and its successors, releases and easements with regard to emissions from the facility.
Specifically, the Grasselli deeds released all claims concerning various off-site properties, and the productivity thereof, arising from the "past, present or future" operation of the plant or any "substances" discharged therefrom. Moreover, the deeds conveyed to Grasselli, and its successors, a perpetual right, or easement running with the land, for the discharge of "substances" over and onto the off-site properties. The term "substances" was defined in the deeds as including "solids, liquids, smokes, dust, precipitates, gases, fumes, vapors and other matters" discharged from the smelter facility. According to the circuit court, parcels subject to the Grasselli deeds comprise approximately 40% of the land in the class area.
DuPont operated the zinc smelter until 1950 at which time it conveyed the facility to the Matthiessen & Hegeler Zinc Co. Matthiessen proceeded with smelting activities, and, in 1971, sold the facility to T.L. Diamond & Co., Inc.[9] Up to that point, the facility had engaged in primary zinc smelting, resulting in the production of elemental *832 or slab zinc. Beginning in 1972, under Diamond, until the facility closed in 2001, the plant engaged in "secondary zinc smelting" to produce zinc dust or powder from secondary materials. As determined by the circuit court, Diamond followed the practice of previous smelter owners and continued to deposit residue containing arsenic, cadmium and lead onto the exposed waste pile. The waste pile, still smoldering, reached near the West Fork River.

B. Regulatory Background
For purposes of this action, the involvement of regulatory agencies with the Spelter site began during Diamond's ownership of the smelter facility.
In February 1996, an internal memorandum was sent to Abraham Ferdas, Associate Division Director, Office of Superfund Programs of the federal Environmental Protection Agency (hereinafter referred to as "the EPA"). The memorandum, written by Jack L. Downie and entitled Recommendation for Determination of Imminent and Substantial Endangerment, concerned the smelter facility and stated that,
[t]he presence of elevated levels of lead, cadmium and arsenic onsite and in drainage pathways leading directly to the West Fork River create the potential for direct contact to contaminates [sic] by any person that comes on or near the site. The initial data indicates significant offsite exposure either by runoff or wind borne emissions.. . .
. . . .
. . . The tailings pile and Site soils are a massive reservoir of unprotected heavy metals. Site soils and the tailings pile do not support vegetation. The prevailing winds in the area are out of the west and southwest. The Town of Spelter lies in the downwind footprint of the unprotected Site soils and tailings pile. High levels of lead have been found in the Town and playground areas.
The last page of the memorandum included a paragraph signed by Ferdas which stated, in part, "I hereby determine that the release or threatened release of hazardous substances at and/or from the Site presents or may present an imminent and substantial endangerment to the public health or welfare or to the environment."
Soon after, in March 1996, the EPA sent a "Notice of Potential Liability" to Diamond and former plant owners pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. 42 U.S.C. § 9601, et seq. The Notice provided that, inasmuch as the EPA had documented the release or threatened release of hazardous substances from the smelter facility, the "potentially responsible parties," such as Diamond and DuPont, may be liable for clean-up activities and for damages to natural resources.
Subsequently, in a report dated July 30, 1996, from the federal Agency for Toxic Substances and Disease Registry (hereinafter referred to as "the ATSDR"), the results of blood lead testing of twenty-five children living in the Spelter community were published.[10] The ATSDR, with the cooperation of the Harrison-Clarksburg Health Department, performed the testing because of the possible threat to public health posed by the smelter facility. The Report concluded that,
[b]ased on this limited investigation, it does not appear that children in Spelter are being exposed to hazardous levels of lead.
Recommendations
Further community-wide screening for lead poisoning in Spelter is not indicated at this time. However, CDC [Centers for Disease Control] guidelines for preventing lead poisoning in children should be implemented on an individual basis by private physicians and other primary health care providers.
In September 1997, the EPA issued an administrative order finding that the actual or threatened release of hazardous substances, including arsenic, cadmium and lead, *833 from the smelter posed a risk to public health and the environment and that responsive action was required to abate the problem. A number of remedial measures were set forth in the order for which Diamond and DuPont were determined to be jointly and severally liable. The measures included activities such as: (1) the installation of barrier devices and the consolidation of waste material to prevent off-site drainage and erosion into the community and the West Fork River, (2) the removal of debris from the river bank, (3) the providing of security to prevent public access to the facility and (4) the development of a plan for site control. DuPont returned to the facility, then owned by Diamond, and began work to stabilize and clean up the site. The administrative order did not require off-site remediation in the surrounding community.
Section XXVI of the administrative order stated that upon performance by Diamond and DuPont of Section VIII of the order, entitled "Response Action Plan-Development and Implementation," the EPA, after review, would provide a notice of completion. In May 1999, the EPA issued a notice of completion to Diamond and DuPont with regard to the smelter facility.
Thereafter, by application dated July 13, 1999, Diamond and DuPont sought acceptance of the smelter facility into the Voluntary Remediation Program established pursuant to the West Virginia Voluntary Remediation and Redevelopment Act, W. Va. Code § 22-22-1, et seq.[11] The phrase "voluntary remediation" is defined in the Act as "a series of measures that may be self-initiated by a person to identify and address potential sources of contamination of property and to establish that the property complies with applicable remediation standards." W. Va.Code § 22-22-2(ff) (1996) (Repl. Vol. 2009). In promulgating the Act, the West Virginia Legislature sought to "encourage persons to voluntarily develop and implement remedial plans without the need for enforcement action by the [West Virginia] Division of Environmental Protection" (hereinafter referred to as "the WV DEP"). W. Va.Code § 22-22-1(d) (1996) (Repl. Vol. 2009). The application filed by Diamond and DuPont stated that the fifty-acre waste or tailings pile was the primary source of contamination at the smelter facility.
The smelter facility was accepted into the Program, and, in January 2000, Diamond, DuPont, and the WV DEP executed a document entitled "Voluntary Remediation Agreement for Investigation and Remediation Activities." Noting that Diamond and DuPont completed "interim remedial measures" under the federal administrative order, the remediation agreement stated that further clean up activities at the facility would be undertaken pursuant to a work plan and under the supervision of a licensed remediation specialist.[12] As in the case of the federal administrative order, the remediation agreement did not require off-site remediation in the surrounding community.
In 2001, all zinc operations were permanently terminated, and DuPont acquired the facility from Diamond. Specifically, by "ENVIRONMENTAL AND SALE AGREEMENT" dated October 29, 2001, Diamond transferred the facility to DuPont, *834 and DuPont assumed liability for the "past, current and future environmental condition" of the property, including, inter alia: (1) "any obligations pursuant to the Voluntary Remediation Agreement," and (2) "any liabilities related to the off-site migration of soil, sediment, groundwater or surface water from the Real Property." Moreover, DuPont agreed to release Diamond from and against all claims, costs, expenses, etc., in that regard. The "ENVIRONMENTAL AND SALE AGREEMENT" concluded by providing that Diamond "shall pay to DuPont the sum of $200,000, adjusted for prepaid property taxes, to be used by DuPont toward the cost of obligations under the Voluntary Remediation Agreement for the Real Property."
DuPont states that it spent $20,000,000 for remediation of the site pursuant to EPA and WV DEP requirements. The smelter was dismantled, and the waste pile was capped and covered with soil.

C. Procedural Background
The proceedings and rulings in the circuit court will be fully set forth as each appeal is discussed in this opinion. This section provides a general procedural background with regard to the entire action.
1. Pre-Trial Matters. On June 15, 2004, Lenora Perrine and other residents in the vicinity of the smelter filed an environmental class action in the Circuit Court of Harrison County against DuPont, Diamond and others involved, currently or in the past, with the facility.[13] As stated in the second amended complaint, the Plaintiffs sought: (1) damages for private real property owners, (2) medical monitoring for residents, whether or not they are private real property owners, and (3) punitive damages, all as a result of the offsite migration of hazardous substances, including arsenic, cadmium, and lead, from the Spelter facility. The Plaintiffs made clear that the action "does not seek damages for personal injuries." The Plaintiffs grounded the action upon theories of: (1) negligence and recklessness, (2) negligence per se, (3) public and private nuisance, (4) trespass, (5) strict liability, and (6) unjust enrichment (in failing to abate the emissions).
The second amended complaint contains the following allegation with regard to medical monitoring:
As a proximate result of the exposure, Plaintiffs and others similarly situated have suffered an increased risk of contracting serious latent diseases which makes it reasonably necessary for them to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of the exposure. . . .
. . . .
Plaintiffs have no adequate remedy at law, and the establishment of a court-supervised medical monitoring fund is reasonably necessary and highly appropriate to pay for medical monitoring. . . .
As the action progressed, DuPont and Diamond denied the principal allegations of the Plaintiffs and asserted entitlement to contribution from their respective co-defendants. In this regard, DuPont asserted a cross-claim against the co-defendants in the action (which included Diamond) seeking "a judgment against its Co-Defendants in this action for either pro rata or comparative contribution." In addition, Diamond filed a cross-claim against DuPont for indemnification based upon the October 29, 2001, "ENVIRONMENTAL AND SALE AGREEMENT" by which Diamond transferred the facility to DuPont. The cross-claim alleged that, pursuant to the "ENVIRONMENTAL AND SALE AGREEMENT," DuPont was solely liable for the past, current, and future environmental condition of the smelter site and had agreed to release Diamond from and against all claims, costs, expenses, etc., in that regard.
On November 14, 2005, the Plaintiffs filed a motion asking the circuit court to certify the class pursuant to Rule 23 of the West Virginia Rules of Civil Procedure. A three-day *835 evidentiary hearing was conducted upon the motion in May 2006. On September 14, 2006, the circuit court entered an order granting the motion for certification and dividing the class into two overlapping subclasses, the property class and the medical monitoring class. As stated in the consolidated petition for appeal filed by DuPont, "[t]he Circuit Court certified two overlapping classes: a property-damage class of property owners in a five-by-seven mile area surrounding the smelter site,[[14]] and a medical-monitoring class of approximately 8,500 people who had lived in the class area[.]" (Footnote added).
Pursuant to the September 14, 2006 order, the property class was defined as "[t]hose who currently own, or who on or after December 1, 2003, have owned, private real property lying within the below-referenced communities or any other private real property lying closer to the Spelter Smelter facility than one or more of the below-referenced communities." That provision included a footnote which stated that, for clarity, the circuit court further defined the property class "as those who actually own property at the time of entry of this Order [(September 14, 2006),] or owned property as of December 1, 2003."
The description of the medical monitoring class, however, was not finalized until June 14, 2007, at which time the circuit court entered an order granting the Plaintiffs' motion to modify the medical monitoring class definition. The June 14 order established "proximity zones" for class determination with regard to the community surrounding the facility. Thus, the medical monitoring class was defined as:
THOSE WHO CURRENTLY OR AT ANY TIME IN THE PAST SINCE 1966 HAVE RESIDED ON PRIVATE REAL PROPERTY IN THE CLASS AREA FOR AT LEAST THE MINIMUM TOTAL RESIDENCY TIME FOR A ZONE. . . .

ZONE 1: [CLOSEST TO THE PLANT SITE]: MINIMUM TOTAL RESIDENCY TIME OF ONE YEAR SINCE 1966.

ZONE 2: MINIMUM TOTAL RESIDENCY TIME OF THREE YEARS SINCE 1966.

ZONE 3: MINIMUM TOTAL RESIDENCY TIME OF FIVE YEARS SINCE 1966.
RESIDENCY TIME WITHIN A ZONE OR ZONES CLOSER TO THE FORMER SMELTER FACILITY BUT NOT MEETING THE MINIMUM TOTAL RESIDENCY TIME FOR A CLOSER ZONE IS ACCUMULATED WITH ANY RESIDENCY TIME WITHIN A ZONE OR ZONES FURTHER AWAY IN DETERMINING TOTAL RESIDENCY TIME.
Meanwhile, by agreement dated November 21, 2006, Diamond assigned to the Plaintiffs its right to indemnification under the "ENVIRONMENTAL AND SALE AGREEMENT" with regard to any judgment entered against Diamond arising from the class action. In return, Diamond promised to cease defending against the Plaintiffs' claims, and the Plaintiffs agreed to limit their pursuit of Diamond's assets. Thus, in the event of a judgment against Diamond, the Plaintiffs, under the assignment, could hold DuPont accountable to satisfy Diamond's liability. By letter dated April 23, 2007, and by order entered on May 7, 2007, the circuit court approved the assignment. Moreover, the order stated:
[T]he indemnification cross-claim by [Diamond] against DuPont is based upon the interpretation of contractual rights and responsibilities under the Environmental and Sale Agreement, and does not pertain to issues of liability or apportionment of fault.
The order concluded further:
[B]ifurcation will aid in the efficient resolution of the common issues to be determined in the tort liability trial by severing for later trial, if necessary, the distinct *836 issues raised by the contractual indemnification cross-claim.
As a result, the circuit court bifurcated the question of indemnification, in the context of the "ENVIRONMENTAL AND SALE AGREEMENT" and the assignment, from the issues of tort liability arising from the operation of the smelter facility. With regard to tort liability, the circuit court, on June 14, 2007, issued a management plan stating that the upcoming jury trial would consist of the following four phases: Phase I, the general liability phase, would concern evidence of the alleged exposure of the property and medical monitoring classes to contaminants from the smelter facility; Phase II would concern whether medical monitoring is warranted; Phase III would concern the Plaintiffs' claims for property damages; and Phase IV would concern punitive damages.
In July 2007, DuPont and the Plaintiffs filed motions for summary judgment upon the issue of indemnification. DuPont asserted, inter alia, that its duty to indemnify Diamond under the "ENVIRONMENTAL AND SALE AGREEMENT" did not apply in this action because DuPont did nothing to cause Diamond to be named as a defendant and because the "ENVIRONMENTAL AND SALE AGREEMENT" did not contemplate the indemnification of Diamond against its own fault. The Plaintiffs, however, as assignees of Diamond, argued that the "ENVIRONMENTAL AND SALE AGREEMENT" plainly obligated DuPont to indemnify and release Diamond from and against any claims arising from the Spelter litigation.
On September 14, 2007, the circuit court entered an order granting summary judgment in favor of the Plaintiffs on the indemnification issue. The circuit court concluded that the terms of the "ENVIRONMENTAL AND SALE AGREEMENT" were unambiguous and that DuPont had an obligation pursuant to the Agreement to indemnify Diamond from and against any liability in the action, including any damages or other relief which may be awarded. In the order, the circuit court noted that Diamond had already incurred costs and expenses in defending the action. Such costs and expenses were not expressly contemplated in the prior November 21, 2006, assignment to the Plaintiffs. Ultimately, therefore, on February 15, 2008, a judgment was entered against DuPont in the amount of $814,949.37 for Diamond's costs and expenses in defending the action.
DuPont also filed a motion for summary judgment alleging, in relevant part, (1) that the property damage claims of numerous plaintiffs are barred by releases and easements set forth in the Grasselli deeds, and (2) that the Plaintiffs' claims were also barred by the statute of limitations. The Plaintiffs opposed the motion. By separate order, also dated September 14, 2007, and pursuant to a subsequent order entered on September 20, 2007,[15] the circuit court granted DuPont's motion for summary judgment with regard to the Grasselli deeds. The circuit court determined that the Grasselli releases and easements are "binding and enforceable" upon those plaintiffs who are successors-in-title to the original grantors. The damage claims of those members of the property class were, therefore, dismissed, thus forming the basis of the Plaintiffs' appeal in no. 34333. In the same two orders, the circuit court denied DuPont's motion for summary judgment with respect to the statute of limitations, and granted summary judgment in favor of the Plaintiffs on that issue. The circuit court's summary judgment ruling is challenged by DuPont as part of appeal no. 34334.
In a third order dated September 14, 2007, the circuit court held that, except for the property claims barred by the Grasselli releases and easements, DuPont is responsible as a matter of law for the conduct of the Grasselli Chemical Company concerning the smelter facility. In that regard, the circuit *837 court found that DuPont's acquisition of Grasselli in 1928 constituted a consolidation or merger and that DuPont assumed successor liability at the time of the transaction. Therefore, according to the circuit court, because DuPont assumed the liabilities of Grasselli, "DuPont bears successor liability as to both compensatory and punitive damages."
2. Trial and Post-Trial Matters. The six-week trial of the action commenced in September 2007 with Phase I concerning general liability. The same jury was utilized throughout the trial. On October 1, 2007, the jury returned a Phase I verdict finding that Grasselli, DuPont, Matthiessen & Hegeler, and Diamond had caused, or contributed to, the exposure of residents or property in the class area to arsenic, cadmium, or lead. The jury determined that the exposure occurred in each zone within the area and resulted from negligence, public and private nuisance, trespass and strict liability. The jury assigned 100% of the responsibility for the negligence, public and private nuisance, trespass, and strict liability, to DuPont and 0% to Grasselli, Matthiessen & Hegeler and Diamond.
Phase II concerned medical monitoring, and on October 10, 2007, the jury returned a verdict finding: (1) that the class members were significantly exposed in each zone to arsenic, cadmium, or lead; (2) that those elements are hazardous substances; and (3) that the significant exposure to those hazardous substances was "due to emissions from the smelter." Furthermore, the jury found that, as a proximate result of exposure to arsenic, cadmium or lead, due to emissions from the smelter, the class members have a "significantly increased risk of contracting" certain diseases making it "reasonably necessary" for all class members to undergo periodic diagnostic medical examinations "different from what would be prescribed in the absence of the exposure." The diseases thus determined by the jury included: (1) skin cancer, (2) lung cancer, (3) bladder cancer, (4) kidney cancer, (5) stomach cancer, (6) decreased renal function, (7) renal failure, (8) plumbism (lead poisoning), and (9) neurocognitive injury.
Thereafter, Phase III, the property damage phase, began, and on October 15, 2007, the jury returned a verdict in favor of the Plaintiffs in the amount of $55,537,522.25 for soil and structural remediation. The jury determined that the Plaintiffs who were owners of "non-released or otherwise non-excluded properties" were entitled to reasonable costs and expenses for the remediation of their properties. Specifically the jury found that the Plaintiffs were entitled to remediation damages with regard to: (1) soil, (2) residences, (3) mobile homes and (4) commercial structures. Although the jury returned no damages for "annoyance and inconvenience associated with loss of use during the repair period," the jury found that the Plaintiffs were entitled to damages for the reasonable costs of "management, overhead, profit and contingencies associated with the implementation of the remediation."[16]
Finally, in Phase IV, the jury returned a verdict for punitive damages in favor of the Plaintiffs on October 19, 2007, in the amount of $196,200,000. As indicated on the verdict form, the jury found that "the Classes proved that DuPont engaged in wanton, willful, or reckless conduct with respect to the Spelter plant."
Accordingly, on November 16, 2007, the circuit court, by amended order: (1) entered judgment as to Phase I in favor of the property class and the medical monitoring class, with all liability attributed to DuPont, (2) entered judgment as to Phase II in favor of the medical monitoring class "based upon the jury's finding that Defendant DuPont is responsible for medical monitoring," (3) entered *838 judgment as to Phase III in favor of the property class "based upon the jury's finding that Defendant DuPont is responsible for remediation costs in the amount of $55,537,522.25" and (4) entered, as to Phase IV, "judgment in favor [of] the Plaintiffs based upon the jury's finding that Defendant DuPont is responsible for punitive damages in the amount of $196,200,000." The amended order concluded with a provision that the circuit court would retain jurisdiction "to determine the management, scope, and duration of the medical monitoring plan, the management and distribution of the monies for the remediation costs, the management and distribution of punitive damages, and any other post-trial issues necessary to implement the jury's verdict[.]"
On February 25, 2008, the circuit court entered five orders pertaining to post-judgment matters in this action. In the first order, the circuit court, after conducting an evidentiary hearing, set forth several rulings concerning the scope, duration and cost of the medical monitoring plan. Noting that 8,528 people are eligible to participate in the program, the circuit court adopted the medical monitoring plan described by the Plaintiffs' expert, Dr. Charles Werntz, a physician in the Department of Occupational and Environmental Medicine at West Virginia University. The circuit court, thus, concluded that the duration of the plan would be forty years based upon the latency periods of various cancers associated with exposure to arsenic, cadmium, and lead, and would include: (1) medical screening every two years, (2) informed consent by the patient with regard to testing and (3) review by the circuit court every five years. Finally, the order stated that the cost of the medical monitoring program would be $129,625,819 and would be funded upon a "pay as you go" approach. As explained in the order,
[t]he Court believes the most appropriate and equitable approach is to have a "pay as you go" approach to fund the medical monitoring program so that the medical monitoring remedy is funded and paid for based on actual experience and costs incurred over time. Furthermore, the precise mechanism by which any amounts are escrowed, how the escrow is replenished, how funds are disbursed, and other similar matters should be evaluated by the Special Master, who should in turn make a prompt recommendation to the Court.
In the second order, the circuit court appointed a "Claims Administrator and Special Master to aid the Court in carrying out the medical monitoring, property remediation, and punitive damages distribution aspects of this case."
In the third, fourth and fifth orders, the circuit court denied DuPont's motion for judgment as a matter of law or, in the alternative, to decertify the class action in order to litigate claims and defenses upon an individual basis; denied DuPont's motion for a new trial; and denied DuPont's motion to vacate or reduce the punitive damages award.
As indicated above, the post-trial orders entered on February 25, 2008, form the basis of DuPont's appeal in no. 34334.
On March 13, 2008, the circuit court entered orders staying the amended final judgment order with regard to the jury trial; the order concerning the scope, duration and cost of the medical monitoring plan; and the indemnification order directing DuPont to pay costs and expenses to Diamond. On September 25, 2008, this Court granted the appeals in no. 34333, no. 34334, and no. 34335, and ordered that they be consolidated for purposes of argument, consideration and decision.

II.

STANDARD OF REVIEW
Although this Court typically sets out our standard for reviewing appeals in a separate section of the published opinion, due to the variety of issues raised in these three consolidated appeals, we will set out the standards for our review of each particular issue or group of similar issues in connection with our discussion of those issues.

III.

DISCUSSION
Our discussion of the issues raised in this appeal is organized as follows: We will first *839 discuss three issues that were resolved on summary judgment, those issues being DuPont's indemnity of T.L. Diamond, the effect of the Grasselli deeds, and the statute of limitations. We will then address, seriatim, class certification, the propriety of certain 404(b) evidence, expert testimony, the verdict form and instructions, the sufficiency of evidence pertaining to medical monitoring, and, finally, issues pertaining to the punitive damages award.

A. Summary Judgment Issues

(Indemnity, Grasselli Deeds, and Statute of Limitations)
Three of the issues raised in these consolidated appeals relate to summary judgment orders of the circuit court. This Court's standards of review concerning summary judgments are well settled. Upon appeal, "[a] circuit court's entry of summary judgment is reviewed de novo." Syl. pt. 1, Painter v. Peavy, 192 W.Va. 189, 451 S.E.2d 755 (1994). Accord Syl. pt. 1, Koffler v. City of Huntington, 196 W.Va. 202, 469 S.E.2d 645 (1996). In conducting our de novo review, we are mindful that, pursuant to Rule 56 of the West Virginia Rules of Civil Procedure, summary judgment is proper where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." W. Va. R. Civ. P. 56(c). See generally Franklin D. Cleckley, Robin J. Davis, & Louis J. Palmer, Jr., Litigation Handbook on West Virginia Rules of Civil Procedure § 56, at 1113 (3d ed. 2008); 11A Michie's Jur. Judgment and Decrees § 217.1-217.5, at 351 (Repl. Vol. 2007). Indeed, applying Rule 56, this Court has held that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York, 148 W.Va. 160, 133 S.E.2d 770 (1963). Accord Syl. pt. 2, Jackson v. Putnam County Bd. of Educ., 221 W.Va. 170, 653 S.E.2d 632 (2007) (per curiam); Syl. pt. 1, Mueller v. American Elec. Power Energy Servs., Inc., 214 W.Va. 390, 589 S.E.2d 532 (2003) (per curiam). In other words, "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." Syl. pt. 3, Painter v. Peavy, 192 W.Va. 189, 451 S.E.2d 755.
With due consideration for the foregoing standards, we proceed to separately address the summary judgment rulings of the circuit court involving DuPont's indemnification of Diamond, the enforceability of the releases and easements contained in the Grasselli deeds, and the statute of limitations.
1. Indemnification of Diamond. In 2001, all zinc operations at the Spelter plant were terminated, and, pursuant to the October 29, 2001, "ENVIRONMENTAL AND SALE AGREEMENT," DuPont acquired the facility from Diamond. The Agreement provided that Diamond would pay DuPont the sum of $200,000 to be used by DuPont toward the cost of compliance with the Voluntary Remediation Agreement executed in January 2000 by Diamond, DuPont, and the WV DEP. The terms of the "ENVIRONMENTAL AND SALE AGREEMENT" required DuPont to assume liability for the "past, current and future" environmental condition of the property and to release Diamond from and against all claims, costs, expenses, etc., in that regard. Diamond retained liability for certain "government imposed fines or penalties."
On November 21, 2006, Diamond assigned to the Plaintiffs its right to indemnification under the "ENVIRONMENTAL AND SALE AGREEMENT" with regard to any judgment entered against Diamond arising from the class action. Thus, as a result of the assignment, the Plaintiffs, rather than Diamond, filed a motion for summary judgment on the issue of indemnification. DuPont likewise sought summary judgment with respect to the indemnity issue. On September 14, 2007, the circuit court granted summary judgment in favor of the Plaintiffs on this issue. Thereafter, on February 15, 2008, a supplementary order was entered directing payment by DuPont in the amount *840 of $814,949.37 for Diamond's costs and expenses in defending the action.[17]
The following provisions of the "ENVIRONMENTAL AND SALE AGREEMENT" formed the basis of the summary judgment granted in favor of the Plaintiffs:
5. . . . as between TLD [Diamond] and DuPont, DuPont shall be solely liable for the past, current and future environmental condition of the Real Property, including, but not limited to: (a) any obligations pursuant to the Voluntary Remediation Agreement; (b) any obligations pursuant to the NPDES [National Pollutant Discharge Elimination System] Permit & Consent Order; [and] (c) any liabilities related to the off-site migration of soil, sediment, groundwater or surface water from the Real Property. . . .
6. From and after the Closing Date, DuPont shall release TLD [Diamond], its officers, directors, shareholders and employees from and against any and all losses, claims, demands, liabilities, obligations, causes of action, damages, costs, expenses, fines or penalties (including, without limitations, attorney and consultant fees) arising out of the past, current or future environmental condition of the Real Property, including, but not limited to: (a) any obligations pursuant to the Voluntary Remediation Agreement; (b) any obligations pursuant to the NPDES Permit & Consent Order; [and] (c) any liabilities related to the off-site migration of soil, sediment, groundwater or surface water from the Real Property. . . .
. . . .
8. DuPont shall take no action to include, or that leads any other person to include, TLD [Diamond] in any judicial or administrative proceeding related to a Released Claim. If DuPont takes any such action, DuPont shall be solely liable for the defense of TLD [Diamond] in such proceeding and for the payment of any judgment entered against TLD [Diamond] in such proceeding.
According to DuPont, paragraph five is the only paragraph in the Agreement that actually is an indemnification provision, and paragraph five does not apply to the claims asserted by the Plaintiffs in this action because it does not clearly state that DuPont assumed liability for Diamond's own negligence or other wrongful conduct committed by Diamond. Moreover, according to DuPont, paragraph six is a release provision, rather than an indemnification provision, and, consequently, is limited to precluding claims DuPont alone could have asserted against Diamond. Therefore, paragraph six would not support any obligation by DuPont to indemnify Diamond in connection with third-party claims, such as the claims alleged by the Plaintiffs. Finally, DuPont argues that, although paragraph eight required indemnification in connection with third-party claims, paragraph eight is inapplicable to this action because it is conditioned upon DuPont taking action to include, or leading another person to include, Diamond in a judicial or administrative proceeding. According to DuPont, it was the Plaintiffs, rather than DuPont, who included Diamond in this action, and, thus, the indemnification provisions of paragraph eight were never triggered.
The Plaintiffs and Diamond, however, assert that the "ENVIRONMENTAL AND SALE AGREEMENT" clearly and unambiguously obligated DuPont to indemnify and release Diamond with regard to the claims alleged by the Plaintiffs in this action. Relying primarily upon paragraph five, the circuit court agreed and concluded that indemnification was required as a matter of law.
"`Where the terms of a contract are clear and unambiguous, they must be applied and not construed.' Syl. Pt. 2, Bethlehem Mines Corp. v. Haden, 153 W.Va. 721, 172 S.E.2d 126 (1969)." Syl. pt. 2, Orteza v. Monongalia County General Hosp., 173 W.Va. 461, 318 S.E.2d 40 (1984). Accord Syl. pt. 1, Kanawha Valley Power Co. v. Justice, 181 W.Va. 509, 383 S.E.2d 313 (1989) (per curiam). Stated another way,

*841 "`[i]t is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them.' Syllabus Point 3, Cotiga Development Co. v. United Fuel Gas Co., 147 W.Va. 484, 128 S.E.2d 626 (1962)." Syllabus point 1, Hatfield v. Health Management Associates of West Virginia, 223 W.Va. 259, 672 S.E.2d 395 (2008) (per curiam).
Syl. pt. 5, Dan's Carworld, LLC v. Serian, 223 W.Va. 478, 677 S.E.2d 914 (2009).
Moreover, a contract is not rendered ambiguous merely because the parties disagree as to its construction. As expressed by this Court in Syllabus point 1 of Berkeley County Public Service District v. Vitro Corp. of America, 152 W.Va. 252, 162 S.E.2d 189 (1968), "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous. The question as to whether a contract is ambiguous is a question of law to be determined by the court." Accord Syl. pt. 3, Energy Dev. Corp. v. Moss, 214 W.Va. 577, 591 S.E.2d 135 (2003).
Express indemnity agreements, such as the written "ENVIRONMENTAL AND SALE AGREEMENT" between DuPont and Diamond, are commonly governed by the principles surrounding the requisites, validity and construction of contracts generally.[18] As Syllabus point 4 of VanKirk v. Green Construction Company, 195 W.Va. 714, 466 S.E.2d 782 (1995), observes, "[i]n construing the language of an express indemnity contract, the ordinary rules of contract construction apply." See also Sydenstricker v. Unipunch Prods. Inc., 169 W.Va. 440, 445, 288 S.E.2d 511, 515 (1982) (commenting that "express indemnity agreements are based on contract principles"); Sellers v. Owens-Illinois Glass Co., 156 W.Va. 87, 92, 191 S.E.2d 166, 169 (1972) (explaining that "[t]he rules governing the requisites and validity of contracts generally apply to contracts of indemnity"); 42 C.J.S. Indemnity § 10, at 112 (2007) (stating "[t]he general rules which govern the construction and interpretation of other contracts apply in construing a contract of indemnity. ..."). Thus, facilitating the intention of the parties is a fundamental consideration. Syllabus point 2 of Sellers, supra, holds that, "[i]n construing a contract of indemnity and determining the rights and liabilities of the parties thereunder, the primary purpose is to ascertain and give effect to the intention of the parties." See also Moore v. Chesapeake & Ohio Ry. Co., 493 F.Supp. 1252, 1269 (S.D.W.Va.1980) ("In construing a contract of indemnity ... the primary purpose is to ascertain and give effect to the intention of the parties."), aff'd, 649 F.2d 1004 (4th Cir.1981).
The September 14, 2007, order granting the Plaintiffs' motion for summary judgment essentially tracks the key language of the "ENVIRONMENTAL AND SALE AGREEMENT" to the effect that, in paragraphs five and six, DuPont assumed sole liability for, and promised to release Diamond from and against, the past, current, and/or future environmental condition of the property with regard to "any liabilities related to the off-site migration of soil, sediment, groundwater or surface water" from the smelter facility. The language in these paragraphs makes clear that the actions of Diamond, including the possibility of negligence, while engaging in secondary zinc smelting between 1972 and 2001 were within the contemplation of the parties when the "ENVIRONMENTAL AND SALE AGREEMENT" was executed. Finally, although not relied upon by the circuit court, paragraph eight of the agreement, concerning indemnification for including Diamond "in any judicial or administrative proceeding," provides an additional basis for DuPont's obligation to indemnify Diamond. In that regard, the filing by DuPont of a cross-claim against Diamond for contribution, in the context of this *842 complex litigation, was sufficient to trigger that provision.
Upon our de novo review, this Court is of the opinion that Diamond's motion for summary judgment on the issue of DuPont's duty to indemnify Diamond was properly granted. Accordingly, the September 14, 2007, order of the circuit court granting summary judgment in favor of Diamond upon the indemnification issue, and the February 15, 2008, order directing payment by DuPont in the amount of $814,949.37 for Diamond's costs and expenses, are affirmed.[19]
2. The Grasselli Deeds. This appeal concerns the validity of the circuit court's orders of September 14, 2007, and September 20, 2007,[20] dismissing the property damage claims of those plaintiffs who are successors-in-title to the original grantors of the Grasselli deeds. The Grasselli deeds sought to preclude all claims relating to various off-site properties, and any decline in crop and livestock productivity thereof, arising from the "past, present or future" operation of the smelter facility or any substances discharged therefrom.[21]
The Grasselli Chemical Company, the original owner and operator of the smelter, using horizontal retorts or furnaces in the zinc extraction process, began the practice of depositing zinc residue or tailings[22] at an on-site location that ultimately became the fiftyacre waste pile. Production under Grasselli took place from 1911 until 1928 when DuPont acquired the facility. During the Grasselli years, local farmers complained about a decline in crop and livestock productivity and filed a number of actions seeking recovery of damages caused by fumes, gases, and dust emitted from the smelter. The Bear and Morgan Report, commissioned by Grasselli in 1919, concluded that dust and fumes from the smelter had negatively impacted plants and livestock in the Spelter Community. Following the 1928 acquisition, DuPont and Grasselli settled the claims and actions of the farmers and other property owners in the community.[23]
As part of the settlement, certain predecessors-in-title to a number of the plaintiffs in the property class executed deeds in the 1930s granting Grasselli, and its successors, releases and easements with regard to emissions from the facility. Specifically, the Grasselli deeds released all claims concerning various off-site properties, and any decline in crop and livestock productivity thereof, arising from the "past, present or future" operation of the plant or any substances discharged therefrom. Moreover, the deeds *843 conveyed to Grasselli, and its successors, a perpetual right, or easement running with the land, for the discharge of substances over and onto the off-site properties. According to the circuit court, parcels subject to the Grasselli deeds comprise approximately forty percent of the land in the class area.
The following provisions are representative of the releases and easements found in the Grasselli deeds:
the said party of the first part does hereby remise, release and forever discharge said parties of the second part [the Grasselli Chemical Company, its successors, etc.], and each of them, and the successors and assigns of them and each of them, of and from all actions, causes of action, suits, liabilities, damages, claims, debts and/or demands, in law or equity, which said party of the first part ... shall or may have against said parties of the second part ... for or by reason of any and all injuries, damages and/or losses of every kind whatsoever, to said land of said party of the first part, the productivity and/or products of said land ... which have been caused, arisen or resulted, or are caused, arise or result [or] hereafter may or shall be caused, arise or result from, by reason or out of said plant or the past, present or future existence, construction, maintenance or operation of said plant, or any substance or substances in the past, present or future produced, discharged, emanating, cast, precipitated or escaping therefrom. ... The substance or substances hereinbefore and elsewhere in this deed mentioned do and shall include and extend to any and all solids, liquids, smokes, dust, precipitates, gases, fumes, vapors and other matters and things which have been, are or hereafter may or shall be produced, discharged, emanated, cast or precipitated, or did, do or shall escape, by or from said plant in, about or by reason of the manufacture, smelting, extraction or production of zinc or any product thereof. ...
... the] party of the first part does hereby grant and convey to said The Grasselli Chemical Company, a Delaware corporation as aforesaid, and its successors and assigns forever, the full, free and perpetual right to construct, maintain, operate and use the said plant ... to carry on the manufacturing, smelting, extracting and/or producing operation aforesaid, and to produce, discharge, emanate, cast, precipitate and cause or permit to escape the aforesaid substance or substances therefrom and over, on and/or onto said land of said party of the first part or any property or thing, real, personal or mixed, therein or thereon, without any compensation except the above recited consideration already received as aforesaid ... said party of the first part, for himself, and the heirs, personal representatives and assigns of him, hereby releasing any and all such actions, causes of action, suits, liabilities, damages, claims, debts and/or demands.
Said party of the first part, for himself, and the heirs, personal representatives and assigns of him, covenants and agrees that all of the grants, releases, rights, easements, restrictions, covenants and agreements in or by this deed made, granted, created or imposed shall run with said land and the title thereto and shall bind said land, said party of the first part, and the heirs, personal representatives and assigns of him, and every subsequent owner, possessor or occupant of said land, or any part thereof, and shall inure to the benefit of said parties of the second part and each of them, and the successors and assigns of them and each of them forever.
The Plaintiffs in the current action sought, inter alia, recovery for damage to real property resulting from the off-site migration of hazardous substances, including arsenic, cadmium and lead, from the Spelter facility. As alleged in the second amended complaint, the release of hazardous substances from the plant "occurred on a continuing basis for over 90 years" and the release of arsenic, cadmium and lead "also contaminated nearby water bodies and groundwater."
In July 2007, DuPont filed an omnibus motion for summary judgment which included the following averment concerning the Grasselli deeds: "[t]he claims of numerous individual plaintiffs are barred by the operation of releases and easements granted to the Grasselli Chemical Company and its successors *844 and assigns which expressly allow for the discharge of the products and by-products of the smelter's operations over and onto their lands." The Plaintiffs responded by asserting that the releases and easements do not bar the property damage claims: (1) because the extent of the potential contamination and damage was beyond the contemplation of the original landowners and (2) because the releases and easements, ostensibly allowing off-site emissions of contaminated materials, violate public policy.
In nearly identical orders entered on September 14, 2007, and September 20, 2007,[24] the circuit court granted DuPont's motion for summary judgment with regard to the Grasselli deeds, thereby dismissing the property damage claims of those plaintiffs who are successors-in-title to the original grantors of the Grasselli deeds. The circuit court noted that the deeds resulted from the settlement of prior claims and lawsuits, and, finding that the releases and easements were unambiguous, relied upon the express language of the deeds to conclude that the releases and easements set forth therein are "binding and enforceable" upon those plaintiffs who are successors-in-title to the original grantors. The property damage claims of those plaintiffs were, therefore, dismissed.[25] Upon careful examination of the Grasselli deeds, we agree with the circuit court.
This Court has long recognized that, "[w]here the intent of the parties is clearly expressed in definite and unambiguous language on the face of the deed itself, the court is required to give effect to such language and, ordinarily, will not resort to parole or extrinsic evidence." Pocahontas Land Corp. v. Evans, 175 W.Va. 304, 308, 332 S.E.2d 604, 609 (1985). Accord Carr v. Michael Motors, Inc., 210 W.Va. 240, 245, 557 S.E.2d 294, 299 (2001); Henderson v. Coombs, 192 W.Va. 581, 585, 453 S.E.2d 415, 419 (1994) (per curiam). See generally 4A Michie's Jur. Contracts § 40, at 458 (Repl. Vol. 2007) (observing that, if the written contract is unequivocal, the court is not at liberty to search for its meaning beyond the instrument itself).
A review of the Grasselli deeds reveals that the deeds utilized plain language to clearly express the intent of the parties. Notably, the Grasselli deeds were executed as part of the settlement of numerous lawsuits brought against Grasselli by local land owners seeking to recover damages caused by fumes, gases, and dust emitted from the smelter. In exchange for settling these claims, the deeds, in plain language, released Grasselli and its successors and assigns from all actions for losses of "every kind whatsoever" caused by the "past, present or future" operation of the plant or caused by "any substance or substances in the past, present or future," emanating from the plant.[26] The deeds further grant Grasselli and its successors the "free and perpetual right" to discharge, or permit to escape onto the off-site lands of the grantors, the substances specified therein. Finally, the deeds provide that the releases and easements "shall run with [the] land" to the benefit of Grasselli and its successors. Not only do the Grasselli deeds utilize unmistakable language, but we additionally find notable the fact that the deeds were executed in the settlement of actions brought by area landowners seeking compensation for damage to their property caused by the substances emanating from the smelter. This fact leaves no doubt that the parties to the Grasselli deeds understood that they were agreeing to the continued discharge of harmful substances onto their properties, even if they did not know the exact composition of those substances. Accordingly, we find no error in the circuit court's conclusion *845 that, due to the plain language utilized, the Grasselli deeds are "binding and enforceable." The Plaintiffs, however, present this Court with two arguments challenging the deeds on grounds other than the language therein used: (1) under West Virginia law, the exculpatory clauses in the deeds do not protect DuPont from reckless or wanton conduct, and (2) exculpatory clauses insulating parties against actions for grossly negligent, wanton or intentional conduct are void as a matter of public policy. We address these issues in turn.
In support of their argument that, "[u]nder West Virginia law, the general exculpatory clause in the [Grasselli deeds] does not shield DuPont from liability for reckless or wanton conduct," the Plaintiffs primarily rely on Murphy v. North American River Runners, Inc., 186 W.Va. 310, 412 S.E.2d 504 (1991). The Plaintiffs' reliance on Murphy is misplaced. Murphy involved a release executed by the plaintiff prior to embarking upon a white-water rafting expedition offered by the defendant, North American River Runners, Inc. (hereinafter referred to as "North American"). After sustaining an injury during the rafting trip,[27] Ms. Murphy sued North American. North American filed a motion for summary judgment based upon the anticipatory release that had been executed by Ms. Murphy. The trial court granted the motion, and Ms. Murphy appealed. This Court then held that,
[a] general clause in a pre-injury exculpatory agreement or anticipatory release purporting to exempt a defendant from all liability for any future loss or damage will not be construed to include the loss or damage resulting from the defendant's intentional or reckless misconduct or gross negligence, unless the circumstances clearly indicate that such was the plaintiff's intention.

Syl. pt. 2, Murphy, 186 W.Va. 310, 412 S.E.2d 504 (emphasis added).
Notably, the Murphy holding is expressly limited to a "pre-injury" exculpatory agreement. A pre-injury exculpatory agreement is distinguishable from the type of release/easement granted in the instant case. In the pre-injury context, a release is granted before any injury has been caused, and is often required in exchange for receiving a service that is accompanied by some element of danger, such as white-water rafting. In such a circumstance, the grantor of the release is entitled to expect that the person or entity being released will act with reasonable care and will not intentionally cause harm. Indeed, in the pre-injury release context, an intentional act would not be foreseeable; therefore, the law will not excuse "intentional or reckless misconduct or gross negligence, unless the circumstances clearly indicate that such was the plaintiffs intention." Syl. pt. 2, Murphy, 186 W.Va. 310, 412 S.E.2d 504.[28]
Conversely, a release granted in connection with a settlement, such as that at issue in the instant case, is executed after an injury has occurred. In this circumstance, there is no foreseeability issue. Because the injury has already been caused, the circumstances *846 "clearly indicate ... the plaintiff's intention" to allow the injury to continue. Syl. pt. 2, in part, Murphy. Therefore, the grantor, who is aware that an injury has been suffered and has sought redress for the same, may agree to permit continued harm in exchange for compensation in consideration for the harm. This is especially true where, as here, that intention is expressly set out in the unambiguous terms of the agreement (here, the deed).
It has been similarly observed that there are several contexts, including trespass to land, in which consent to actions that would otherwise amount to intentional torts is acceptable in the right circumstances:
Concerning intentional conduct, ... it is universally held that in the right circumstances one can consent to certain actions that otherwise would be intentional torts. This is true of defamation, surgical procedures, trespass to land, sporting events that involve physical contact, and a host of other acts that would be tortious in the absence of consent. See generally PROSSER & KEETON ON TORTS § 18 (consent as defense to intentional torts). Moreover, even when an act is a criminal offense, consent can bar a tort suit, though not a criminal prosecution. With certain exceptions not involved here, "consent is effective to bar recovery in a tort action although the conduct consented to is a crime." RESTATEMENT (2ND) OF TORTS § 892C (1979).
Smith v. Holley, 827 S.W.2d 433, 438 (Tex. Ct.App.1992) (first emphasis added) (footnote omitted). See also Restatement (Second) of Torts § 892A(1) (1979) ("One who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for harm resulting from it.").
In the instant case, numerous landowners brought lawsuits against Grasselli in the late 1920s for injury to their land and personal property caused by Grasselli's discharge of the residue of its zinc smelting activities. The parties to these lawsuits negotiated settlements with Grasselli in which they agreed to accept monetary compensation in exchange for expressly allowing Grasselli to continue to discharge onto their land the residue of its zinc smelting activities. Because the landowners had already experienced the harm resulting from the discharge of the smelting residue, they could easily foresee the harm caused to their property from the smelting residue. In these circumstances, West Virginia law does not prohibit landowners from granting a release authorizing reckless or wanton conduct.
In addition, we note that the releases at issue expressly authorized the intentional continuation of harm by Grasselli and its successors and assigns. Insofar as the release authorized intentional acts, it is rather nonsensical for the Plaintiffs to now complain that the actions of Grasselli and its successors should have been prohibited as being reckless[29] and wanton.[30] Moreover, the landowners' consent to the continued intentional contamination of their land was granted in the form of easements. This Court has previously recognized that "an easement allows a person to engage in activities on another's land that, in the absence of the easement, would be a nuisance." Quintain Dev., LLC v. Columbia Nat. Res., Inc., 210 W.Va. 128, 135, 556 S.E.2d 95, 102 (2001). Finally, the easements were designated to run with the land and were duly recorded. Therefore, subsequent owners were put on notice of the existence of the easements encumbering their land. Based upon these facts, we find no grounds upon which to conclude that the *847 releases and easements contained in the Grasselli deeds do not protect DuPont from liability for reckless or wanton conduct.
The Plaintiffs next contend that the Grasselli deeds are void as a violation of public policy insofar as they insulate DuPont from grossly negligent, wanton or intentional conduct. This argument is very similar to the preceding argument asserted by the Plaintiffs, and we reject it for very similar reasons.
First, we are unpersuaded by the Plaintiffs' reliance on general principles of contract law pertaining to exculpatory agreements. Plaintiffs cite numerous cases for the general proposition that courts will not enforce, on public policy grounds, exculpatory provisions that attempt to absolve a party of its wanton, reckless or intentional conduct. However, a review of these cases reveals that the agreements at issue in nearly all of those cases were executed in the context of a pre-injury release;[31] thus, as explained in the preceding discussion, they simply do not apply in the context of an unambiguous post-injury settlement agreement.
Furthermore, this Court has previously held that "`[a] deed will be interpreted and construed as of the date of its execution.' Syllabus point 2, Oresta v. Romano Brothers, [Inc.,] 137 W.Va. 633, 73 S.E.2d 622 (1952)." Syl. pt. 3, Quintain Dev., LLC v. Columbia Nat. Res., Inc., 210 W.Va. 128, 556 S.E.2d 95. *848 Therefore, a determination of whether the agreements at issue violate public policy must be determined based upon the public policy in existence in the early 1930s when the agreements were executed. With respect to public policy, this Court has recognized that,
[t]he determination of the existence of public policy in West Virginia is a question of law. Syl. pt. 1, Cordle v. General Hugh Mercer Corp., 174 W.Va. 321, 325 S.E.2d 111 (1984). Additionally, the determination of public policy requires careful thought:
'Much has been written by text writers and by the courts as to the meaning of the phrase "public policy." All are agreed that its meaning is as "variable" as it is "vague," and that there is no absolute rule by which courts may determine what contracts contravene the public policy of the state. The rule of law, most generally stated, is that "public policy" is that principle of law which holds that "no person can lawfully do that which has a tendency to be injurious to the public or against public good * * *" even though "no actual injury" may have resulted therefrom in a particular case "to the public." It is a question of law which the court must decide in light of the particular circumstances of each case.
The sources determinative of public policy are, among others, our federal and state constitutions, our public statutes, our judicial decisions, the applicable principles of the common law, the acknowledged prevailing concepts of the federal and state governments relating to and affecting the safety, health, morals and general welfare of the people for whom government  with us  is factually established.
Morris v. Consolidation Coal Co., 191 W.Va. 426, 433 n. 5, 446 S.E.2d 648, 655 n. 5 (1994) (quoting Cordle v. General Hugh Mercer Corp., 174 W.Va. at 325, 325 S.E.2d at 114) (additional citation omitted). See also Mitchell v. Broadnax, 208 W.Va. 36, 45, 537 S.E.2d 882, 891 (2000), superseded by statute on other grounds as stated in Syl. pt. 7, Findley v. State Farm Mut. Auto. Ins. Co., 213 W.Va. 80, 576 S.E.2d 807 (2002).
In their "RESPONSE IN OPPOSITION TO DEFENDANT DUPONT'S MOTION FOR SUMMARY JUDGMENT," the Plaintiffs relied on emissions violations recorded by the WV DEP and the EPA between the years 1971 and 1998 as the source of the public policy allegedly violated by the Grasselli deeds. Thus, this Court is being asked to retroactively impose public policy spanning the years 1971 to 1998 on an agreement executed in the 1930s. We simply are not at liberty to do so. A 1930s agreement must be judged upon the public policy that existed in the 1930s.[32] In the absence of any evidence that the agreement violated public policy at the time it was entered, we find that the circuit court did not err in granting partial summary judgment in favor of DuPont with respect to the property damage claims of those plaintiffs subject to the Grasselli deeds.[33]
*849 3. The Statute of Limitations. In the circuit court, DuPont sought summary judgment based upon the argument that all of the Plaintiffs' claims, for both medical monitoring and property damage, were barred by the two-year statute of limitations applicable to tort actions under West Virginia law.[34] DuPont recognized the application of the discovery rule to the Plaintiffs' claims, and provided the circuit court with various exhibits that, according to DuPont, demonstrated that the Plaintiffs possessed knowledge adequate to trigger the running of the statute of limitations long before the Plaintiffs' action was filed on June 15, 2004. Specifically, DuPont directed the circuit court's attention to, inter alia, (1) the fact that property owners in the area had filed lawsuits in the 1920s alleging property damage resulting from emissions from the smelter; (2) the deposition testimony of plaintiff Benjamin Quinones, which indicated that Mr. Quinones had believed there might be health hazards associated with the smoke blowing into the town of Spelter as early as the 1950s when he went to work at the plant; (3) newspaper articles from 1993 and 1997 that characterized the smelter as an environmental hazard, and reported that EPA and WV DEP tests found lead, arsenic and cadmium in the waste pile;[35] (4) deposition testimony from lead plaintiff Lenora Perrine wherein she stated that she had read newspaper articles pertaining to the smelter in the 1990's;[36] and (5) deposition testimony from Dr. Joseph Simoni, a sociology professor from West Virginia University, stating that he, along with the Plaintiffs' counsel Gary Rich, attended numerous meetings with Spelter residents in the early 2000's concerning the suspected effects on the community of the former operation of the smelter.
In response to DuPont's motion, the Plaintiffs argued that the issue of whether the Plaintiffs knew of the off-site contamination more than two years prior to the filing of their complaint was a question of fact. With respect to the media reports relied upon by DuPont to show knowledge, the Plaintiffs asserted that the reports failed to inform the communities that their yards and homes were contaminated, and "often carried assurances by agency officials that the smelter posed no problem to residents." The Plaintiffs maintained further that DuPont failed to provide evidence that any class member was aware of the 1920s litigation. Additionally, the Plaintiffs opined that the deposition testimony of Mr. Benjamin Quinones was an insufficient basis upon which to grant DuPont's motion for summary judgment. The Plaintiffs argued that a reasonable juror could conclude that they did not have knowledge of the contamination until after a study, published in December 2003 (only six months before the filing of their complaint), showed widespread off-site contamination. Finally, the Plaintiffs asserted that federal law controlled the commencement of the statute of limitations pursuant to 42 U.S.C. § 9658(a)(1) (1986) (2006 ed.).
In two separate summary judgment orders, one entered on September 14, 2007, and the other entered on September 20, 2007,[37] the circuit court denied DuPont's motion for summary judgment with respect to the statute of limitations issue, and went on to grant summary judgment in favor of the Plaintiffs on this issue. In this regard, the circuit court's order of September 14, 2007, set out the evidence submitted by the parties, and then concluded:

*850 In this case, there is abundant evidence that the class members did not know and had no reason to know about their claims more than two years prior to the filing of their Complaint. The undisputed evidence reflects DuPont publicly assured the Plaintiffs they had no reason to be concerned. Media reports were equivocal at best. Government agencies  e.g., the Harrison County Planning Commission and the EPA  appear to remain uncertain to this day whether ... the residents should be concerned for their property or their health.
The Court finds that the evidence submitted by the parties would lead a reasonable factfinder to conclude that before 2003, the class members did not know, nor should they have known, that the smelter was the cause of widespread, heavy metal contamination in the class area and that they and/or their properties had been injured by the smelter. For the reasons outline[d] above, the Court finds as a matter of law that Plaintiffs' claims as set forth in the Second Amended Class Action Complaint were filed in a timely manner and, therefore, none of [the] Plaintiffs' claims is time-barred.
As an initial matter, DuPont essentially argues that the circuit court erred by granting summary judgment in favor of the Plaintiffs when they did not file a motion requesting summary judgment on the statute of limitations issue.[38] This argument is without merit. This Court has previously held that,
[w]hen it is found from the pleadings, depositions and admissions on file, and the affidavits of any party, in a summary judgment proceeding under Rule 56 of the West Virginia Rules of Civil Procedure, that a party who has moved for summary judgment in his favor is not entitled to such judgment and that there is no genuine issue as to any material fact, a summary judgment may be rendered against such party in such proceeding.
Syl. pt. 6, Employers' Liab. Assurance Corp. v. Hartford Accident & Indem. Co., 151 W.Va. 1062, 158 S.E.2d 212 (1967). In awarding summary judgment in favor of a non-moving party, however, a trial court must ensure that the parties have had ample opportunity to fully brief the issue being decided on summary judgment. Cf. Syl. pt. 4, Southern Erectors, Inc. v. Olga Coal Co., 159 W.Va. 385, 223 S.E.2d 46 (1976) (per curiam) ("Where a court acts with great caution, assuring itself that the parties to be bound by its judgment have had an adequate opportunity to develop all of the probative facts which relate to their respective claims, the court may grant summary judgment under Rule 56, W. Va. R.C.P., sua sponte."). Indeed, when a summary judgment issue has been fully briefed, a trial court's grant of summary judgment in favor of the non-moving party promotes the purpose of summary judgment proceedings. In this regard, it has been recognized that "[a]s the purpose of a summary judgment proceeding is to expedite the disposition of the case, summary judgment may be rendered against the party moving for summary judgment and in favor of the opposing party, even though such party has made no motion for [summary] judgment." Cleckley, Davis, & Palmer, Jr., Litigation Handbook on West Virginia Rules of Civil Procedure § 56(c)[4], at 1122 (3d ed. 2008) (footnote omitted) (citing B.F. Goodrich v. Betkoski, 99 F.3d 505 (2d Cir.1996), overruled in part on other grounds as recognized in New York v. National Servs. Indus., Inc., 352 F.3d 682 (2d Cir.2003); Bosarge v. United States Dep't of Educ., 5 F.3d 1414 (11th Cir.1993); National Expositions, Inc. v. Crowley Maritime Corp., 824 F.2d 131 (1st Cir.1987); Southern Erectors, Inc. v. Olga Coal Co., 159 W.Va. 385, 223 S.E.2d 46 (1976) (per curiam); Employers' Liability Assur. Corp. v. Hartford Acc. &Indem. Co., 151 W.Va. 1062, 158 S.E.2d 212 (1967)). Stated simply, there is no error in a trial court granting summary judgment in favor of the nonmoving party when that party is entitled to judgment. Thus, the question we must address to resolve the statute of limitations *851 issue is whether the Plaintiffs were entitled to summary judgment.
According to DuPont, the Plaintiffs were not entitled to summary judgment on the statute of limitations issue. DuPont argues that the circuit court erred in failing to grant summary judgment in its favor on this issue. In the alternative, DuPont contends that the question of when the Plaintiffs possessed the requisite knowledge to trigger the running of the statute of limitations was a question of fact that should have been determined by the jury. The Plaintiffs respond that the circuit court correctly ruled that their complaint was timely filed as a matter of law, because DuPont failed to establish that the Plaintiffs possessed the requisite knowledge more than two years prior to the filing of their complaint.[39]
With respect to the commencement of the statute of limitations period under the discovery rule, this Court has clarified that,
[i]n tort actions, unless there is a clear statutory prohibition to its application, under the discovery rule the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury.
Syl. pt. 4, Gaither v. City Hosp., Inc., 199 W.Va. 706, 487 S.E.2d 901 (1997). Elaborating on Gaither, this Court has recently held that,
A five-step analysis should be applied to determine whether a cause of action is time-barred. First, the court should identify the applicable statute of limitation for each cause of action. Second, the court (or, if questions of material fact exist, the jury) should identify when the requisite elements of the cause of action occurred. Third, the discovery rule should be applied to determine when the statute of limitation began to run by determining when the plaintiff knew, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action, as set forth in Syllabus Point 4 of Gaither v. City Hosp., Inc., 199 W.Va. 706, 487 S.E.2d 901 (1997). Fourth, if the plaintiff is not entitled to the benefit of the discovery rule, then determine whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action. Whenever a plaintiff is able to show that the defendant fraudulently concealed facts which prevented the plaintiff from discovering or pursuing the potential cause of action, the *852 statute of limitation is tolled. And fifth, the court or the jury should determine if the statute of limitation period was arrested by some other tolling doctrine. Only the first step is purely a question of law; the resolution of steps two through five will generally involve questions of material fact that will need to be resolved by the trier of fact.
Syl. pt. 5, Dunn v. Rockwell, 225 W.Va. 43, 689 S.E.2d 255 (2009). Moreover, the Dunn Court held:
Under the discovery rule set forth in Syllabus Point 4 of Gaither v. City Hosp., Inc., 199 W.Va. 706, 487 S.E.2d 901 (1997), whether a plaintiff "knows of or "discovered" a cause of action is an objective test. The plaintiff is charged with knowledge of the factual, rather than the legal, basis for the action. This objective test focuses upon whether a reasonable prudent person would have known, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action.
Syl. pt. 4, Id.
Finally, we note that this Court has clearly established that the determination of when the plaintiff possessed the requisite knowledge to trigger the running of the statute of limitations is a question of fact for the jury. In this regard, the Court held that
[w]here a cause of action is based on tort or on a claim of fraud, the statute of limitations does not begin to run until the injured person knows, or by the exercise of reasonable diligence should know, of the nature of his injury, and determining that point in time is a question of fact to be answered by the jury.

Syl. pt. 3, Stemple v. Dobson, 184 W.Va. 317, 400 S.E.2d 561 (1990) (emphasis added). Accord Gaither v. City Hosp., Inc., 199 W.Va. at 714-15, 487 S.E.2d at 909-10 ("In the great majority of cases, the issue of whether a claim is barred by the statute of limitations is a question of fact for the jury." (emphasis added)). Thus, the question is proper for the court only "[w]here there are undisputed facts from which only one conclusion may be drawn[.]" Carey v. Kerr-McGee Chem. Corp., 999 F.Supp. 1109, 1115 (N.D.Ill.1998) (concluding statute of limitations had run on claims of adult members of medical monitoring class and property class in toxic tort action).
In the case sub judice, there was conflicting evidence with respect to when the Plaintiffs possessed the requisite knowledge to trigger the running of the statute of limitations under the discovery rule. Indeed, the circuit court's own ruling of September 14, 2007, demonstrates that the court resolved conflicting evidence in order to reach its conclusion that the Plaintiffs' action was not barred by the statute of limitations: "[t]he Court finds that the evidence submitted by the parties would lead a reasonable factfinder to conclude. ..." (Emphasis added). Accordingly, we find that the circuit court erred in granting summary judgment in favor of the Plaintiffs on an issue that should have been determined by the jury. Having determined that the circuit court erred in failing to have the jury decide this factual issue, we must now determine whether to remand for retrial of the entire case, or remand for jury determination of the statute of limitations question only.
Looking to how other courts have addressed similar issues, we find that at least three federal courts have affirmed verdicts, in whole or in part, but remanded the case for resolution of a statute of limitations issue. See Anixter v. Home-Stake Prod. Co., 977 F.2d 1549 (10th Cir.1992) (affirming verdict, but remanding for resolution of statute of limitations issue); Gross v. United States, 676 F.2d 295, 304 (8th Cir.1982) ("We affirm the district court in all matters except its treatment of the statute of limitations issue."); Cook v. Avien, Inc., 573 F.2d 685 (1st Cir.1978) (affirming judgment in favor of several defendants, and remanding to consider statute of limitations issue as to one defendant). Based upon the foregoing authority, along with considerations of judicial economy, we now hold that, if, on an appeal by a defendant from a final judgment, this Court determines that a circuit court erroneously found, as a matter of law, that the case was not barred by the statute of limitations, this *853 Court may conditionally affirm[40] the judgment and remand the case for a jury trial solely on the statute of limitations issue. While on remand, if the jury finds that the statute of limitations did not run, then the judgment in favor of the plaintiff stands; if the jury determines otherwise, the trial court must set aside the verdict and render judgment in favor of the defendant.
Applying this holding, we conditionally affirm the verdict, as modified by this opinion, and remand this case with directions to the circuit court to conduct a jury trial on the sole issue of when the Plaintiffs possessed the requisite knowledge to trigger the running of the statute of limitations. If the jury determines that the Plaintiffs did not have the requisite knowledge more than two years prior to filing their cause of action, then the judgment in favor of the Plaintiffs, as modified herein, stands. If, however, the jury determines that the Plaintiffs had the requisite knowledge more than two years prior to filing their cause of action, then the trial court must set aside the verdict and render judgment in favor of DuPont.

B. Class Certification
On November 14, 2005, the Plaintiffs filed a motion asking the circuit court to certify the class pursuant to Rule 23 of the West Virginia Rules of Civil Procedure. A three-day evidentiary hearing was conducted upon the motion in May 2006. On September 14, 2006, the circuit court entered a forty-four page order granting class certification. In the order, the circuit court thoroughly set out the grounds upon which it relied. The order divided the class into two overlapping subclasses,[41] (1) a property class made up of property owners in a five-by-seven mile area surrounding the smelter site and initially defined as[42] "[t]hose who currently own, or who on or after December 1, 2003[,] have owned, private real property lying within the below-referenced communities or any other private real property lying closer to the Spelter Smelter facility than one or more of the below-referenced communities"[43]; and (2) a medical monitoring class made up of approximately 8,500 people who had lived in a designated area around the smelter site. By order entered June 14, 2007, the circuit court granted the Plaintiffs' motion to modify the medical monitoring class definition. The June 14th order established "proximity zones" for class determination with regard to the community surrounding the facility, and defined the medical monitoring class as follows:[44]
THOSE WHO CURRENTLY OR AT ANY TIME IN THE PAST SINCE 1966 HAVE RESIDED ON PRIVATE REAL PROPERTY IN THE CLASS AREA FOR AT LEAST THE MINIMUM TOTAL RESIDENCY TIME FOR A ZONE. ...

ZONE 1: [CLOSEST TO THE PLANT SITE]: MINIMUM TOTAL RESIDENCY TIME OF ONE YEAR SINCE 1966.

*854 ZONE 2: MINIMUM TOTAL RESIDENCY TIME OF THREE YEARS SINCE 1966.

ZONE 3: MINIMUM TOTAL RESIDENCY TIME OF FIVE YEARS SINCE 1966.
RESIDENCY TIME WITHIN A ZONE OR ZONES CLOSER TO THE FORMER SMELTER FACILITY BUT NOT MEETING THE MINIMUM TOTAL RESIDENCY TIME FOR A CLOSER ZONE IS ACCUMULATED WITH ANY RESIDENCY TIME WITHIN A ZONE OR ZONES FURTHER AWAY IN DETERMINING TOTAL RESIDENCY TIME.
On June 22, 2007, DuPont filed in this Court an "Emergency Verified Petition in Prohibition" seeking to decertify the class. This Court denied the petition on June 27, 2007.[45] DuPont now reasserts that the circuit court's certification of this case as a class action was in error.
With regard to our standard for reviewing this issue, it is established that "[t]his Court will review a circuit court's order granting or denying a motion for class certification pursuant to Rule 23 of the West Virginia Rules of Civil Procedure [1998] under an abuse of discretion standard." Syl. pt. 1, In re West Virginia Rezulin Litigation, 214 W.Va. 52, 585 S.E.2d 52 (2003). Accord Syl. pt. 1, Gulas v. Infocision Mgmt. Corp., 215 W.Va. 225, 599 S.E.2d 648 (2004) (per curiam). With due consideration for this standard, we address the class certification issues raised by DuPont.
DuPont argues that trying this case as a class action violated due process by preventing Du Pont from introducing individualized evidence and individualized defenses. To support this claim, DuPont has listed a number of instances where individualized evidence or defenses were not permitted because the case was being tried as a class action. To the extent that this class action was properly certified by the trial court, all of DuPont's individualized evidence issues have no merit. Thus, to resolve this issue, we must determine whether the case was properly certified as a class action.
Class certification and maintenance are governed by Rule 23 of the West Virginia Rules of Civil Procedure. This Court has observed that Rule 23
is a procedural device that was adopted with the goals of economies of time, effort and expense, uniformity of decisions, the promotion of efficiency and fairness in handling large numbers of similar claims. See, e.g., Life of the Land v. Land Use Commission of State of Hawaii, 63 Haw. 166, 178, 623 P.2d 431, 442 (1981); Lilian v. Commonwealth, 467 Pa. 15, 19, 354 A.2d 250, 253 (1976).
Rule 23 provides trial courts with a tool to vindicate the rights of numerous claimants in one action when individual actions might be impracticable. Hicks v. Milwaukee County, 71 Wis.2d 401, 238 N.W.2d 509 (1976). A primary function of the class action is to provide a mechanism to litigate small damage claims which could not otherwise be economically litigated.
In re West Virginia Rezulin Litig., 214 W.Va. 52, 62, 585 S.E.2d 52, 62.
Examining the mechanics of the portions of the rule relevant to this appeal reveals that Rule 23(a) sets out the prerequisites to a class action, while Rule 23(b) establishes the criteria that must also be met for the class action to be maintainable. Following the standards set out in Rule 23(a) & (b), this Court has previously held that,
[b]efore certifying a class under Rule 23 of the West Virginia Rules of Civil Procedure [1998], a circuit court must determine that the party seeking class certification has satisfied all four prerequisites contained in Rule 23(a)  numerosity, commonality, typicality, and adequacy of representation  and has satisfied one of the three subdivisions of Rule 23(b). As long as these prerequisites to class certification *855 are met, a case should be allowed to proceed on behalf of the class proposed by the party.
Syl. pt. 8, In re West Virginia Rezulin Litig.[46] We will consider, in turn, whether the requirements of Rule 23(a) and Rule 23(b) have been met in this action.
1. Certification Requirements Under Rule 23(a).[47] As recognized by this Court in Syllabus point 8 of In re West Virginia Rezulin Litigation, class certification first requires the trial court to determine that the plaintiff has satisfied all four prerequisites contained in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. In conducting our review of whether the circuit court properly certified the class action under Rule 23(a), we need not concern ourselves with what the trial evidence ultimately showed. This is so, because "[a] circuit court's consideration of a motion for class certification should not become a mini-trial on the merits of the parties' contentions." In re West Virginia Rezulin Litig., 214 W.Va. at 63, 585 S.E.2d at 63. Indeed,
[w]hen a circuit court is evaluating a motion for class certification under Rule 23 of the West Virginia Rules of Civil Procedure [1998], the dispositive question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 have been met.
Syl. pt. 7, In re West Virginia Rezulin Litig. We will now examine the circuit court's rulings on each of the Rule 23(a) criteria.
a. Numerosity. This Court has held that,
[t]he numerosity provision of Rule 23(a)(1) of the West Virginia Rules of Civil Procedure [1998] requires that a class be so numerous that joinder of all of its members is "impracticable." It is not necessary to establish that joinder is impossible; rather, the test is impracticability. The test for impracticability of joining all members does not mean "impossibility" but only difficulty or inconvenience of joining all members.
Syl. pt. 9, In re West Virginia Rezulin Litig., 214 W.Va. 52, 585 S.E.2d 52. The In re West Virginia Rezulin Litigation Court observed that "[t]here is no `magic minimum number that breathes life into a class ... and lack of knowledge of the exact number of persons affected is not a bar to certification[.]'" 214 W.Va. at 65, 585 S.E.2d at 65 (quoting Clarkson v. Coughlin, 783 F.Supp. 789, 798 (S.D.N.Y.1992)). However, federal courts[48] have concluded that it may be presumed that numerosity exists when a class is over a certain size, such as forty members. See Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir.1995) ("[N]umerosity is presumed at a level of 40 members." (citation omitted)); Casale v. Kelly, 257 F.R.D. 396, 405 (S.D.N.Y.2009) ("Sufficient *856 numerosity can be presumed at a level of forty members or more." (footnote omitted)); In re Cooper Cos. Inc. Sec. Litig., 254 F.R.D. 628, 634 (C.D.Cal.2009) ("[N]umerosity is presumed where the plaintiff class contains forty or more members." (citation omitted)); Ruggles v. Wellpoint, Inc., 253 F.R.D. 61, 66 (N.D.N.Y.2008) ("In the Second Circuit, numerosity is presumed at a level of 40 members, ... and the exact number and identity of members is unnecessary, even for certification." (quotations and citation omitted)); Romero v. Producers Dairy Foods, Inc., 235 F.R.D. 474, 485 (E.D.Cal.2006) ("A class with over forty members is presumed to satisfy the numerosity prerequisite." (citations omitted)). See generally 1 Alba Conte & Herbert Newberg, Newberg on Class Actions § 3:5, at 247 (4th ed. 2002) ("In light of prevailing precedent, the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone."); Cleckley, Davis, & Palmer, Jr., Litigation Handbook on West Virginia Rules of Civil Procedure § 23(a), at 536 ("Courts have held that a rebuttable presumption of numerosity exists when it is established that the class size is between 25-30 members." (footnote omitted)).
It has also been established that
[a] party seeking class certification is not required to prove the identity of each class member. ...
Furthermore, a circuit court may not deny a class certification motion merely because some members of the class have not suffered an injury or loss, or because there are members who may not want to participate in the class action.
In re West Virginia Rezulin Litig., 214 W.Va. at 66, 585 S.E.2d at 66 (citations omitted).
With respect to numerosity in the case sub judice, the trial court found that
[i]n this particular case, class size alone makes joinder impractical. Defendants have made no serious attack on numerosity. Plaintiffs have identified slightly over 2,700 parcels in the class area and the owner of each parcel. While one may quibble over whether 17 or 50 or even 500 persons is enough, there can be little serious debate about whether joining 3,000 persons (Plaintiffs' estimate of residents in the affected communities) is feasible.
(Footnote omitted). Given the large number of plaintiffs involved in the instant case, we find no error in the circuit court's conclusion that the numerosity prerequisite was met for both the property and the medical monitoring classes.
b. Commonality. This Court has held that
[t]he "commonality" requirement of Rule 23(a)(2) of the West Virginia Rules of Civil Procedure [1998] requires that the party seeking class certification show that "there are questions of law or fact common to the class." A common nucleus of operative fact or law is usually enough to satisfy the commonality requirement. The threshold of "commonality" is not high, and requires only that the resolution of common questions affect all or a substantial number of the class members.
Syl. pt. 11, In re West Virginia Rezulin Litig., 214 W.Va. 52, 585 S.E.2d 52. Elaborating on this holding, the Court has explained that although
[c]ommonality requires that class members share a single common issue. ... However, not every issue in the case must be common to all class members. ... The common questions need be neither important nor controlling, and one significant common question of law or fact will satisfy this requirement. ... In other words, [t]he class as a whole must raise at least one common question of law or fact to make adjudication of the issues as a class action appropriate to conserve judicial and private resources.
Id., 214 W.Va. at 67, 585 S.E.2d at 67 (internal quotations and citations omitted). It has been recognized that the commonality requirement "is easily met in most cases." 1 Conte & Newberg, Newberg on Class Actions § 3:10, at 274-77 (footnote omitted).
The trial court in the instant case found numerous questions of fact were common *857 to the class: (1) the alleged source of the toxic chemicals was the same for each proposed class member; (2) the alleged conduct that caused the contamination is identical for each proposed class member; (3) for medical monitoring purposes, whether (a) the substances were hazardous, (b) the community was exposed to the substances, (c) the defendant behaved tortiously, (d) exposure may result in increased risk of latent diseases, and (e) monitoring procedures exist to detect latent diseases; and (4) for property damage purposes, property valuation. In addition, the trial court found common questions of law in the case. In this regard, the court referred to the issue of whether the defendant's conduct was unlawful and the Plaintiffs' legal theories.
"The Rule 23(a)(2) [commonality] prerequisite is qualitative rather than quantitative; that is, there need be only a single issue common to all members of the class." 1 Conte & Newberg, Newberg on Class Actions § 3:10, at 272-74 (footnote omitted). Because there were numerous common factual and legal issues in this action pertaining to both the property and the medical monitoring classes, we find no error in the circuit court's conclusion that the commonality requirement had been met.
c. Typicality. In this Court's In re West Virginia Rezulin Litigation opinion, it was also held that:
The "typicality" requirement of Rule 23(a)(3) of the West Virginia Rules of Civil Procedure [1998] requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." A representative party's claim or defense is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory. Rule 23(a)(3) only requires that the class representatives' claims be typical of the other class members' claims, not that the claims be identical. When the claim arises out of the same legal or remedial theory, the presence of factual variations is normally not sufficient to preclude class action treatment.
Syl. pt. 12, In re West Virginia Rezulin Litig., 214 W.Va. 52, 585 S.E.2d 52. The In re West Virginia Rezulin Litigation Court went on to explain that,
[t]he rationale behind the requirement is that a class representative with typical claims "will pursue his or her own self-interest in the litigation, and in so doing, will advance the interests of the class members[.]" 1 [Conte & Newberg,] Newberg on Class Actions ... § 3:13, at 325. "[M]ere anticipation that all class members will benefit from the suit ... is not enough. But interests sufficiently parallel to ensure a vigorous and full presentation of all potential claims for relief should satisfy Rule 23(a)(3)." Weiss v. York Hosp., 745 F.2d 786, 810 (3d Cir.1984).
214 W.Va. at 68, 585 S.E.2d at 68. Moreover,
differences in the situation of each plaintiff or each class member do not necessarily defeat typicality: The harm suffered by the named plaintiffs may differ in degree from that suffered by other members of the class so long as the harm suffered is of the same type. ... Furthermore, [t]he fact that a defense may be asserted against the named representatives, as well as some other class members, but not the class as a whole, does not destroy the representatives' status.
Id. at 68, 585 S.E.2d at 68 (quotations and citations omitted).
In this case, the trial court found that the representative parties were affected by the same conduct as the class, and they would rely on legal theories and remedies available to each other and the class members. Accordingly, we find no error in the circuit court's conclusion that the typicality requirement was met for both the property and medical monitoring classes.
d. Adequacy of Representation. The final prerequisite under Rule 23(a) addresses adequacy of representation. In this regard, the Court has held that,
[t]he "adequacy of representation" requirement of Rule 23(a)(4) of the West Virginia Rules of Civil Procedure [1998] requires that the party seeking class action *858 status show that the "representative parties will fairly and adequately represent the interests of the class." First, the adequacy of representation inquiry tests the qualifications of the attorneys to represent the class. Second, it serves to uncover conflicts of interest between the named parties and the class they seek to represent.
Syl. pt. 13, In re West Virginia Rezulin Litig., 214 W.Va. 52, 585 S.E.2d 52.
The trial court found that no conflicts existed between the named plaintiffs and the class. In addition, the trial court found that the Plaintiffs' counsel were qualified to represent the class. In this regard, the circuit court observed that,
[c]lass counsel has demonstrated their ability to investigate the claims of the proposed class and to fully prosecute this case. Class counsel has conducted a thorough investigation of the contamination in the class area. To conduct this investigation, class counsel has employed well-qualified experts in the fields of geochemistry, remediation, economics and real estate, medicine, industrial hygiene, and toxic exposure modeling. Over 1,000 samples have been taken and analyzed. In addition, class counsel has thoroughly mapped and documented the class area including the identification of every parcel and its owner.
We find no error in the circuit court's conclusion that the class representatives and class counsel were adequate representatives of both the property class and the medical monitoring class. Having determined that the circuit court did not err in finding that the Plaintiffs had established each of the prerequisites to class certification under Rule 23(a), we must now consider whether the circuit court correctly concluded that the Plaintiffs satisfied one of the elements set out in Rule 23(b).
2. Certification Requirements Under Rule 23(b).[49] "To be maintainable as a class action, a suit must meet not only the prerequisites of Rule 23(a), but also the additional requirements of one of the subparts of Rule 23(b)." Cleckley, Davis, & Palmer, Jr., Litigation Handbook on West Virginia Rules of Civil Procedure § 23(b)[2], at 543. Accord Syl. pt. 8, In re West Virginia Rezulin Litig., 214 W.Va. 52, 585 S.E.2d 52. The circuit court found that each of the requirements of Rule 23(b) had been satisfied; however, because only one of the Rule 23(b) criteria needs to be met for each class, we will limit our discussion to the criteria in Rule 23(b)(3). We focus on Rule 23(b)(3) because the circuit court found that both the medical monitoring and property damage classes, as well as the Plaintiffs' claims for punitive damages, qualified for certification under Rule 23(b)(3).[50] Rule 23(b)(3) states:

*859 Class actions maintainable.  An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
. . . .
(3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.
Thus, in order to be certified under Rule 23(b)(3), a class must first satisfy both the predominance test and the superiority test:
Under Rule 23(b)(3), a class action may be certified to proceed on behalf of a class if the trial court finds "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and finds that a class action "is superior to other available methods for the fair and efficient adjudication of the controversy."
In re West Virginia Rezulin Litig., 214 W.Va. at 71, 585 S.E.2d at 71. The rule then sets out four additional factors that must be considered. We examine these criteria in turn.
a. Predominance Test. Under the predominance test, "[a] trial court is required to find ... that questions common to the class predominate over questions affecting individual members." Cleckley, Davis, & Palmer, Jr., Litigation Handbook on West Virginia Rules of Civil Procedure § 23(b)(3)[2][a], at 553 (footnote omitted). This Court has recognized that, "[t]he predominance criterion in Rule 23(b)(3) is a corollary to the 'commonality' requirement found in Rule 23(a)(2). While the `commonality' requirement simply requires a showing of common questions, the `predominance' requirement requires a showing that the common questions of law or fact outweigh individual questions." In re West Virginia Rezulin Litig., 214 W.Va. at 71, 585 S.E.2d at 71. Furthermore,
"[a] conclusion on the issue of predominance requires an evaluation of the legal issues and the proof needed to establish them. As a matter of efficient judicial administration, the goal is to save time and money for the parties and the public and to promote consistent decisions for people with similar claims." In the Matter of Cadillac V8-6-4 Class Action, 93 N.J. 412, 430, 461 A.2d 736, 745 (1983). The predominance requirement is not a rigid test, but rather contemplates a review of many factors, the central question being whether "adjudication of the common issues in the particular suit has important and desirable advantages of judicial economy compared to all other issues, or when viewed by themselves." 2 [Conte & Newberg], Newberg on Class Actions, 4th Ed., § 4:25[,] at 174.
Id. at 72, 585 S.E.2d at 72.
In the instant case, the trial court found that
there are common questions of law or fact that predominate over any individual issues that may arise among the class members. Liability is one such issue. A common overriding question in this litigation is, "did the defendants' operation and management of the smelter site cause the contamination of the proposed class area?" Olden v. LaFarge Corp., 383 F.3d 495 (6th Cir.2004) (Liability of plant owner for toxic emissions was a common issue that predominated over individual questions of damages); Bolanos v. Norwegian Cruise Lines, Ltd., 212 F.R.D. 144 (S.D.N.Y.2002) *860 ("Courts should particularly focus on the liability issue ... and if the liability issue is common to the class, common questions are held to predominate over individual questions."). The defendants' liability arises out of the same nucleus of operative facts for each plaintiff. For example, each plaintiff would rely upon the same evidence to show the negligent conduct of each defendant. Each proposed class member would rely on the same evidence to prove the defendants' knowledge of the dangers posed by the waste generated at the smelter and of the releases of this waste into the surrounding communities.
Indeed, the only issue of any significance that is not identical to all class members is the amount of damages sustained by each claimant. But the need for an individual showing of damages does not preclude class certification under Rule 23(b)(3) where, as here, common issues predominate. Rezulin, 214 W.Va. at 72, 585 S.E.2d at 72. Moreover, the medical monitoring remedy is a class remedy that has as its purpose an ongoing determination of any individual injuries.
Applying the principles pertaining to the predominance test set out above to the analysis utilized by the trial court, we find no error in the court's conclusion that "common questions of law or fact ... predominate over any individual issues that may arise among the class members."
b. Superiority Test. Under the superiority test, a trial court must "compare[] the class action with other potential methods of litigation." Cleckley, Davis, & Palmer, Jr., Litigation Handbook on West Virginia Rules of Civil Procedure § 23(b)(3)[2][b], at 554 (footnote omitted). See also Nolan v. Reliant Equity Investors, LLC, No. 3:08-CV-62, 2009 WL 2461008, at *4 (N.D.W.Va. Aug. 10, 2009) ("Superiority requires that a class action be superior to other methods for the fair and efficient adjudication of the controversy." (quotations and citations omitted)); In re West Virginia Rezulin Litig., 214 W.Va. at 75, 585 S.E.2d at 75 (stating that superiority "requirement focuses upon a comparison of available alternatives").
"Factors that have proven relevant in the superiority determination include the size of the class, anticipated recovery, fairness, efficiency, complexity of the issues and social concerns involved in the case." Cleckley, Davis, & Palmer, Jr., Litigation Handbook on West Virginia Rules of Civil Procedure § 23(b)(3)[2][b], at 554 (footnote omitted). In addition, this Court has observed that consideration must be given to the purposes of Rule 23, "`including: conserving time, effort and expense; providing a forum for small claimants; and deterring illegal activities.'" In re West Virginia Rezulin Litig., 214 W.Va. at 76, 585 S.E.2d at 76 (quoting 2 Conte & Newberg, Newberg on Class Actions § 4:32, at 277-78).
Turning to the instant case, the trial court found, with respect to the superiority test, that "[c]lass action is superior to other methods for adjudicating Plaintiffs' claims. Litigating common issues is far superior to thousands of individual claims." Based upon our review of this action in light of the superiority considerations identified above, we agree with the circuit court and find no error in its conclusion that the class had satisfied the superiority test.
c. Additional 23(b)(3) Factors to Be Considered. Finally, we note that Rule 23(b)(3) directs that certain matters are pertinent when determining the propriety of class certification. These pertinent matters include:
(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.
W. Va. R. Civ. P. 23(b)(3).
The circuit court made the following specific findings relevant to the foregoing matters:
Applying the four factors set out in Rule 23(b)(3) underscores the superiority of *861 class adjudication. The Court is persuaded that two individual actions out of the thousands of class members is insufficient to show that there is any interest by the putative class members in individually controlling the litigation. The Court further finds that the two pending cases will not present any difficulty in allowing this case to proceed as a class.
Only two individual cases have been filed, which does not indicate there is an interest among the class members in individually controlling the prosecution. To the contrary, the fact that only two cases have been filed out of potentially thousands of cases demonstrates the superiority of class treatment. Individual actions would likely be prohibitively expensive. For example, class certification will permit a mass appraisal method to determine the effect, if any, the smelter's operations have had on property values. Such a mass appraisal will allow spreading of the cost of the model over the entire class of property owners, as opposed to each property owner being forced to develop expensive and time consuming appraisal models to quantify the effects, if any, the smelter has had on his or her property value.
As to the third factor, the desirability or undesirability of concentrating the litigation of the claims in the particular forum, a class approach not only to liability but also to the establishment of uniform medical monitoring and property damage programs is highly desirable. As to the fourth factor, through proper case management, any difficulties likely to be encountered in the management of this class action will be minimized and will pale in comparison to the onerous, if not impossible task, of trying hundreds, if not thousands, of similar claims separately. Indeed, because of the type of vigorous defense mounted by Defendants, and the expense of hiring experts and otherwise challenging such a defense, it is doubtful that many of these relatively small medical monitoring and property damage claims could be brought without a class approach.
Common defenses such as the Grasselli "release" issue will also greatly benefit by common treatment as to those properties to which they apply. Since some of the class representatives' properties are subject to the release issue, the issue will be joined and will be far more effectively litigated in a common manner than through piecemeal litigation. Similarly, to the extent Defendants request to undertake additional sampling for use in developing alternative remediation cost assessments, these requests can be timely managed through the discovery process.
Post-class trial (i.e., phase two) individual damages adjudications may prove necessary for calculating individual damages such as mental suffering and individual application of the punitive damage liability findings. However, bifurcation, if it proves necessary, will not hinder the efficient litigation of the many class issues.
The decision faced by this Court, in sum, is whether to fragment the common issues into thousands of individual lawsuits, where each plaintiff would assert the same theories against the same defendants based on the same evidence, or to certify the class. In answer, this Court finds that a class action is superior to other available methods for the fair and efficient adjudication of the present controversy.
(Footnotes omitted).
We find no error in the circuit court's conclusions with respect to the final four factors of analysis contained in Rule 23(b)(3). Having found no error in the circuit court's disposition of each of the elements to be considered in certifying a class under Rule 23(a) and (b), we find that certification was proper. Consequently, DuPont's claim that class certification violated its due process rights by preventing it from presenting individualized evidence and individualized defenses is without merit.[51]

*862 C. 404(b) Evidence

DuPont avers that the trial court erred in repeatedly allowing the Plaintiffs to present what DuPont characterizes as highly prejudicial "other acts" evidence without following the requirements of West Virginia Rule of Evidence 404(b).[52] Following an examination of the proper standards for our review, and some general principles pertaining to Rule 404(b), we will address DuPont's challenges.
This Court has previously held that "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. pt. 4, State v. Rodoussakis, 204 W.Va. 58, 511 S.E.2d 469 (1998). More specifically, we have explained, and we now hold, that,
"[t]he standard of review for a trial court's admission of evidence pursuant to Rule 404(b) [of the West Virginia Rules of Evidence] involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review de novo whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the `other acts' evidence is more probative than prejudicial under Rule 403." State v. LaRock, 196 W.Va. 294, 310-11, 470 S.E.2d 613, 629-30 (1996).
State v. Minigh, 224 W.Va. 112, 122, 680 S.E.2d 127, 137 (2009) (per curiam). See also McKenzie v. Carroll Int'l Corp., 216 W.Va. 686, 690, 610 S.E.2d 341, 345 (2004) ("[T]his Court reviews a circuit court's decision on whether `to admit evidence pursuant to Rule 404(b) under an abuse of discretion standard.'" (citation omitted)); State v. McGinnis, 193 W.Va. 147, 159, 455 S.E.2d 516, 528 (1994) ("[W]e review the trial court's decision to admit evidence pursuant to Rule 404(b) under an abuse of discretion standard." (citations omitted)).
In State v. McGinnis, this Court set out the requirements for admitting 404(b) evidence as follows:
Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an in camera hearing as stated in State v. Dolin, 176 W.Va. 688, 347 S.E.2d 208 (1986)[, overruled in part on other grounds by State v. Edward Charles L., 183 W.Va. 641, 398 S.E.2d 123 (1990) ]. After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied *863 that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.
Syl. pt. 2, State v. McGinnis, 193 W.Va. 147, 455 S.E.2d 516. With the foregoing standards and principles in mind, we proceed to the merits of DuPont's claimed errors.
1. General Liability Phase: Videotape Deposition Testimony of Plaintiffs' Witness Kathleen Forte. During Phase I, the general liability phase, the Plaintiffs offered into evidence the videotaped deposition of Kathleen Forte, a DuPont executive. DuPont complains that the Plaintiffs used the Forte deposition to interject into the trial allegations about other DuPont sites, other chemicals, and other acts unrelated to Spelter. DuPont characterizes this evidence as 404(b) evidence,[53] and argues further that the circuit court ignored the requirements for admitting 404(b) evidence set out by this Court in Syllabus point 2 of State v. McGinnis, 193 W.Va. 147, 455 S.E.2d 516. In response, the Plaintiffs submit that DuPont failed to raise a timely, sufficiently particularized objection, and, therefore, the claimed error pertaining to Ms. Forte's deposition testimony is not subject to appellate review. We agree with the Plaintiffs.
With respect to the necessity for a proper objection to preserve for appellate review the admissibility of evidence pursuant to evidentiary Rule 404(b), this Court has reasoned as follows:
We agree with the State's contention that the Appellant's claim of error under Rule 404(b) is precluded from appellate review based on his failure to state this authority as ground for his objection before the trial court. West Virginia Rule of Evidence 103(a)(1) provides, in pertinent part, that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context. ..." Id. (emphasis added). In interpreting the significance of Rule 103(a)(1), Justice Cleckley in his Handbook on Evidence for West Virginia Lawyers states: "the objecting party should not benefit from an insufficient objection if the grounds asserted in a valid objection could have been obviated had the objecting party alerted the offering party to the true nature of the objection." 1 Franklin D. Cleckley, Handbook on Evidence for West Virginia Lawyers § 1-7(C)(2) at 78 (3rd ed. 1994); see Leftwich v. Inter-Ocean Casualty Co., 123 W.Va. 577, 585-86, 17 S.E.2d 209, 213 (1941) (Kenna, J., concurring) ("It is well established that where the objection to the admission of testimony is based upon some specified ground, the objection is then limited to that precise ground and error cannot be predicated upon the overruling of the objection, and the admission of the testimony on some other ground, since specifying a certain ground of objection is considered a waiver of other grounds not specified."); 1 Jack B. Weinstein et al., Weinstein's Evidence ¶ 103[02] at 103-37 (1995) (stating that "a specific objection made on the wrong grounds and overruled precludes a party from raising a specific objection on other, tenable grounds on appeal"); see also United States v. Reed, 977 F.2d 14, 16 (1st Cir. 1992) (finding that defendant failed to make timely Rule 404(b) objection to admission of prior possession of cocaine conviction where, before trial court, defendant only argued that said admission violated Rule 403); United States v. Mascio, 774 F.2d 219, 221-23 (7th Cir.1985) (stating that defendant cannot raise Rule 404(b) issue for first time on appeal, where objection before trial court only concerned lack of foundation and lack of specificity).
State v. DeGraw, 196 W.Va. 261, 272, 470 S.E.2d 215, 226 (1996) (footnote omitted).
*864 We have reviewed the relevant portion of the transcript in the instant case and note that, at trial, DuPont asserted a number of grounds as to why Ms. Forte's deposition testimony should not be played to the jury. However, the only reference that even remotely implicated Rule 404(b) was DuPont's counsel's comment that "[w]e also object because there is testimony or questioning with regard to other sites which are not the subject of this litigation, including Parkersburg and Pompton Lakes." This statement alone, in the context of the numerous other grounds that DuPont raised, is wholly insufficient to alert the trial court that a Rule 404(b) objection was being made and that a specific McGinnis ruling was being requested. The inadequacy of counsel's objection is made clear in the record. While the trial court specifically addressed a number of the objections that DuPont raised regarding Ms. Forte's deposition, there was absolutely no comment by the trial court with reference to a Rule 404(b) objection. The record further demonstrates that, after DuPont made the vague aforementioned reference to evidence related to "other sites," it never followed up by making a specific Rule 404(b) objection. In other words, DuPont allowed the hearing to terminate without ever having its vague reference expressly addressed by the trial court.
Thus, DuPont attempted to bombard the trial court with a number of objections to Ms. Forte's testimony, and, during this bombardment, DuPont neglected to alert the trial court that it was attempting to make a Rule 404(b) argument. See, e.g., Coleman v. Sopher, 201 W.Va. 588, 600-01, 499 S.E.2d 592, 604-05 (1997) ("In the course of this testimony, Sopher's counsel made two objections pertaining to the form of the particular question being asked and one additional objection as to relevancy. Because Sopher failed to raise, on the record, the specific errors he now asserts [that the evidence should have been excluded under West Virginia Rule of Evidence 404(b)], we deem any such errors were waived."); State v. DeGraw, 196 W.Va. 261, 271, 470 S.E.2d 215, 225 (concluding that objection was insufficient to preserve 404(b) issue for appeal where, "[p]rior to trial, the Appellant filed a motion objecting to the above-mentioned questions and responses thereto, stating that `the State made pointed reference to prior criminal offenses of [the] defendant' which was `a naked attempt to circumvent the rule against impeachment of a criminal defendant by prior conviction (Rule of Evidence 609).' The Appellant never cited West Virginia Rule of Evidence 404(b) as a supporting ground for this objection." (footnote omitted)).
With respect to the requirement for a particularized objection, this Court has previously lamented that,
[t]ime and again, we have reiterated that "[t]o preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect." Syllabus Point 2, State ex rel. Cooper v. Caperton, 196 W.Va. 208, 470 S.E.2d 162 (1996). We have further explained:
The rule in West Virginia is that parties must speak clearly in the circuit court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace. ... It must be emphasized that the contours for appeal are shaped at the circuit court level by setting forth with particularity and at the appropriate time the legal ground upon which the parties intend to rely.

Id., 196 W.Va. at 216, 470 S.E.2d at 170 (citation omitted). Trial courts should not have to guess the nature of claimed defects. Further, this Court should not have to examine with a fine tooth comb the lines of trial transcripts to discern the true meaning of objections made at trial.

State v. Ladd, 210 W.Va. 413, 428-29, 557 S.E.2d 820, 835-36 (2001) (emphasis added). Additionally, we note that "Rule 103 of the West Virginia Rule of Evidence is also indicative of this principle[.]" State v. Shrewsbury, 213 W.Va. 327, 334, 582 S.E.2d 774, 781 (2003). Rule 103 states, in relevant part:
(a) Effect of erroneous ruling.  Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
(1) Objection.  In case the ruling is one admitting evidence, a timely objection or *865 motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context. ...
(Second emphasis added). Based upon the foregoing, we now expressly hold that an objection to a circuit court ruling that admits evidence must be timely made and must state the specific ground of the objection, if the specific ground is not apparent from the context. See also W. Va. R. Civ. P. 46 ("Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which the party desires the court to take or the party's objection to the action of the court and the grounds therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice the party." (emphasis added)).
Because DuPont failed to tender a sufficiently specific objection to the trial court, the issue of whether the evidence presented in Ms. Forte's deposition violated Rule of Evidence 404(b) has not been preserved for appellate review.[54]
2. Punitive Damages Phase. DuPont also complains that, during Phase IV of the trial, the punitive damages phase, the circuit court conducted an inadequate McGinnis hearing and thereby permitted the Plaintiffs to introduce a "mountain of improper 404(b) evidence." The Plaintiffs disagree and assert that the trial court conducted a proper McGinnis hearing and reviewed all 404(b) documents in camera. We have reviewed the McGinnis hearing and find that the trial court indicated that it had conducted an in camera review of the documents, and that it would admit the documents tendered by the Plaintiffs into evidence. Thus, we find no merit to DuPont's contention that the trial court failed to conduct an adequate review.[55]
Accordingly, we find no error with respect to the Rule 404(b) issues raised by DuPont.[56]

*866 D. Expert Testimony

During Phase I of the trial, the general liability phase, the Plaintiffs tendered Dr. Kirk Brown as "an expert in contaminant assessment, remediation, related fields such as fate and transport, risk assessment and the [sic] fingerprinting contamination," and the circuit court qualified Dr. Brown "within his areas of expertise and within the limits as expressed by him." DuPont argues on appeal that the circuit court erred by allowing Dr. Brown to testify outside his area of expertise. Specifically, DuPont complains of the following testimony, which it characterizes as involving "medical and toxicology" expertise, given by Dr. Brown during his direct examination by the Plaintiffs:
Q. Dr. Brown, ... what are the health effects of arsenic, cadmium and lead exposure?
. . . .
Q. Just take them one by one.
A. Okay. Arsenic  we all know that someone can be poisoned rather quickly with arsenic. A couple of doses and it will kill you, and it will kill you within four or five days. That's not what we're talking about here.
There is a  there's no such concentrations here. People have not been exposed to the point where we would even consider that.
However, we do know that over long-term exposures of low doses of arsenic, it does increase the probability that you would get cancer. The cancer would be skin cancer, bladder cancer, lung cancer, then there's some evidence for kidney cancer.
So that's what we're concerned about for arsenic.
For cadmium, the cancers that we're concerned about, after a long-term exposure again, would be lung cancer and kidney cancer. We also have other things that might happen before you get kidney cancer. There could be kidney failure and things of that nature.
Lead is a little bit different. We have less evidence, although there is growing evidence, that lead could be cancerous to lungs, kidney and perhaps even stomach. However, the immediate concern  just as we have an immediate concern with arsenic, we have an immediate concern with lead.
And the concern is particularly about children, children under the age of six. Lead exposure to children under the age of six  particularly by hand-to-mouth transfer, that is, they're exposed by touching things that have dust on them or lead on them and putting them in their mouth  that's why we just recently heard that these toys coming from China that had lead paint, that they're suddenly being recalled and taken off the market.
In this country, we have made a lot of progress to get lead out of the environment. No more lead in gas; no more lead in paint in this country. And we've made marvelous progress protecting children and adults from lead.
But if a child is exposed in an environment where there is elevated lead and they can get their hands on it, dust, soil, toys, whatever it is, within a few days, their blood lead level can increase.
And the nasty thing about increasing blood lead level in a child is that it interferes with brain development. A child ultimately has a lower IQ and potential and could have a detrimental impact on them for the rest of their life.
So this would be short-term exposures. The longer they're in that environment, the more damage that will be done. And this is why you hear about people cleaning the lead paint out of their house and why we hear about cautions for lead paint.
We do not want to allow children to be exposed to this chemical, even on a short-term basis.
Additionally, DuPont complains about the following testimony by Dr. Brown:
Q. Let's talk about doing a risk assessment and risk methodology. Will you describe to the jury how you go about doing it and what you did in this case?
A. What one does in a risk assessment is evaluate all the pathways which are likely to cause exposure to people. So *867 where we're interested in a metal like arsenic, we're interested in how are people exposed and what's the mechanism of exposure.
So people can be exposed if they get it on their skin. They can be exposed by breathing it. They can be exposed by eating it, ingestion, we call that.
Now, none of us want to admit that we eat dirt, okay? But studies have been done where we  where scientists have figured out how much soil or dirt children get into their mouth and eat and how much soil or dirt each of us adults eat, and it's not very much. It's a small amount, about 100 milligrams a day. But that's what they figure that we ingest.
And we all know that, you know, there are occasions where we didn't wash that piece of fruit that may have set on the table when we eat it, and you know, there's the five-second rule, it drops on the floor and you wait and grab it, can't be contaminated.
So we're all exposed to  to soil. We also know, through careful studies, how much people breathe. We know how much children breathe. Typical adult is breathing 10 to 20 cubic meters a day. So we have all these factors then that we're able to add up from the concentration, how much metal, a particular metal, one at a time, people are exposed to through the various pathways.
We know that if we eat produce that has metal in it, eat something from the garden or something from the grocery store, we're going to have some levels of metal. If our drinking water has some in, we will have some levels of metal. That doesn't appear to be a problem here, but it's a part of risk assessment.
If people are eating meat, deer meat or fish from the environment, that will also carry some metal. So what we do is: We take all these pathways and figure out which ones of them are important and put them together in a set of equations that then we use to calculate based on the concentration of the metal in the various media, how much is in the air, how much is in the dust, and then also relationships that have been developed and are published and are, in fact, reviewed by ATSDR [(Agency for Toxic Substances and Disease Registry)] on a five-year basis, as to what dose increases your probability of cancer.
So every cancer-causing chemical is different. So what dose is  is going to increase your probability of cancer?
So then you put all that together in the equation, and you calculate out what the risk is for that particular chemical. Did that for arsenic, and we did it again for cadmium.
Now, since [arsenic] and cadmium are both known to cause lung cancer, then we add those together. So we add the various metals. So we're looking at all exposure pathways, all the metals that are put together.
I did not include lead. The data is less certain on lead. We think it may be a carcinogen in humans, but to be conservative, I didn't include lead. Zinc we didn't include at all, because we don't have evidence that it's going to be harmful to us.
So we did it for cadmium, we did it for arsenic, we added those together. This was methodology that was developed and approved by the U.S. EPA. It's a methodology that's used by West Virginia DEP. It's a very standard methodology.
The decisions have to be made, though, by the risk assessor as to which pathways to include and what concentrations to use, because one might say, "Well, we're not going to include the pathway from skin contact," or "We're going to say, instead of using this data, we don't believe this data, so we're going to somehow estimate the data from something else," so for instance if we don't have  if somebody says, "We don't have the concentration in air in the house," there have been methods suggested by the EPA where you could calculate the method of air  the concentration of air in the house, form methods from dust in the floor or even form methods from the soil outside.
So it's a matter of which data you use. You can create your own data or you use the data that's available when you put this *868 together. The methodology is the same methodology that was used by DuPont. In fact, had they not used this methodology, the risk assessment would not have been accepted by the West Virginia Department of Environmental Protection.
So for their on-site risk assessment, they did the same thing, only keep in mind there's nobody living on-site, so they didn't do the complete risk assessment for people off-site. You've heard that six ways already.
But essentially, what they did was the same thing I did, but I did it more complete since I was also interested in off-site.
Q And let's go to the next slide. And what were the results of your risk assessment?
A. Risk assessment is put to scale, and this is the probability of an individual getting cancer. And the scale increases from the  as we go up. The regulatory residential standard that West Virginia uses and the normal standard above which you should give public notification is called 1 times 10 to the minus 6 or 1 in a million, so that's an increase of cancer of 1 in a million.
The cancers that we found  or the probability of increased cancers that we found, the people living within the class area range from 7 times 10 to minus 5 or a little bit lower than 1 in 10,000 to over 1 in 1000.
So we're 100  1000 times greater than the minimum risk which is often considered by the regulatory community as being acceptable.
You go up to the highest one there, that's 1 in 100 of getting cancer, and when I did a risk calculation on one home in Spelter, which is right across from the front gate, that's just about the risk in that one individual home.
When we did it by the class area, we're between 7 times 7 minus 5 and 2.8 times 10 to minus 3 increase in cancer risk.
Q. And let's just go back to the 1 times 10 to the minus 6. You've got an asterisk by that. Now, you said something about "notification." What do you mean by "notification?"
A. Right. The West Virginia Department of Environmental Protection requires public notification if you're going to do a cleanup, and the cleanup would cause a calculated risk of greater than 1 in a million or 1 times 7 to the minus 6.
Q. And if DuPont had included these communities in their cleanup, what would that have required them to do?
A. That, in my opinion, would have required them to give public notification.
The Plaintiffs respond that the circuit court did not err in allowing the testimony of Dr. Brown, who is a respected pioneer in the field of environmental science.
In reviewing a circuit court's determination as to the admissibility of testimony by an expert witness, we apply an abuse of discretion standard:
"The admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong." Syllabus Point 6, Helmick v. Potomac Edison Company, 185 W.Va. 269, 406 S.E.2d 700 (1991), cert. denied, 502 U.S. 908, 112 S.Ct. 301, 116 L.Ed.2d 244 (1991).
Syl. pt. 3, Green v. Charleston Area Med. Ctr., Inc., 215 W.Va. 628, 600 S.E.2d 340 (2004) (per curiam).
The analysis to be applied in determining whether an expert is qualified to give an opinion has been well established by this Court. Initially, we note that "`Rule 702 of the West Virginia Rules of Evidence is the paramount authority for determining whether or not an expert is qualified to give an opinion.' Syl. Pt. 6, in part, Mayhorn v. Logan Med. Found., 193 W.Va. 42, 454 S.E.2d 87 (1994)." Syl. pt. 2, Walker v. Sharma, 221 W.Va. 559, 655 S.E.2d 775 (2007).[57] Notably,

*869 [w]e have previously interpreted Rule 702 as containing three major requirements: "(1) the witness must be an expert; (2) the expert must testify to scientific, technical or specialized knowledge; and (3) the expert testimony must assist the trier of fact." Gentry [v. Mangum, 195 W.Va. 512, 524, 466 S.E.2d 171, 183 (1995)].
Watson v. Inco Alloys Int'l, Inc., 209 W.Va. 234, 242, 545 S.E.2d 294, 302 (2001). In other words,
"[i]n determining who is an expert, a circuit court should conduct a two-step inquiry. First, a circuit court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact. Second, a circuit court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify." Syllabus point 5, Gentry v. Mangum, 195 W.Va. 512, 466 S.E.2d 171 (1995).
Syl. pt. 4, Id. Furthermore, this Court has recognized that,
the Rules of Evidence are liberal and ... a trial court should "err on the side of admissibility." [Gentry,] 195 W.Va. at 525, 466 S.E.2d at 184 ("What must be remembered, however, is that there is no `best expert' rule. Because of the `liberal thrust' of the rules pertaining to experts, circuit courts should err on the side of admissibility." (citing II Franklin D. Cleckley, Handbook on Evidence for West Virginia Lawyers § 7-2(A), at 24 ("`[t]his standard is very generous and follows the general framework of the federal rules which favors the admissibility of all relevant evidence'"))).
Watson, 209 W.Va. at 246, 545 S.E.2d at 306. Pertinent to the specific error assigned by DuPont, that Dr. Brown testified outside of his expertise, this Court has also previously observed that,
"[t]he second part of the expert qualification criteria is assuring that the expert has expertise in the particular field in which he testifies. Here too, a circuit court has reasonable discretion. In discussing how much of a specialist should the expert be, a circuit court must always remember that the governing principle is whether the proffered testimony can assist the trier of fact. Necessarily the `helpfulness' standard calls for decisions that are very much ad hoc, for the question is always whether a particular expert can help resolve the particular issue at hand."
Watson, 209 W.Va. at 245-46, 545 S.E.2d at 305-06 (quoting Gentry, 195 W.Va. 512, 526, 466 S.E.2d 171, 185). Finally, we note that,
[a]s we acknowledged in Gentry, pursuant to Rule 702, an expert may testify if he or she is "`qualified as an expert by knowledge, skill, experience, training, or education.'" 195 W.Va. at 520, 466 S.E.2d at 179 (quoting W. Va. R. Evid. 702). It has been noted that the use in Rule 702 of the disjunctive "or" allows an expert to be qualified by any of the five methods listed. See II Franklin D. Cleckley, Handbook on Evidence for West Virginia Lawyers § 7-2(A)(1), at 24 (1994) ("[I]nasmuch as the rule is disjunctive, a person may qualify to render expert testimony in any one of the five ways listed.").
Watson, 209 W.Va. at 246, 545 S.E.2d at 306.
Prior to being qualified by the circuit court to provide the above-quoted expert testimony in this case, Dr. Brown testified as to his qualifications. Dr. Brown stated that he had served as a tenured professor at Texas A & M University for approximately twenty years, where he taught courses on environmental science, including courses "on waste disposal, the land disposal of waste, in particular, [and] land treatment," to both undergraduate and graduate students.[58] He further explained that "those courses also include considerations of the fate and movement of contaminants in the environment, risk assessment, remediation, selection of how you clean up and how you restore contaminated properties."
*870 Dr. Brown testified that he possessed a bachelor's degree, as well as a masters degree, and a Ph.D., in agronomy. He explained that he "specialized in soils, focusing more on the environmental aspects, emission of chemicals from the soil released to the environment." With respect to risk assessment, Dr. Brown testified that in the early 1980's he had worked for the EPA and had "developed some aspects of risk assessment, including plant uptake of metals, which of course then goes into the food chain, and some of my early research in that time period, ultimately was used in developing the early aspects of some of the risk assessments that we now use." He stated that he had also worked for the ATSDR (Agency for Toxic Substances and Disease Registry), where he
served for many years as a reviewer. As more information became available, every five years, the ATSDR upgrades its review of and scientific information on the toxicity of certain chemicals. For many years, I served as a reviewer on creosote.
My responsibility there was to evaluate the epidemiological studies, that is, studies where people were known to have been exposed, that then showed up in known cancers or other detrimental effects.
I also reviewed the animal studies that were done, tumor studies in mice and rabbits and other things.
I also reviewed data that was being collected on the impact of these chemicals on other biological systems. Because we can use, for instance, microbes instead of animals to see when there is mutation which could lead to detrimental impact of chemicals....
So I reviewed the whole spectrum of tests every five years to assist the ATSDR in upgrading their publication which said how toxic, how cancer-causing that particular chemical was.
So in doing one chemical, I became very familiar with the procedures, the data that goes into it and how that's evaluated and how the agency then actually decides whether or not a chemical would be called carcinogenic or not.
Elaborating on his experience in risk assessment, Dr. Brown testified further that,
I developed some of the early data and some of the early concepts on risk assessments. I was then assisting the EPA in putting some of these early studies together. As a result, I soon became aware of the efforts we were putting in there, and risk assessment includes such factors as how much of a metal is taken up by a plant growing in a garden that then one might eat and how much that metal you'd be exposed to, and that's the type of data I was developing.
I then followed that development of the risk assessment, and then once the Environmental Protection Agency put out a formal set of equations, if you will, to calculate risk assessment, I studied those, so became well aware of them, read the literature on it and then began teaching that in courses.
In addition, Dr. Brown testified that he had
worked on a variety of smelters and a variety of even Superfund sites that are metal contaminants. I've worked particularly on chromium sites and lead sites, although arsenic and zinc  in fact, one of the lead sites that I'm working on and continue to work on was a zinc mine where a lot of lead was released into the environment.
During voir dire by DuPont, Dr. Brown explained his toxicology experience thusly:
I do not classify myself as a toxicologist. I know and have researched and published on certain aspects of things that are within the realm of toxicology, but I don't generally call myself a toxicologist.
. . . .
My expertise stops ... at the point where I know what kind of concentrations cause what end points of diseases in the body. But I stop there. I don't know the mechanism; I don't know the  you know, the time course of those things. I haven't studied those type of things.
When asked about his experience, training or education regarding what causes cancer, Dr. Brown replied, "That  the question's a bit *871 broad. I know what causes cancer from exposure. I don't have expertise in the actual biochemical processes within the body that cause cancer, but I know if you're exposed to certain chemicals  benzene, arsenic, cadmium, for instance  I know that they cause cancer."
Having reviewed the specific expert testimony of which DuPont complains in light of Dr. Brown's testimony regarding his knowledge, skill, experience, training, and education, we find Dr. Brown's expert testimony was within his demonstrated expertise. Dr. Brown plainly detailed his background as it related to understanding the health effects of certain substances, including arsenic, cadmium, lead and zinc, and the risk of cancer involved therewith. Not only did he demonstrate his knowledge about calculating risks, but he explained that he had played a role "in developing the early aspects of some of the risk assessments that we now use." Thus, we find no error on the part of the circuit court in allowing Dr. Brown's testimony.

E. Verdict Form and Instructions
DuPont next contends that the verdict form and instructions provided to the jury in Phase I[59] erroneously allowed the jury to apply inaccurate standards of law with respect to the property damage class.
At the outset, we consider the proper standard for our review of this issue. With respect to jury instructions, this Court has held that,
"[a]s a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is de novo." Syl. pt. 1, State v. Hinkle, 200 W.Va. 280, 489 S.E.2d 257 (1996).
Syl. pt. 2, Foster v. Sakhai, 210 W.Va. 716, 559 S.E.2d 53 (2001). Moreover,
[t]he formulation of jury instructions is within the broad discretion of a circuit court, and a circuit court's giving of an instruction is reviewed under an abuse of discretion standard. A verdict should not be disturbed based on the formulation of the language of the jury instructions so long as the instructions given as a whole are accurate and fair to both parties.
Syl. pt. 6, Tennant v. Marion Health Care Found., Inc., 194 W.Va. 97, 459 S.E.2d 374 (1995).
Turning to DuPont's argument pertaining to the verdict form, we note that this Court has never expressly set out its standard for reviewing a trial court's decision regarding a verdict form. However, in Adkins v. Foster, the Court applied an abuse of discretion standard in determining that, "[u]nder the circumstances, the Court cannot conclude that the trial judge abused his discretion in submitting the verdict form submitted rather than the verdict form offered by the appellant or that the refusal of the court to submit the appellant's form constituted reversible error." 195 W.Va. 566, 573, 466 S.E.2d 417, 424 (1995) (per curiam) (emphasis added) (footnote omitted). See also Dodrill v. Nationwide Mut. Ins. Co., 201 W.Va. 1, 17, 491 S.E.2d 1, 17 (1996) ("The record in this case does not demonstrate that the trial court abused its sound discretion by using its verdict form rather than the special interrogatories submitted by Nationwide."). See generally Cleckley, Davis, & Palmer, Jr., Litigation Handbook on West Virginia Rules of Civil Procedure § 49[2], at 1014 (3d ed. 2008) (discussing West Virginia Rule of Civil Procedure 49 and observing that, "[a]s a general rule, a trial court has considerable discretion in determining what verdict form to use" (footnote omitted)).[60]Cf. Syl. pt. 8, *872 Barefoot v. Sundale Nursing Home, 193 W.Va. 475, 457 S.E.2d 152 (1995) ("As a general rule, a trial court has considerable discretion in determining whether to give special verdicts and interrogatories to a jury unless it is mandated to do so by statute."). Accordingly, we now expressly hold that, generally, this Court will apply an abuse of discretion standard when reviewing a trial court's decision regarding a verdict form.[61] We now consider whether the circuit court abused its discretion in the instant case.
1. Verdict Form. DuPont complains that the verdict form permitted the jury to find DuPont liable and to award property remediation damages without finding that the Plaintiffs' property was harmed.[62] The Plaintiffs respond that DuPont, in making this argument, ignores the fact that the jury instructions required the jury to find harm to the Plaintiffs' land. We agree.
Although DuPont complains that the verdict form did not contain specific language requiring the jury to find an "unreasonable risk of harm," DuPont has failed to provide this Court with any authority placing a mandatory duty upon the trial court to include such language in the verdict form. Thus, if the jury was properly instructed, then there was no abuse of discretion on the part of the trial court in not duplicating the instructions on the verdict form. See, e.g., Horne v. Owens-Corning Fiberglas Corp., 4 F.3d 276, 284 (4th Cir.1993) ("The district court's decision to omit `gross negligence' from the verdict form in this case will not represent an abuse of discretion if, when viewed in the context of controlling North Carolina law, the verdict form and charge to the jury adequately informed the jury of the issues before it.").
In our review of the jury instructions, we find that the trial court adequately informed the jury that it must find an unreasonable risk of harm caused by DuPont's conduct. For example, the trial court instructed the jury, in part, as follows:
In deciding whether the defendants' conduct at or regarding the Spelter zinc smelter site that [sic] was abnormally dangerous, you must consider the following factors: A, whether there existed a high degree of risk of some harm to the person, land or personal property of others; B, whether the likelihood  whether the likelihood [sic] that the harm that would result from the defendant's conduct would be great; C, whether there existed an inability to eliminate the risk of harm by the exercise of reasonable care; D, whether the conduct is a matter of common usage; E, whether the defendant's conduct was appropriate to the place where it was carried on; and F, whether the value of the defendant's conduct to the community was outweighed by its dangerous attributes.
(Emphasis added). In our review of the jury instructions, we find that the trial court properly *873 instructed the jury to consider whether the property class plaintiffs suffered harm to their property. Therefore, the trial court did not abuse its discretion in declining to repeat this element on the verdict form.
2. Instructions. DuPont next argues that the trial court improperly rejected a jury instruction that would have explained that "only `materially] increased levels'" of arsenic, cadmium, or lead created an unreasonable risk of harm. With regard to jury instructions, this court has held that
"[a] trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense." Syl. Pt. 11, State v. Derr, 192 W.Va. 165, 451 S.E.2d 731 (1994).
Syl. pt. 5, Alley v. Charleston Area Med. Ctr., Inc., 216 W.Va. 63, 602 S.E.2d 506 (2004) (per curiam). We find that it was within the trial court's discretion to reject DuPont's instruction. The concept that the property class plaintiffs must have suffered harm to their property from DuPont's actions was conveyed in the jury instructions, particularly that portion of the instructions quoted above. Thus, DuPont's requested instruction was substantially covered in the charge actually given to the jury, and it was not error for the trial court to refuse the instruction.[63]

F. Sufficiency of the Medical Monitoring Evidence
DuPont argues that the evidence presented by the Plaintiffs was insufficient to support the medical monitoring verdict rendered by the jury.
In Bower v. Westinghouse Electric Corp., 206 W.Va. 133, 522 S.E.2d 424 (1999), this Court recognized a cause of action for medical monitoring by holding:
In order to sustain a claim for medical monitoring expenses under West Virginia law, the plaintiff must prove that (1) he or she has, relative to the general population, been significantly exposed; (2) to a proven hazardous substance; (3) through the tortious conduct of the defendant; (4) as a proximate result of the exposure, plaintiff has suffered an increased risk of contracting a serious latent disease; (5) the increased risk of disease makes it reasonably necessary for the plaintiff to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of the exposure; and (6) monitoring procedures exist that make the early detection of a disease possible.
Syl. pt. 3, id. (emphasis added).
At the conclusion of Phase II of the trial, the medical monitoring phase, the jury returned a verdict in favor of the Plaintiffs on all issues. Pertinent to this assignment of error, the jury specifically found, inter alia, that class members in each of the designated zones had "been significantly exposed to arsenic, *874 cadmium, or lead," and that, as a proximate result of their exposure to arsenic, cadmium, or lead, class members have a significantly increased risk of contracting certain diseases.[64]
DuPont now urges this Court to find that the evidence presented at trial was insufficient to support the portions of the jury's medical monitoring verdict finding significant exposure and increased risk. The Plaintiffs, on the other hand, contend that the evidence was sufficient to support the verdict.
Concerning our standard of review of this issue, we note that a finding of insufficient evidence to support a verdict is not easily made. Thus, DuPont bears a heavy burden in attempting to establish an error in this regard. Cf. Syl. pt. 6, in part, State v. McCracken, 218 W.Va. 190, 624 S.E.2d 537 (2005) (per curiam) ("`A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden....'" (quoting Syl. pt. 3, State v. Guthrie, 194 W.Va. 657, 461 S.E.2d 163 (1995))). Indeed, this Court has held that,
"[i]n determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved." Syl. pt. 5, Orr v. Crowder, 173 W.Va. 335, 315 S.E.2d 593 (1983).
Syl. pt. 15, Foster v. Sakhai, 210 W.Va. 716, 559 S.E.2d 53 (2001). See also Dodrill v. Nationwide Mut. Ins. Co., 201 W.Va. 1, 11, 491 S.E.2d 1, 11 (1996) ("When examining the record for the sufficiency of evidence to support the verdict, we view the evidence in the light most favorable to the prevailing party. We are not concerned with how we might decide the facts in the jury's stead, nor does our review favor the inferences and conflicts in the evidence helpful to the losing party."); Syl. pt. 3, Walker v. Monongahela Power Co., 147 W.Va. 825, 131 S.E.2d 736 (1963) ("In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true.").
In support of its argument, DuPont submits that "[t]he actual measurements showed that arsenic, cadmium, and lead are not present throughout the class area at levels that increase the risk of disease." In addition, DuPont states that the Plaintiffs' environmental data are consistent with the ATSDR's[65] blood-lead measurement of children in the Spelter community, and the ATSDR concluded that "it does not appear that children in Spelter are being exposed to hazardous levels of lead." DuPont further complains that the Plaintiffs' medical monitoring expert, Dr. Charles Werntz, simply assumed significant class-wide exposure to arsenic, cadmium, and lead. Finally, DuPont asserts that uncontradicted evidence established that the "increased risk" deemed sufficient by the Plaintiffs' soil expert, Dr. Brown, was equal to the risk from smoking a single pack of cigarettes over an entire lifetime.
The Plaintiffs respond that Dr. Werntz did not assume exposure. Rather, he relied on a team of experts who actually measured the levels of contamination in the class area and developed a risk assessment that showed a significant increase in the risk of cancer for people living in the class area. The Plaintiffs explain that the evidence revealed that, for decades, the smelter blanketed the class area *875 with toxic smoke, and that particles from this smoke contaminated the soil and homes, thus creating multiple paths of exposure. In addition, the Plaintiffs state that in a majority of the homes tested by Dr. Brown, lead levels in the indoor dust exceeded the screening level for outdoor soil, and, in some of the homes, the lead levels were five times greater than the screening level for lead in soil. The Plaintiffs opine that indoor levels that exceed the screening level of outdoor soil is persuasive evidence of significant exposure. Dr. Brown also found elevated levels of cadmium in living space dust of the homes he tested. The elevated levels ranged from eight to seventy times the level of cadmium found in typical house dust.
Based upon our review of the record, we find the evidence was controverted on this issue, with both sides presenting evidence in support of their position. However, as noted above, we are bound to view the evidence in the light most favorable to the Plaintiffs as the prevailing parties, and we must view every reasonable and legitimate inference, fairly arising from the evidence, in favor of the Plaintiffs. Under this standard, we find there was sufficient evidence to support the portions of the jury's medical monitoring verdict finding significant exposure and increased risk.[66]

G. Punitive Damages
The next issue we address involves punitive damages. DuPont asserts four general assignments of error to support its argument that the punitive damages award should be vacated. In this regard, DuPont argues that the circuit court erred by: (1) refusing to give an instruction offered by DuPont pertaining to dissimilar conduct; (2) allowing allegedly improper comments by the Plaintiffs' counsel; (3) permitting the award of punitive damages in connection with the Plaintiffs' claims for medical monitoring; and (4) upholding a punitive damages award that was excessive and not supported by the evidence. We will address each of these issues in turn.
*876 1. Dissimilar Conduct. DuPont contends that the punitive damages award should be vacated because the circuit court erred in refusing to give an instruction offered by DuPont that informed the jury that it could not punish DuPont based on evidence of dissimilar conduct. Initially, we note that
[t]he formulation of jury instructions is within the broad discretion of a circuit court, and a circuit court's giving of an instruction is reviewed under an abuse of discretion standard. A verdict should not be disturbed based on the formulation of the language of the jury instructions so long as the instructions given as a whole are accurate and fair to both parties.
Syl. pt. 6, Tennant v. Marion Health Care Found., Inc., 194 W.Va. 97, 459 S.E.2d 374 (1995). Thus, "[a]s a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is de novo." Syl. pt. 1, State v. Hinkle, 200 W.Va. 280, 489 S.E.2d 257 (1996).
In conducting our review, we are mindful that,
"`[i]t will be presumed that a trial court acted correctly in giving or in refusing to give instructions to the jury, unless it appears from the record in the case that the instructions were prejudicially erroneous or that the instructions refused were correct and should have been given.' Syllabus Point 1, State v. Turner, 137 W.Va. 122, 70 S.E.2d 249 (1952)." Syllabus point 1, Moran v. Atha Trucking, Inc., 208 W.Va. 379, 540 S.E.2d 903 (1997).
Syl. pt. 3, Matheny v. Fairmont Gen. Hosp., Inc., 212 W.Va. 740, 575 S.E.2d 350 (2002). Furthermore,
[a] trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misle[d] by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.
Syl. pt. 4, State v. Guthrie, 194 W.Va. 657, 461 S.E.2d 163 (1995).
During Phase IV of the trial, which addressed punitive damages, the Plaintiffs presented evidence involving DuPont's conduct toward nonparties at one of its facilities in Parkersburg, West Virginia. In response, DuPont characterized this evidence as dissimilar conduct and proposed the following instruction, which was rejected by the circuit court: "[a] defendant's dissimilar acts, independent from the acts upon which you based your previous findings of liability, may not serve as the basis for punitive damages." (Internal quotations omitted). DuPont relied on Boyd v. Goffoli, 216 W.Va. 552, 608 S.E.2d 169 (2004), and State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), as authority for its proposed instruction.
Although the trial court rejected DuPont's proposed instruction, it gave the following relevant instructions:
The Court instructs the jury that during the course of Phase 4, you've heard evidence of alleged DuPont conduct relating to sites other than Spelter and involving individuals who are not plaintiffs or class members in this lawsuit. You may not award punitive damage to punish DuPont on account of alleged harm to nonparties.

In considering whether DuPont's conduct is reprehensible, however, you may consider evidence of actual harm to nonparties, but only if the harm to nonparties was caused by the same conduct that allegedly harmed the plaintiffs.
The Court instructs the jury that you may not assess punitive damages against the defendant to punish or deter any perceived deficiencies of a defendant's operations outside of the state.

*877 The Court instructs the jury that you've heard evidence mentioning another DuPont site at Parkersburg, West Virginia. This evidence is not to be considered for the purpose of proving the character of DuPont, to show that it acted in conformity therewith.
It is, however, admissible for other purposes, such as proof of intent, preparation, plan, knowledge or absence of mistake or accident.
In this case, plaintiffs are offering this evidence to show how DuPont managed the off-site environmental issues at another site within the State of West Virginia.
(Emphasis added).
Reviewing the circuit court's instructions in light of this Court's decision in Boyd v. Goffoli, 216 W.Va. 552, 608 S.E.2d 169,[67] and the United States Supreme Court decisions in State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585,[68] and Philip Morris USA v. Williams, 549 U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007),[69] we find that the instructions, when considered as a whole, were legally correct in directing the jury that it could consider DuPont's conduct against non-parties in determining whether DuPont's conduct was reprehensible, only if "the harm to nonparties was caused by the same conduct that allegedly harmed the plaintiffs." But, more importantly, the trial court instructed the jury that it could not award punitive damages as punishment for conduct toward nonparties. Accordingly, we find that the circuit court did not abuse its discretion in refusing DuPont's instruction.
2. Comments by the Plaintiffs' Counsel. DuPont argues that the circuit court erred in allowing the Plaintiffs' counsel to urge the jury to "send a message" to large, out-of-state corporations. Specifically, DuPont complains about the following statements by the Plaintiffs' counsel during Phase IV closing arguments:
This is the company that you need to send back home and you need to say, "Don't come into our state and do that."
And when you tell them [DuPont] that with a number, you won't have people blowing tops off of mountains, and you won't have people polluting your rivers, and you won't have these carpetbaggers *878 coming into this town  that's the only way I know how to describe it  and raping the natural resources of this area. You will not have it if they get it.
And you know what? This is the first time in  in this state  I'm sure you all figured it out. This is the first time this is gonna be tested in this state, with a full-blown community environmental process, right here.
DuPont also complains of comments by the Plaintiffs' counsel during opening statements for Phase IV of the trial, which DuPont characterizes as urging the jury to punish DuPont for choosing to defend itself in court:
[W]hat does it take for this corporation to get it? They didn't get it the first time you came out with the first part of the verdict, they didn't get it. They didn't get it the second time you came out with the second part of your verdict, they didn't get it. They didn't get it yesterday when you came back with your verdict, they didn't get it. And they don't get it today.[[70]]
At the conclusion of the Phase IV opening and closing arguments quoted above, DuPont tendered a motion for a mistrial, which was denied by the circuit court each time. With respect to a circuit court's ruling on a motion for mistrial, this Court has held:
Whether a motion for a mistrial should be sustained or overruled is a matter which rests within the trial court's discretion and the action of the trial court in ruling on such a motion will not be cause for reversal on appeal unless it clearly appears that such discretion has been abused.
Syl. pt. 4, Moore, Kelly & Reddish, Inc. v. Shannondale, Inc., 152 W.Va. 549, 165 S.E.2d 113 (1968). Accord Board of Educ. of McDowell County v. Zando, Martin & Milstead, Inc., 182 W.Va. 597, 611, 390 S.E.2d 796, 810 (1990). Furthermore, with respect to the circuit court's determination as to the propriety of counsel's arguments, we have held:
"`The discretion of the trial court in ruling on the propriety of argument by counsel before the jury will not be interfered with by the appellate court, unless it appears that the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom.' Syl. pt. 3, State v. Boggs, 103 W.Va. 641, 138 S.E. 321 (1927)." Syllabus point 2, Lacy v. CSX Transportation, Inc., 205 W.Va. 630, 520 S.E.2d 418 (1999).
Syl. pt. 6, Matheny v. Fairmont Gen. Hosp., Inc., 212 W.Va. 740, 575 S.E.2d 350. Finally, this Court has advised that
"`"[g]reat latitude is allowed counsel in argument of cases, but counsel must keep within the evidence, not make statements calculated to inflame, prejudice or mislead the jury, nor permit or encourage witnesses to make remarks which would have a tendency to inflame, prejudice or mislead the jury." Syl. pt. 2, State v. Kennedy, 162 W.Va. 244, 249 S.E.2d 188 (1978).' Syl. pt. 8, Mackey v. Irisari, 191 W.Va. 355, 445 S.E.2d 742 (1994)." Syllabus point 1, Lacy v. CSX Transportation, Inc., 205 W.Va. 630, 520 S.E.2d 418 (1999).
Syl. pt. 7, Id.
This Court recently addressed improper closing arguments in Jones v. Setser, 224 W.Va. 483, 686 S.E.2d 623 (2009) (per curiam). In Jones, defense counsel attacked the "character and ethics" of the plaintiffs counsel and the plaintiffs expert witness, and "personalized the effects of his rhetoric though the use of demonstrative aids to argue that both [counsel and the expert] were intent on pursuing claims of medical malpractice regardless of whether such claims had merit." Id., 224 W.Va. at 490, 686 S.E.2d at 630.[71] This Court concluded that the trial *879 court erred in refusing to grant a mistrial based upon the "cumulated prejudicial effects on the jury that arose through the viewing of the cartoon, being subjected to disparaging remarks about plaintiffs counsel and expert witness, and from the wrongful appeal to the local passions and concerns of the jurors." Id., 224 W.Va. at 492, 686 S.E.2d at 632.
Turning to the instant case, we note that we do not approve of the comments made by the Plaintiffs' counsel; however, we do not find that those comments rise to the level of the improper prejudicial error that warranted a new trial in Jones. Accordingly, we affirm the circuit court's denial of DuPont's motion for a mistrial on punitive damages, based upon the closing arguments and opening statements of the Plaintiffs' counsel.
3. Punitive Damages for Medical Monitoring Claims. Prior to the Phase IV trial on punitive damages, the circuit court rejected DuPont's motion to preclude a punitive damages phase in this case, based, in part, upon DuPont's argument that punitive damages may not be awarded for medical monitoring claims. In addition, DuPont proposed a jury verdict form that allowed punitive damages to be awarded only for the property damage claims. The trial court rejected DuPont's verdict form and instead used a verdict form that simply inquired of the jury "[d]o you find that the Classes proved that DuPont engaged in wanton, willful, or reckless conduct with respect to the Spelter plant?" Before this Court, DuPont argues that the circuit court erred in allowing the jury to award punitive damages to the medical monitoring class. We agree.
At the outset, we note that the issue of whether to allow punitive damages in connection with a medical monitoring claim presents a question of law, for which we exercise de novo review. See Syl. pt. 1, Chrystal R.M. v. Charlie A.L., 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a de novo standard of review.").
DuPont argues that punitive damages should not be permitted for medical monitoring claims because an award of punitive damages requires a showing of actual harm and an award of compensatory damages. DuPont contends these two elements are missing from a claim for medical monitoring, which requires only a showing of increased risk of disease, not actual present harm.[72] The Plaintiffs, on the other hand, assert that, in West Virginia, medical monitoring damages are considered actual harm, therefore, punitive damages may be proper.[73]
The issue of whether to allow punitive damages in connection with a medical monitoring claim has not previously been resolved by this Court. We were asked to decide this issue in the case of State ex rel. Chemtall Inc. v. Madden, 221 W.Va. 415, 655 S.E.2d 161 (2007) (per curiam), which was an original jurisdiction action in prohibition that was filed before the action had been tried. Finding the question would be "best decided in light of a verdict based on a full development of the evidence at trial," this Court declined to address the issue at the "early pre-trial stage" of the Chemtall litigation. 221 W.Va. at 421, 655 S.E.2d at 167.[74] However, in a *880 separate opinion, concurring in part and dissenting in part, Justice Benjamin persuasively explained his view that punitive damages are not appropriate in medical monitoring cases:
Our Court has defined the "injury" claimed by medical monitoring plaintiffs as a "significantly increased risk of contracting a particular disease." See State ex rel. Chemtall, Inc. v. Madden, 216 W.Va. 443, 455, 607 S.E.2d 772, 784 (2004) (emphasis added). A plaintiff is not required to show that a particular disease is certain or even likely to occur as a result of exposure. "All that must be demonstrated is that the plaintiff has a significantly increased risk of contracting a particular disease relative to what would be the case in the absence of exposure, and `[n]o particular level of quantification is necessary to satisfy this requirement.'" Bower [v. Westinghouse Elec. Corp.], 206 W.Va. [133,] 142, 522 S.E.2d [424,] 433 [(1999)]. Our Court has long recognized that a plaintiff may not recover punitive damages in the absence of actual harm and recovery of compensatory damages. See Garnes [v. Fleming Landfill, Inc.], 186 W.Va. [656,] 667[, 413 S.E.2d 897, 908 (1991),] & Syl. Pt. 1 [of Garnes]. Because the respondents have not asserted personal injury claims, as they have not suffered any actual, present physical injuries from their alleged exposure to petitioners' products, punitive damages simply should not be available in this case.
Furthermore, the Due Process Clause requires a jury to measure the entitlement to punitive damages by the amount of harm suffered by the respondents, and prohibits "grossly excessive or arbitrary punishments." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). A proper measure of punitive damages begins with a determination of the proportionality between compensatory damages and punitive damages. Id., 538 U.S. at 418, 123 S.Ct. 1513. Any award of punitive damages in this class action will be completely arbitrary because there are no actual compensatory damages on which to base a multiplier. ...
Chemtall, 221 W.Va. at 425, 655 S.E.2d at 171.
Surveying how other jurisdictions have addressed this issue reveals that there is a lack of case law discussion on the issue of recovering punitive damages on a purely medical monitoring claim. Our research has uncovered only three cases, all from the same federal district, that have addressed the issue.
Only one case appears to have expressly held that punitive damages could be awarded for medical monitoring. See Carlough v. Amchem Prods., Inc., 834 F.Supp. 1437 (E.D.Pa.1993). In Carlough, the Plaintiffs filed a class action seeking medical monitoring due to asbestos exposure. The federal district judge, in response to a motion by the defendants, had to determine whether the Plaintiffs' claim would result in a recovery that equaled the jurisdictional minimum for bringing an action in federal court. In making that determination, the defendants argued that the trial judge could not consider any potential recovery for punitive damages, because punitive damages were not allowed purely for medical monitoring. The trial court disagreed as follows:
In any event, it is not uncommon for plaintiffs to join claims for punitive damages with claims for medical monitoring. The potential substantiality of such claims is shown by In re Fernald Litig., [No. C-1-85-149,] 1989 WL 267039, 1989 U.S. Dist. LEXIS 17764 (S.D. Ohio [Sept. 29,] 1989). There the court approved a class action settlement of claims brought by owners of property adjacent to a nuclear facility and certain current and former employees of the facility. In evaluating the settlement, the court noted that, to facilitate settlement, it had conducted an advisory summary jury trial in which the nonbinding verdict included "$1,000,000 for diminution of property values, $80,000,000 for a medical monitoring fund, and *881 $55,000,000 for punitive damages." Id., 1989 WL 267039, at *2, 1989 U.S. Dist. Lexis 17764, at *4.
Carlough, 834 F.Supp. at 1460 (footnote omitted).[75]
In two recent cases, federal courts have held that punitive damages could not be awarded for medical monitoring. See Guinan v. A.I. duPont Hosp. for Children, 597 F.Supp.2d 517 (E.D.Pa.2009); Hess v. A.I. DuPont Hosp., No. 08-0229, 2009 WL 595602 (E.D.Pa. Mar. 5, 2009).
The federal court in Guinan v. A.I. duPont Hospital for Children, 597 F.Supp.2d 517 (E.D.Pa.2009), had to decide whether Delaware, whose state law applied to the case, recognized a claim for medical monitoring. The district court held that based upon prior decisions of Delaware courts, it believed Delaware would recognize a cause of action for medical monitoring. In doing so, the opinion indicated in a footnote that such a cause of action would be recognized because "[l]imiting the remedy to compensatory damages and expressly excluding non-economic and punitive damages serves as a disincentive to the hordes of plaintiffs' attorneys who the Supreme Court feared might be tempted to bring an onslaught of medical monitoring litigation." Guinan, 597 F.Supp.2d at 540 n. 10. The decision in Hess v. A.I. DuPont Hospital, No. CIV. A. 08-0229, 2009 WL 595602 (E.D.Pa. Mar. 5, 2009), interpreted the footnote in Guinan "to mean that punitive damages are not available with medical monitoring claims." Hess, at *13 n. 9.
Given the well reasoned argument made by Justice Benjamin in his separate opinion in State ex rel. Chemtall Inc. v. Madden, 221 W.Va. 415, 655 S.E.2d 161, and the scant authority on this issue from other jurisdictions, we now hold that punitive damages may not be awarded on a cause of action for medical monitoring. Applying this holding to the instant case, we conclude that the circuit court erred in allowing the jury to award punitive damages for the Plaintiffs' medical monitoring claims.
The verdict form in the instant action did not allocate punitive damages between the Plaintiffs' property damage claims and their medical monitoring claims. During oral argument, however, the parties stated that, after the punitive damages verdict was returned, the trial court apportioned punitive damages between the property claims and the medical monitoring claims, allocating forty percent to the medical monitoring claims and sixty percent to the property claims.[76] Accepting this undisputed representation by the parties, we reduce the $196,200,000 punitive damages award by forty percent, leaving punitive damages in the amount of $117,720,000 to be applied solely to the claims of the property class.
4. Propriety and Excessiveness of Punitive Damages. Finally, DuPont argues that the circuit court erred in upholding an award of punitive damages that was excessive and not justified by DuPont's conduct. *882 Following Phase IV, DuPont filed a motion to vacate or reduce the punitive damages award under Garnes v. Fleming Landfill, 186 W.Va. 656, 413 S.E.2d 897 (1991). The circuit court denied the motion in a thirty-five page Garnes order. Before this Court, DuPont contends that the evidence failed to establish that DuPont's actions warranted punitive damages, that the circuit court conducted an inadequate review under Garnes, and that the punitive damages violate federal due process.
Before addressing the merits of the issues raised by DuPont, we examine the proper standard for our review. It has been recently clarified that,
[w]hen reviewing an award of punitive damages in accordance with Syllabus point 5 of Garnes v. Fleming Landfill, Inc., 186 W.Va. 656, 413 S.E.2d 897 (1991), and Syllabus point 5 of Alkire v. First National Bank of Parsons, 197 W.Va. 122, 475 S.E.2d 122 (1996), this Court will review de novo the jury's award of punitive damages and the circuit court's ruling approving, rejecting, or reducing such award.
Syl. pt. 16, Peters v. Rivers Edge Mining, Inc., 224 W.Va. 160, 680 S.E.2d 791 (2009). In addition, to the extent that DuPont's alleged errors require us to consider the sufficiency of the evidence, we note that,
[i]n determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.
Syl. pt. 5, Orr v. Crowder, 173 W.Va. 335, 315 S.E.2d 593 (1983). It is from the above described perspective that we proceed to consider DuPont's alleged errors.
This Court has previously characterized the analytical model for addressing challenges to a punitive damages awards as follows:
"Our punitive damage jurisprudence includes a two-step paradigm: first, a determination of whether the conduct of an actor toward another person entitles that person to a punitive damage award under Mayer v. Frobe, 40 W.Va. 246, 22 S.E. 58 (1895); second, if a punitive damage award is justified, then a review is mandated to determine if the punitive damage award is excessive under Garnes v. Fleming Landfill, Inc., 186 W.Va. 656, 413 S.E.2d 897 (1991)." Syllabus Point 7, Alkire v. First Nat. Bank of Parsons, 197 W.Va. 122, 475 S.E.2d 122 (1996).
Syl. pt. 9, Bowyer v. Hi-Lad, Inc., 216 W.Va. 634, 609 S.E.2d 895 (2004) (per curiam). See also Kessel v. Leavitt, 204 W.Va. 95, 191-92, 511 S.E.2d 720, 816-17 (1998) ("Upon the appeal to this Court of a punitive damages assessment, we review awards of punitive damages in the first instance to determine whether the facts and circumstances of the case at issue are sufficient to permit an award of such damages.... In conducting a review of the propriety of punitive damages, we employ the criteria set forth [in Mayer v. Frobe] describing the situations in which punitive damages are proper. We next review such awards to ascertain whether the amount of punitive damages actually awarded by the jury is proper or whether such an award is excessive." (citations omitted)). However, our review of a circuit court's decision also requires an analysis under Syllabus point 15 of TXO Production Corp. v. Alliance Resources Corp., 187 W.Va. 457, 419 S.E.2d 870 (1992). See Syl. pt. 6, in part, Alkire v. First Nat'l Bank of Parsons, 197 W.Va. 122, 475 S.E.2d 122 (1996) ("Every post-trial analysis as to the amount of the punitive damage award should be conducted by the trial court exclusively within the boundaries of Syllabus Points 3 and 4 of Garnes v. Fleming Landfill, Inc., 186 W.Va. 656, 413 S.E.2d 897 (1991), and Syllabus Point 15 of TXO Production Corp. v. Alliance Resources Corp., 187 W.Va. 457, 419 S.E.2d 870 (1992)...."). Thus, to synthesize the process for reviewing punitive damages awards, we now hold that, when this Court, or a trial court, reviews an award of punitive damages, the court must first evaluate whether the conduct of the *883 defendant toward the plaintiff entitled the plaintiff to a punitive damage award under Mayer v. Frobe, 40 W.Va. 246, 22 S.E. 58 (1895), and its progeny. If a punitive damage award was justified, the court must then examine the amount of the award pursuant to the aggravating and mitigating criteria set out in Garnes v. Fleming Landfill, Inc., 186 W.Va. 656, 413 S.E.2d 897 (1991), and the compensatory/punitive damage ratio established in TXO Production Corp. v. Alliance Resources Corp., 187 W.Va. 457, 419 S.E.2d 870 (1992).[77]
a. Propriety of Punitive Damages Under Mayer v. Frobe. Pursuant to Syllabus point 4 of Mayer v. Frobe,
[i]n actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous.
40 W.Va. 246, 22 S.E. 58. Accord Syl. pt. 4, Alkire v. First Nat'l Bank of Parsons, 197 W.Va. 122, 475 S.E.2d 122. DuPont contends that the evidence was insufficient to establish that its conduct warranted consideration of punitive damages by the jury under Mayer. In other words, DuPont contends that the circuit court's finding that "[t]he Plaintiffs presented evidence of wanton, reckless and willful conduct by DuPont sufficient to justify a punitive damage [instruction]" was in error. We disagree.
DuPont specifically argues that its conduct does not support punitive liability for the following reasons: (1) DuPont's 1928-1950 conduct in connection with operating the smelter does not justify punitive damages, because such operation was both lawful and in accord with industry standards of the time; and (2) DuPont's remediation efforts cannot support punitive damages, because DuPont complied with all applicable regulations and government orders in remediating the site and the WV DEP and the EPA concluded that off-site remediation was not necessary.
In its order denying DuPont's motion to vacate or reduce punitive damages, the circuit court devoted approximately twenty pages to describing evidence submitted by the Plaintiffs to show that DuPont's conduct was wanton, willful, or reckless. Following its review of the evidence, the circuit court concluded that
DuPont intentionally acted with a disregard to a known risk with the high probability that harm would follow. DuPont knew or reasonably should have known of the risks attendant to its conduct. DuPont argues that its historical operations of the Spelter smelter met or exceeded the prevailing industry standards at the time and therefore it cannot be deemed to have acted recklessly. DuPont, however, was aware that emissions from the smelter were landing on its neighbors' properties. Residents complained of pollution as early as 1914, a commissioned study in 1919 showed the smelter had already had profound deleterious effects on the surrounding vegetation and livestock, and the Grasselli litigation throughout the 1920s and 1930s confirmed the existence of arsenic and other heavy metals in the emissions. Despite this knowledge and the obvious needs to abate the air pollution, DuPont made no effort to implement any air pollution controls. Instead, DuPont simply continued smelting zinc at full-capacity. Finally, when it appeared that DuPont could no longer avoid allocating money for air pollution controls, DuPont sold the smelter and left town. At a minimum, DuPont's conduct of knowingly disposing of huge piles of zinc tailings containing toxic wastes on its property and consciously discharging those same toxins into the air from its smoke stacks rises to the level of intentional, wanton and reckless conduct.
When DuPont was called back to Spelter, it was faced with the possibility of a Superfund site, which would likely require off-site remediation as well as on-site *884 remediation. In an effort to save an estimated $300 million that the Superfund remediation would require, DuPont initiated its corporate strategy of minimizing and manipulating information and misleading the public. While DuPont remediated the property it owned (after the EPA and [WV] DEP became involved) ..., it actively worked to avoid cleaning up the class area, intentionally concealing and misrepresenting information to the residents of the class in order to hide from them the true nature of the risk they were facing and to avoid responsibility for the situation it had caused.
DuPont argues that its recent site remediation was conducted in full compliance with the applicable rules and regulations and therefore it cannot be assessed with punitive damages. DuPont's machinations to avoid its responsibilities to the class members vitiates DuPont's claims of voluntary remediation and good corporate citizenry. In an effort to stay off the National Priority List and manage public relations to prevent potential legal, tort and/or public issues, DuPont chose to conceal or misrepresent information concerning the health risks associated with the smelter. From the day DuPont purchased the smelter, DuPont knew that hazardous emissions of heavy metals were escaping from the smelter plant and pile and landing on its neighbors' properties. DuPont did nothing to fix the problem, instead leaving town when fixing the problem was going to be costly. When DuPont finally returned, at the federal government's insistence, DuPont cleaned the site but, in the hopes of avoiding of [sic] tort liability and the expense of off-site remediation, followed an aggressive, dishonest strategy of keeping regulators close to the vest, insisting on loyalty from contractors who were willing to manipulate the data, and limiting information by misleading the public.
Finally, DuPont argues that it cannot be held responsible for punitive damages on the basis of its lobbying efforts toward the [WV] DEP to limit the scope of the remediation. First, the Court has previously addressed and denied this argument in its Order denying DuPont's Motion for a New Trial and incorporates that Order herein.[[78]] Second, the Court notes that DuPont has defended against claims of off-site contamination and the lack of off-site remediation *885 by pointing to regulatory agencies that purportedly approved of a remediation restricted to the smelter property and contending that the regulatory agencies' approval of the remediation plan is evidence of no unreasonable contamination to the surrounding communities. DuPont may not rely on regulatory agencies' findings as a defense and, at the same time, prevent the jury from hearing how DuPont obtained those findings.
Third, the Court finds that Plaintiffs presented evidence sufficient to warrant punitive damages regardless of any evidence associated with DuPont's manipulation of regulatory agencies. DuPont was aware of the health hazards of arsenic, cadmium and lead, deliberately misinformed the community residents, refused to inform the members of the class of the offsite contamination and the threats to their health, and continuously refused to address the off-site contamination issue....
(Footnote added).
We agree with the circuit court's conclusions and find no error in the circuit court's decision to instruct the jury on the issue of punitive damages. Having determined that the circuit court properly allowed the issue of punitive damages to go to the jury, we next examine whether the amount of punitive damages awarded by the jury is excessive under the analyses set out in Syllabus points 3 and 4 of Garnes v. Fleming Landfill, Inc., and Syllabus point 15 of TXO Production Corp. v. Alliance Resources Corp.
b. Excessiveness of Punitive Damages Under Garnes v. Fleming Landfill, Inc. and TXO Production Corp. v. Alliance Resources Corp. Before conducting our review under Garnes and TXO to determine whether the amount of punitive damages awarded in this case is excessive, we first wish to clarify the analysis to be utilized by this Court and circuit courts when addressing the excessiveness issue under Garnes. In this regard, we observe that Syllabus point 3 of Garnes actually sets out aggravating and mitigating factors to be considered by a jury in determining the amount of punitive damages:[79]
When the trial court instructs the jury on punitive damages, the court should, at a minimum, carefully explain the factors to be considered in awarding punitive damages. These factors are as follows:
(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater.
(2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.
(3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.
(4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.

*886 (5) The financial position of the defendant is relevant.
186 W.Va. 656, 413 S.E.2d 897. Accord Syl. pt. 10, Bowyer v. Hi-Lad, Inc., 216 W.Va. 634, 639-40, 609 S.E.2d 895, 900-01 (2004). Syllabus point 4 of Garnes instructs that trial courts reviewing punitive damages awards must consider the same evidence considered by the jury under Syllabus point 3 of Garnes, and adds additional aggravating and mitigating factors that must also be considered by the trial court:
When the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors:
(1) The costs of the litigation;
(2) Any criminal sanctions imposed on the defendant for his conduct;
(3) Any other civil actions against the same defendant, based on the same conduct; and
(4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff.
Because not all relevant information is available to the jury, it is likely that in some cases the jury will make an award that is reasonable on the facts as the jury know them, but that will require downward adjustment by the trial court through remittitur because of factors that would be prejudicial to the defendant if admitted at trial, such as criminal sanctions imposed or similar lawsuits pending elsewhere against the defendant. However, at the option of the defendant, or in the sound discretion of the trial court, any of the above factors may also be presented to the jury.
(Emphasis added). Accord Syl. pt. 11, Bowyer v. Hi-Lad, Inc. Importantly, the "at a minimum" language contained in Syllabus point 4 of Garnes demonstrates that the list of factors contained therein is not intended to be exhaustive. Thus, it is within the trial court's discretion to consider other relevant aggravating and mitigating evidence. Accord Bowyer v. Hi-Lad, Inc., 216 W.Va. at 650, 609 S.E.2d at 911 ("Finally, the appellant has not been exposed to punitive damages, criminal sanctions, or excessive litigation expenses as a result of its misconduct, all factors which might merit a reduction by the circuit court of a punitive damage award as specified in Syllabus Point 4 of Garnes.").
Upon an appeal of a punitive damages award to this Court, we will consider the same aggravating and mitigating evidence that we require the circuit court to consider. See Syl. pt. 5, in part, Garnes, 186 W.Va. 656, 413 S.E.2d 897 ("Upon petition, this Court will review all punitive damages awards. In our review of the petition, we will consider the same factors that we require the jury and trial judge to consider...."). Accord Syl. pt. 5, Alkire v. First Nat'l Bank of Parsons, 197 W.Va. 122, 475 S.E.2d 122.
Without changing any of the criteria set out in Garnes, we believe that court review of punitive damages awards would be simplified if the factors were grouped according to their purpose. Therefore, we now hold that, when a trial or appellate court reviews an award of punitive damages for excessiveness under Syllabus points 3 and 4 of Garnes v. Fleming Landfill, Inc., 186 W.Va. 656, 413 S.E.2d 897 (1991), the court should first determine whether the amount of the punitive damages award is justified by aggravating evidence including, but not limited to: (1) the reprehensibility of the defendant's conduct; (2) whether the defendant profited from the wrongful conduct; (3) the financial position of the defendant; (4) the appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed; and (5) the cost of litigation to the plaintiff. The court should then consider whether a reduction in the amount of the punitive damages should be permitted due to mitigating evidence including, but not limited to: (1) whether the punitive damages bear a reasonable relationship to the harm that is likely to occur and/or has occurred as a result of the defendant's conduct; (2) whether punitive damages bear a reasonable relationship to compensatory damages; (3) the cost of litigation *887 to the defendant; (4) any criminal sanctions imposed on the defendant for his conduct; (5) any other civil actions against the same defendant based upon the same conduct; (6) relevant information that was not available to the jury because it was unduly prejudicial to the defendant; and (7) additional relevant evidence.
We now review the punitive damages in the instant case pursuant to the criteria set out in Garnes. We begin by reviewing the aggravating evidence. In conducting our analysis, however, we remain mindful that "we cannot simply examine these ... criteria seriatim, awarding a certain number of points to each. The Garnes factors are interactive and must be considered as a whole when reviewing punitive damages awards." TXO Prod. Corp. v. Alliance Res. Corp., 187 W.Va. 457, 474, 419 S.E.2d 870, 887.

(i). Garnes Aggravating Factors.
(aa). Reprehensibility of DuPont's Conduct. The first factor to be considered as an aggravating factor supporting the amount of punitive damages awarded is the reprehensibility of DuPont's conduct. DuPont asserts that, without proof that DuPont could have or should have prevented the emissions, or had known that they posed significant health risks, the evidence does not support any punitive award. DuPont argues further that its failure to remediate beyond the boundaries of the smelter does not give rise to punitive damages, because expert regulators told DuPont that such remediation was unnecessary. With respect to this factor, the circuit court found that,
DuPont's conduct rose to the level of reprehensibility. DuPont's conduct occurred over a 90 year period, from the time it purchased the smelter knowing that it was actively polluting and contaminat[ing] the surrounding properties, causing blight and death to vegetation and livestock, to the time it repurchased the smelter and initiated a strategy to conceal the extent of the contamination.... Plaintiffs demonstrated it was DuPont's practice ... to obscure and limit information to thwart claimants. The Court is unaware of any attempt by DuPont to make amends or offer a settlement for the actual harm once its liability became clear to it. Indeed, DuPont has yet to acknowledge any liability.
We agree with the trial court's finding, in essence, that the Plaintiffs presented sufficient evidence from which the jury could conclude that DuPont covered up the extent of the damage it had caused to the Plaintiffs. Thus, we find no error in the circuit court's conclusion that DuPont's conduct was reprehensible.
(bb). Profitability of Wrongful Conduct. The next aggravating factor under Garnes requires consideration of whether DuPont profited from its conduct and instructs that punitive damages should remove the profit, and be in excess of the profit, so as to discourage future bad acts by DuPont. The circuit court concluded that,
[w]hile there was no evidence showing that DuPont's conduct in misleading the Plaintiffs and concealing the contamination directly profited DuPont, DuPont profited indirectly. From the time it purchased the smelter, DuPont avoided installing pollution control devices. When it looked as if DuPont would have to install the devices at a hefty price, DuPont sold the plant. DuPont has avoided the cost of cleaning up its pollution for over half a century. By staying off the National Priorities List, DuPont avoided a remediation cost of the surrounding communities that was estimated at $300 million. DuPont has profited, albeit indirectly, from its conduct.
DuPont contends that its profits do not justify the punitive damages award granted in this case; however, the basis for DuPont's argument is largely unresponsive to this issue. To support its argument, DuPont contends that the $325,000 the Plaintiffs assert it would have cost DuPont to install the pollution-control equipment necessary to comply with governmental standards is not a sufficient amount to support the large punitive damages award in this case. DuPont also responds by referring to evidence of profit that was not considered by the circuit court and is not relevant to this issue, such as DuPont's total firm-wide profit, and the amount of money DuPont saved in its on-site *888 remediation by capping, as opposed to removing, the tailings pile. In determining that DuPont had indirectly profited from its conduct in this case, the circuit court did refer to the savings DuPont achieved by failing to install pollution control devices, but the circuit court did not consider DuPont's firm-wide profits or any savings it achieved in connection with its on-site remediation of the Spelter smelter. Indeed, these latter two elements are irrelevant to this issue. Rather, the circuit court concluded that DuPont had experienced significant savings through years of successfully avoiding any off-site remediation of the community surrounding the Spelter smelter.[80] DuPont has not challenged this finding, and, therefore, we find no error with the circuit court's conclusion that DuPont profited, albeit indirectly, from its wrongful conduct.
(cc). Defendant's Financial Position. Under Garnes, we next consider DuPont's financial position. The circuit court concluded that,
[g]iven DuPont's size and resources, a large punitive damage award is reasonable. While the wealth of a defendant cannot justify an unconstitutional punitive damages award, the award in this case is not unconstitutional or excessive. Indeed, to accomplish punishment and deterrence for such a wealthy company, a punitive damage award must necessarily be large. See, e.g., Leach v. Biscayne Oil and Gas Co., 169 W.Va. 624, 628[, 289 S.E.2d 197, 199] (1982) (quoting Pendleton v. Norfolk & W. Ry. Co., 82 W.Va. 270, 277-78[, 95 S.E. 941, 944] (1918) ("The object of such punishment is to deter the defendants from committing like offenses in the future, and this it may be said is one of the objects of all punishment, and we recognize that it would require, perhaps, a larger fine to have this deterrent effect upon one of large means than it would upon one of ordinary means, granting the same malignant spirit was possessed by each.")).
DuPont argues that "`the wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award,'"[81] and observes that the United States Supreme Court recently applied a strict ratio cap against what DuPont characterizes as the wealthiest company in the world.[82] Accordingly, DuPont asserts its wealth has no bearing on the question of whether the punitive damages award in this case was excessive. We reject this argument on the simple ground that the United States Supreme Court approved of the Garnes factors in its review of those factors in TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).
On the merits of the matter, we agree with the circuit court's conclusion that "to accomplish punishment and deterrence for such a wealthy company [as DuPont], a punitive damages award must necessarily be large." Thus, DuPont's financial position supports the amount of punitive damages awarded in the case sub judice.
(dd). Encourage Fair and Reasonable Settlements. This Garnes factor asks the reviewing court to consider whether the amount of punitive damages is appropriate to encourage fair and reasonable settlements when a clear wrong has been committed. DuPont argues that its failure to settle the claims does not warrant a large punitive award because there was no "clear wrong" here. Moreover, contends DuPont, this massive punitive award, against a party that complied with all regulations, magnifies "`the stark unpredictability of punitive awards,'" *889 and renders future settlements less likely. Quoting Exxon Shipping Co. v. Baker, ___ U.S. ___, ___, 128 S.Ct. 2605, 2610, 171 L.Ed.2d 570 (2008).[83] DuPont further asserts that reliance on this factor violates its right to litigate potentially meritorious defenses.
DuPont has misinterpreted the purpose behind this factor. DuPont appears to construe this factor as requiring consideration of whether DuPont was adequately punished for failing to settle this action. This interpretation is incorrect. The focus of the reviewing court's consideration of whether the punitive damages award would encourage fair and reasonable settlements is on the impact it is likely to have on future litigants. That is, was the award large enough so that a future defendant who has committed a clear wrong will be encouraged to accept a fair and reasonable settlement rather than force the wronged plaintiff into litigation and risk incurring a similarly large punitive damages award. In the instant case, the circuit court concluded that,
punitive damages are most likely necessary in this instance to deter DuPont and other similar companies from engaging in reckless disregard of its neighbors' property and persons, continuing in a course of contamination and then concealment. A large award such as this should reasonably encourage companies like DuPont to resolve similar disputes without the necessity of claimants expending, literally, millions of dollars to have companies clean up their environmental messes.
We agree with the circuit court's conclusions and find the amount of punitive damages awarded in this case is likely to encourage fair and reasonable settlements in the future.
(ee). The Cost of Litigation to the Plaintiffs. The circuit court observed that
[t]he Plaintiffs have expended in excess of $8 million to bring this case to trial and have devoted over 30,000 hours of attorney time. The fact that the Plaintiffs did not individually finance this litigation does not reduce the cost necessary to bring DuPont to trial. Indeed, it is highly unlikely that any individual claimant could have had the resources necessary to bring DuPont to justice.
We find that the high cost of this litigation to the Plaintiffs supports the amount of punitive damages awarded in this case.
Having completed our review of aggravating evidence, and considering that evidence as a whole, we conclude that the award of punitive damages in this case is justified by the aggravating factors standing alone. However, our analysis does not end here. The amount of the punitive damages award must also be within the constitutional boundaries set by this Court in Syllabus point 15 of TXO Production Corp. v. Alliance Resources Corp., 187 W.Va. 457, 419 S.E.2d 870, and scrutinized under the mitigating factors set out in Garnes. Thus, we will next consider the award under TXO, and then we will weigh any mitigating Garnes factors to determine whether a reduction in the amount of punitive damages should be permitted.
(ii). Ratio Determination Under TXO Production Corp. v. Alliance Resources Corp. DuPont argues that the ratio of compensatory to punitive damages in this case warrants a reduction in the punitive damages award. We disagree. Subsequent to Garnes, this Court elaborated on what an acceptable ratio between punitive damages and compensatory damages might be in TXO Production Corp. v. Alliance Resources Corp., 187 W.Va. 457, 419 S.E.2d 870. The TXO Court observed that, "[a]lthough there is no mechanical mathematical formula to use in all punitive damages cases, we think it appropriate here to offer some broad, general guidelines concerning whether punitive damages bear a reasonable relationship to actual damages." 187 W.Va. at 474, 419 S.E.2d at 887. The TXO Court held that,
[t]he outer limit of the ratio of punitive damages to compensatory damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no actual intention to cause *890 harm and in which compensatory damages are neither negligible nor very large is roughly 5 to 1. However, when the defendant has acted with actual evil intention, much higher ratios are not per se unconstitutional.
Syl. pt. 15, TXO. The Court went on to explain that greater or lesser ratios would be entirely appropriate in circumstances where the compensatory damages are either very large or negligible:
This is not necessarily the case, however, when compensatory damages are minimal. In cases such as Hospital Authority of Gwinnett County v. Jones, 261 Ga. 613, 409 S.E.2d 501 (1991), in which the potential for harm from the defendant's conduct was tremendous, but the actual compensatory damages were negligible, punitive damages in a ratio much greater than five to one were entirely appropriate.12
TXO, 187 W.Va. at 476, 419 S.E.2d at 889. In footnote 12 of the above quote, the TXO court continued by stating that "[c]oncomitantly, if the compensatory damages are very high then punitive damages even in the ratio of 5:1 might be excessive. See, e.g., Mason v. Texaco, Inc., 948 F.2d 1546 (10th Cir.1991) (compensatory damages of $9.025 million; punitive damages remitted to $12.5 million from $25 million)." Id. at n. 12.
The circuit court, having observed that "comparing the property remediation award against the punitive damages award, the ratio is 3.5:1well within the ratio of 5 to 1," concluded that "the ratio of punitive damages to the remediation award ... is reasonable." Because we have ruled in this appeal that punitive damages are not permitted with respect to claims for medical monitoring, and have accordingly reduced the punitive damages award to $117,720,000, a new ratio may be calculated. Comparing the adjusted punitive damages award of $117,720,000 to the $55,537,522.25 awarded for property remediation, the ratio becomes 2.1:1, a figure that is well within that permitted by TXO.
At this juncture, we wish to clarify that, while a court is required to reduce a punitive damages award that is found to be unconstitutionally large under the analysis set out in TXO, the TXO analysis does not deprive a reviewing court of its discretion to reduce a constitutionally acceptable punitive damages award when a reduction is warranted by mitigating factors such as those set out in Syllabus point 4 of Garnes. See Miller v. Triplett, 203 W.Va. 351, 356, 507 S.E.2d 714, 719 (1998) (citing Abdulla v. Pittsburgh & Weirton Bus Co., 158 W.Va. 592, 213 S.E.2d 810 (1975), for proposition that remittitur is reviewed for abuse of discretion). See, e.g., South Carolina Farm Bureau Mut. Ins. Co. v. Love Chevrolet, Inc., 324 S.C. 149, 153-54, 478 S.E.2d 57, 59 (1996) ("[I]t is clear that Gamble [v. Stevenson, 305 S.C. 104, 406 S.E.2d 350 (1991),] did not alter the discretion historically afforded to trial courts of this state to reduce, or add to, verdicts which they find inadequate or excessive. Gamble merely draws a bright line at which a trial court must reduce a punitive damages award, to ensure the defendant's due process rights have not been violated. Gamble did not, however, hold that a trial judge may only reduce a damages award upon finding a due process violation, nor did it overrule prior precedent permitting the trial judge to exercise its discretion in reducing, or adding to, verdicts it finds overliberal."). See generally, Cleckley, Davis, & Palmer, Jr., Litigation Handbook on West Virginia Rules of Civil Procedure § 59(a), at 196-97 (3d ed. Cum. Supp.2010) ("[E]ven though the amount of a punitive damages award may ultimately satisfy the requirements of syllabus point 15 of TXO, a trial court may nevertheless require a remittitur in the amount of punitive damages or grant a new trial on such damages because of mitigating circumstances. However, requiring a reduction in punitive damages because of mitigating circumstances is a purely discretionary decision of the trial court. That is, the Supreme Court has never held that the mere fact that mitigating factors are present necessitates a reduction in the amount of punitive damages." (footnote omitted)).
Accordingly, we now expressly hold that, a punitive damages award that is not constitutionally excessive under TXO Production Corp. v. Alliance Resources Corp., 187 W.Va. 457, 419 S.E.2d 870 (1992), may nevertheless be reduced by a reviewing court *891 when, in the discretion of the court, a reduction is warranted by mitigating evidence. We now consider whether any mitigating factors exist in this case.
(iii). Garnes Mitigating Factors. The Garnes mitigating factors include, but are not limited to: (1) whether punitive damages bear a reasonable relationship to compensatory damages; (2) whether punitive damages bear a reasonable relationship to the harm that is likely to occur and/or has occurred as a result of the defendant's conduct; (3) the cost of litigation to the defendant; (4) any criminal sanctions imposed on the defendant for his conduct; (5) any other civil actions against the same defendant based upon the same conduct; (6) relevant information that was not available to the jury because it was unduly prejudicial to the defendant; and (7) additional relevant evidence.
(aa). Reasonable Relationship Between Punitive Damages and Compensatory Damages. DuPont contends that the large compensatory damages award in this case is justification for a lower punitive damages award. In addressing this challenge below, the circuit court observed that "the property remediation costs are distributed among 2,821 parcels, resulting in an actual award of approximately $20,000 per parcel. Individually, the remediation award does not result in a `large' compensatory award."
Given that the compensatory damages are not large when considered in light of the size of the class of plaintiffs, we find no error in the circuit court's conclusion that the relationship between punitive and compensatory damages in this case does not warrant any reduction in the amount of punitive damages awarded.
(bb). Reasonable Relationship to Harm. A punitive damages award should bear a reasonable relationship to the harm that has occurred. In the case sub judice, the circuit court expressly found that,
[t]he actual harm in the instant action is continuing exposure to heavy metals on their properties.... As a result, Plaintiffs must have their properties remediated.... These remedies do [not] make the Plaintiffs whole. They mitigate, rather than eliminate, the damages to the property.... DuPont subjected over 2000 parcels of land to damage.... Given this amount of harm ... the Court finds a reasonable relationship between the punitive damages and the harm that has occurred....[[84]]
(Footnote added).
Considering the evidence presented, we agree with the circuit court's conclusion that there is a reasonable relationship between the punitive damages awarded and the harm caused. In this case, the evidence demonstrated that DuPont caused grievous harm to the Plaintiffs by knowingly depositing on their properties known hazardous substances for a period of twenty-two years (from 1928 to 1950). Thereafter, DuPont planned and engaged in a course of conduct designed to avoid any obligation to clean up any contaminated property lying outside the boundaries of the plant itself. Accordingly, no reduction in punitive damages is warranted by this factor.
(cc). The Cost of Litigation to the Defendant. DuPont has not addressed this issue in its brief to this Court. In Syllabus point 5 of Garnes, this Court held that,
[u]pon petition, this Court will review all punitive damages awards. In our review of the petition, we will consider the same factors that we require the jury and trial judge to consider, and all petitions must address each and every factor set forth in Syllabus Points 3 and 4 of this case with particularity, summarizing the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage. Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law.

186 W.Va. 656, 413 S.E.2d 897 (emphasis added). Accordingly, because DuPont failed to properly address this issue, it has been waived. Cf. Syl. pt. 6, Addair v. Bryant, 168 *892 W.Va. 306, 284 S.E.2d 374 (1981) ("Assignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived.").
(dd) Criminal Sanctions Imposed on the Defendant. The circuit court found, and DuPont has conceded, that there have been no criminal sanctions imposed upon DuPont for its conduct. Therefore, no consideration will be given as to whether a reduction is appropriate with respect to this factor.
(ee) Other Civil Actions Against the Same Defendant Based upon the Same Conduct. The circuit court concluded, in essence, that DuPont was not entitled to a reduction in the amount of punitive damages based upon other civil actions for the same conduct because DuPont had not been subject to any such civil actions.[85] The circuit court's conclusion as to this element is correct only up to the point that DuPont assumed liability for the Grasselli litigants.[86] To the extent that DuPont may have been entitled to some reduction in the punitive damages award because of costs it may have incurred in resolving the Grasselli actions, the parties have failed to direct this Court's attention to any part of the record in this case providing details of what those costs may have been. Moreover, we observe that DuPont's brief on this issue is extremely terse and, in fact, demonstrates a misunderstanding of how this factor is applied by asserting that "the deterrent effect of other lawsuits" does not support the punitive damages award granted in this case.
We can only assume that DuPont's misunderstanding of this issue explains why the parties have not identified evidence showing the cost that DuPont may have incurred in connection with the Grasselli lawsuits. Nevertheless, it is not this Court's duty to find mitigating evidence for a defendant.[87] Indeed, we find that, by failing to adequately set out an argument pertaining to other civil actions and summarizing the evidence, DuPont has waived this issue. See Syl. pt. 5, in part, Garnes v. Fleming Landfill, Inc., 186 W.Va. 656, 413 S.E.2d 897 ("Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law."). Cf. Syl. pt. 6, Addair v. Bryant, 168 W.Va. 306, 284 S.E.2d 374 ("Assignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived.").
(ff) Relevant Information That Was Not Available to the Jury Because it Was Unduly Prejudicial to the Defendant. DuPont has not directed this Court's attention to any unduly prejudicial evidence that was not presented to the jury. Therefore, no reduction is appropriate with respect to this factor.
(gg) Additional Relevant Evidence. DuPont has argued, in part, that punitive damages are improper because of its remediation efforts at the Spelter smelter site. As explained above, we have heretofore concluded that DuPont's conduct was sufficiently willful, wanton, and reckless for the question of punitive damages to be presented to the jury, and the aggravating evidence presented at trial was sufficient to support the amount of punitive damages. Therefore, we reject DuPont's claim that the entire punitive damages award should be set aside. However, the circuit court also rejected DuPont's argument that it should receive consideration for the cost of remediation of the Spelter smelter site itself. This was error. In this case, DuPont's remediation efforts should have been considered by the trial court in its review of the punitive damages. Trial testimony *893 indicated that DuPont spent approximately $20 million for the remediation of the Spelter smelter site.[88]
Thus, based upon our review of the mitigating evidence presented at trial, we find that DuPont is entitled to a reduction in the amount of punitive damages equal to the amount that it has spent to remediate the Spelter smelter site.[89] The method of granting such a reduction is by remittitur. It has been explained that,
[t]he historic rationale for remittitur practice is that it saves the time and expense of a new trial if the plaintiff will accept a lesser sum as a verdict. The plaintiff is satisfied because the expense of a new trial is avoided, and the defendant is satisfied because he or she either obtains a new trial, or has had the verdict against him or her reduced. Thus this procedure generally has the effect of facilitating settlement, thereby enhancing judicial economy.
Allsup's Convenience Stores, Inc. v. North River Ins. Co., 127 N.M. 1, 6, 976 P.2d 1, 6 (1998). It is generally understood that, when a court grants a remittitur, the plaintiff is given the option of either accepting the reduction in the verdict or electing a new trial. See Jordan v. Bero, 158 W.Va. 28, 210 S.E.2d 618 (1974) (remanding case with directions to the trial court to give plaintiff a period of thirty days to decide whether he will accept remittitur or submit to a new trial). See generally 1 Linda L. Schlueter, Punitive Damages § 6.2A, at 366 (5th ed. 2005) ("If remittitur is ordered, the plaintiff has the option of either accepting the reduced award or seeking a new trial on the issue. The trial court should not simply order remittitur but must get plaintiffs consent or order a new trial." (footnotes omitted)). Accordingly, we now expressly hold that, when a court grants a remittitur, the plaintiff must be given the option of either accepting the reduction in the verdict or electing a new trial.[90]
Furthermore,
[w]e recognized in Syllabus Point 3 of Gebhardt v. Smith, 187 W.Va. 515, 420 S.E.2d 275 (1992), that where liability has been clearly established and, on appeal, error has been found to have occurred, a new trial may be awarded on that issue alone:

"`Rule 59(a), [West Virginia Rules of Civil Procedure], provides that a new trial may be granted to any of the parties on all or part of the issues, and in a case where the question of liability has been resolved in favor of the plaintiff leaving only the issue of damages, the verdict of the jury may be set aside and a new trial granted on the single issue of damages.' Syl. pt. 4, Richmond v. Campbell, 148 W.Va. 595, 136 S.E.2d 877 (1964)."
Wilt v. Buracker, 191 W.Va. 39, 52, 443 S.E.2d 196, 209 (1993) (emphasis added). See, e.g., Harless v. First Nat'l Bank in Fairmont, 169 W.Va. 673, 698, 289 S.E.2d 692, 706 (1982) (according right of remittitur to plaintiff on condition that he accept reduced judgment against defendant within forty-five days from mandate of this Court or judgment would be set aside and plaintiff entitled to new trial on issue of damages); Delong v. Albert, 157 W.Va. 874, 205 S.E.2d 683 (1974) (granting new trial on issue of *894 damages); Biddle v. Haddix, 154 W.Va. 748, 179 S.E.2d 215 (1971) (same); Richmond v. Campbell, 148 W.Va. 595, 136 S.E.2d 877 (1964) (same). Thus, when there are no issues as to liability or compensatory damages, a plaintiff may choose to either accept a remittitur, or submit to a new trial only as to punitive damages. See Chopra v. General Elec. Co., 527 F.Supp.2d 230, 246-47 (D.Conn.2007) ("If plaintiff does not accept the remittitur, the Court shall vacate the punitive damages award and conduct a new trial limited to the question of punitive damages." (emphasis added) (citing Vasbinder v. Scott, 976 F.2d 118, 123 (2d Cir.1992))).
Accordingly, we reverse and remand the award of punitive damages with instructions to the circuit court to give the Plaintiffs a period of thirty days from the date the mandate for this opinion is issued to advise the circuit court whether they will accept remittitur in the amount of $20 million, or submit to a new trial on punitive damages only.
c. Federal Due Process. DuPont's final argument related to the propriety and excessiveness of punitive damages is that the award violates federal due process. In this regard, DuPont contends that the amount of punitive damages awarded in this case exceeds constitutional limits as set forth in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). Thus, we will examine each of these cases in turn.
(i). BMW of North America, Inc. v. Gore. DuPont argues that the punitive damages award in the instant case exceeds constitutional limits pursuant to the three factors set out by the United States Supreme Court in BMW. The United States Supreme Court in BMW set out the following three guideposts for assessing punitive damages awards:
Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.... The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff.... Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness.
517 U.S. 559, 575, 580, & 583, 116 S.Ct. 1589, 1599, 1601, & 1603 (footnote omitted) (citation omitted). Subsequent to BMW, in a case styled Vandevender v. Sheetz, Inc., 200 W.Va. 591, 490 S.E.2d 678 (1997) (per curiam), this Court reexamined the punitive damages analysis established in Garnes v. Fleming Landfill, Inc., 186 W.Va. 656, 413 S.E.2d 897, and concluded that the Garnes analysis satisfied the requirements of BMW. The Vandevender Court observed that,
[w]hile the BMW decision clearly delineates three "guideposts" for use in connection with the review of punitive damage awards, these so-called "guideposts" are merely reiterations of factors previously-adopted by both this Court and the United States Supreme Court. Contrary to Sheetz' position that BMW somehow alters this State's law on punitive damages review,... [o]ther than utilizing the "guidepost" terminology, BMW does not depart from existing law regarding punitive damages. Although BMW confines its analysis of the issue of notice to these three "guideposts"a term that certainly suggests the possible use of additional factorsthere is nothing in BMW that eliminates reference to previously-delineated factors that are not among the big three "guideposts." Proof of this point is gleaned from the section of the BMW opinion that discusses the second "guidepost." Although that particular "guidepost" is phrased in terms of the ratio between the plaintiff's compensatory damages and the amount of the punitive damages, the BMW opinion approvingly quotes its prior decision in TXO [Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)], as stating "the proper inquiry" to be "`"whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred."'" 517 U.S. at [581] 116 S.Ct. at 1602 (quoting *895 TXO, 509 U.S. at 460, 113 S.Ct. at 2721-22) (emphasis in original), quoting [Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991)]. Thus, the Supreme Court's own analysis in BMW demonstrates by its reference to an expanded concept of "the proper inquiry" necessary to a ratio comparison that the "guideposts" were not crafted for the purpose of replacing existing law on punitive damages nor were they intended to be viewed in a limiting fashion, as Sheetz suggests. See Rush [v. Scott Specialty Gases, Inc., 930 F.Supp. 194, 201 (E.D.Pa.1996),] (referring to BMW, TXO, and Haslip and noting "[o]ur reading of these three opinions reveals a presumably non-exclusive list of factors that combine to create a reasonable verdict") (emphasis supplied)[, rev'd on other grounds, 113 F.3d 476 (3rd Cir.1997)]. Upon analysis, there is simply no basis for Sheetz' suggestion that BMW demands that punitive damages awards be reviewed differently from the fashion in which they are currently being reviewed under Garnes and its progeny.
Vandevender v. Sheetz, Inc., 200 W.Va. at 605-06, 490 S.E.2d at 692-93. Although the Garnes analysis has been determined to satisfy the principles of BMW, we note that there is one guidepost from BMW that is not expressly set out in our Garnes analysis. That guidepost is a comparison of the punitive damages award with civil or criminal sanctions that could be imposed for comparable misconduct.[91] In this regard, DuPont argues that the punitive award vastly exceeds civil penalties for comparable conduct. In support of this argument, DuPont submits that the WV DEP does not make its penalties publicly available, but the highest penalty discussed in a published judicial decision was only $100,000 imposed for the illegal discharge of raw sewage into a waterway.[92] DuPont further contends that the highest fine ever imposed by EPA's Region 3, which includes West Virginia, is $12 million for a "catastrophic explosion" that killed a worker and caused a "massive discharge of spent sulfuric acid." The Plaintiffs point out that the examples set out by DuPont are far from similar to the conduct involved in the case sub judice.[93] While we find that these civil penalties provide some guidance, we agree with the Plaintiffs that the duration and extent of the exposure to toxic substances involved in the instant case does not compare with that of DuPont's examples. Thus, we do not believe that the civil penalties relied upon by DuPont set the proper measuring tool.
(ii). State Farm Mutual Automobile Insurance Co. v. Campbell. Finally, DuPont argues that the punitive damages award is excessive pursuant to the ratio established by the United States Supreme Court in State Farm.[94] We disagree. The State Farm Court established that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution...." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425, 123 S.Ct. 1513, 1524, 155 L.Ed.2d 585 (2003). Thus, any punitive damages award that is in single digits would presumptively be within the constitution. In the instant case, we have reduced the punitive damages award to $117,720,000 by removing that portion of the award that related to the Plaintiffs' medical monitoring claims. As we have previously observed in this opinion, comparing the punitive damages award of $117,720,000 to the $55,537,522.25 awarded to the Plaintiffs for property remediation, the ratio becomes 2.1:1. Moreover, should the *896 Plaintiffs accept the $20 million remittitur herein ordered, the punitive damages will be further reduced to $97,720,000, and the ratio to compensatory damages will be 1.76:1. Therefore, we find that this award does not violate the principles of due process under State Farm.[95]
In summary, to conclude our review of the punitive damages award in the instant case, we reverse the circuit court's award of punitive damages in connection with the Plaintiffs' claims for medical monitoring, and therefore reduce the punitive damages award by forty percent, leaving punitive damages in the amount of $117,720,000, to be applied solely to the claims of the property class. In addition, we reverse the circuit court insofar as it declined to give DuPont credit for the $20 million it expended to remediate the Spelter smelter site, and grant a remittitur in that amount. In all other respects, the circuit court's order denying DuPont's motion to vacate or reduce the punitive damages award is affirmed.[96]

IV.

CONCLUSION
For the reasons set out in the body of this opinion, the September 14, 2007, order of the circuit court granting summary judgment in favor of Diamond upon the indemnification issue, and the February 15, 2008, order directing payment by DuPont in the amount of $814,949.37 for Diamond's costs and expenses, are affirmed. The September 14, 2007, and September 20, 2007, orders of the circuit court are affirmed in part and reversed in part. We affirm that portion of the orders granting partial summary judgment in favor of DuPont with respect to the property damage claims of those plaintiffs subject to the Grasselli deeds. We reverse those portions of the September 14, 2007, and September 20, 2007, orders granting summary judgment in favor of the Plaintiffs on the issue of the statute of limitations. Accordingly, we remand with directions to the circuit court to hold a jury trial on the sole issue of when the Plaintiffs possessed the requisite knowledge to trigger the running of the statute of limitations. If the jury determines that the Plaintiffs did not have the requisite knowledge more than two years prior to filing their cause of action, then the judgment in favor of the Plaintiffs, as modified by this opinion, stands. If, however, the jury determines that the Plaintiffs had the requisite knowledge more than two years prior to filing their cause of action, then the trial court must set aside the verdict and render judgment in favor of DuPont.
Furthermore, the circuit court's order of September 14, 2006, granting class certification, is affirmed. Likewise, we affirm the circuit court's rulings admitting certain evidence pursuant to Rule 404(b) of the West Virginia Rules of Evidence, qualifying Dr. Kirk Brown as an expert witness and allowing his testimony, and utilizing a verdict form and certain instructions that were objected to by DuPont. In addition, we find the evidence was sufficient to support the jury's medical monitoring verdict finding significant exposure and increased risk.
Finally, we reverse the punitive damages award. Because we have concluded that punitive damages are not proper on a cause of action for medical monitoring, we reduce the punitive damages award by forty percent. In addition, we find that mitigating circumstances warranted a $20,000,000 reduction in the punitive damages award. Accordingly, we remand with directions that the trial *897 court give the Plaintiffs a period of thirty days from the issuance of this Court's mandate to decide whether they will accept a punitive damages remittitur in the amount of $20,000,000, resulting in a total punitive damages verdict of $97,720,000, or submit to a new trial on punitive damages only.
Affirmed, in part, Conditionally Affirmed, in part, Reversed, in part, and Remanded.
Justice BENJAMIN and Justice McHUGH disqualified.
Judge DEREK C. SWOPE, and Judge ALAN D. MOATS, sitting by temporary assignment.
Chief Justice DAVIS concurs, in part, dissents, in part, and reserves the right to file a separate opinion.
Justice WORKMAN concurs, in part, dissents, in part, and reserves the right to file a separate opinion.
Justice KETCHUM concurs, in part, dissents, in part, and reserves the right to file a separate opinion.
DAVIS, Chief Justice, concurring, in part, and dissenting, in part:
I wish to take this opportunity to commend Judge Moats on his very thorough and well-reasoned opinion in this case. Although the assignments of error presented were numerous and, at times, quite complex, the resulting opinion will prove to be an invaluable resource to members of the bench and the bar faced with similar issues and, most especially, as to the precise procedure to be followed in determining the correctness of a punitive damages award. Nevertheless, I am compelled to write separately to respond to two, distinct issues: (1) Justice Ketchum's objection to Dr. Brown's expert testimony and (2) the majority's refusal to permit the recovery of punitive damages for medical monitoring.
First, I concur generally with the majority's opinion in this case except with respect to its refusal to permit the Plaintiffs to recover punitive damages in connection with their claim for medical monitoring. In addition to this general concurrence, I also concur specially with respect to the majority's decision finding the testimony of the Plaintiffs' expert, Dr. Kirk Brown, to be admissible. Justice Ketchum, in his separate opinion dissenting, in part, relies heavily upon an unpublished decision from the United States District Court for the Northern District of Oklahoma, which court also considered the admissibility of Dr. Brown's expert testimony in a case strikingly similar to the case sub judice. See Palmer v. Asarco Inc., Nos. 03-CV-0498-CVE-PJC, 03-CV-0565-CVPJC, 03-CV-0566-CVE-PJC, 03-CV-0567-CVE-PJC, 03-CV-0569-CVE-PJC, 2007 WL 2302584 (N.D.Okla. Aug. 7, 2007). In summary, Justice Ketchum interprets Palmer as precluding Dr. Brown's expert testimony in that case. Extending the application of Palmer to the instant proceeding, Justice Ketchum then suggests that Dr. Brown should have been prevented from testifying in the case sub judice. With Justice Ketchum's interpretation and proposed application of Palmer, I disagree.
In Palmer, the court considered Dr. Brown's expert qualifications in relation to matters about which he was proffered to testify. The Palmer Court then permitted Dr. Brown to testify as to all but two issues about which the plaintiffs sought his testimony. The two issues upon which Dr. Brown's testimony was excluded(1) whether "lead from each defendant's chat pile reached each plaintiffs residence"[1] and (2) whether "any child has had such [lead] exposure or has had an elevated blood lead level"[2]are matters that were not put in issue in the case sub judice and about which the Plaintiffs did not seek Dr. Brown's testimony. However, the district court permitted Dr. Brown to testify as to all other matters about which the Palmer plaintiffs sought to introduce his expert testimony, including that "wind-blown dust has caused lead contamination in [the affected communities]"[3] and that there exists "an increased risk of lead exposure for children *898 living in [those communities]"[4]issues about which Dr. Brown also testified in the case sub judice. Insofar as the court's ruling in Palmer was rendered approximately one month before the commencement of the underlying jury trial in this case, I find the Palmer court's decision particularly persuasive and concur in the majority's decision finding Dr. Brown's expert testimony to be admissible in the case presently before the Court.
Second, and more importantly, I write separately to respond to the majority's decision prohibiting the Plaintiffs from receiving punitive damages in connection with the successful litigation of their medical monitoring claim. The position taken by the majority on this issue is inconsistent with and confuses existing law, and, therefore, from this ruling, I strongly dissent.

A CLAIM FOR MEDICAL MONITORING SUPPORTS AN AWARD OF PUNITIVE DAMAGES
Whether punitive damages may be recovered in connection with a claim seeking medical monitoring is an issue of first impression in West Virginia. A review of the established law of this State, as well as decisions from other jurisdictions, supports the award of punitive damages in a medical monitoring claim.

I. Purpose of Medical Monitoring Cause of Action
In Bower v. Westinghouse Electric Corporation, 206 W.Va. 133, 522 S.E.2d 424 (1999), this Court recognized a cause of action for medical monitoring costs. See Syl. pt. 2, id. ("A cause of action exists under West Virginia law for the recovery of medical monitoring costs, where it can be proven that such expenses are necessary and reasonably certain to be incurred as a proximate result of a defendant's tortious conduct.").[5] Succinctly stated, "[a] claim for medical monitoring seeks to recover the anticipated costs of long-term diagnostic testing necessary to detect latent diseases that may develop as a result of tortious exposure to toxic substances." Bower, 206 W.Va. at 138, 522 S.E.2d at 429. In other words, "a claim for medical monitoring is essentially `a claim for future damages.'" Id., 206 W.Va. at 138-39, 522 S.E.2d at 429-30 (quoting Ball v. Joy Techs., Inc., 958 F.2d 36, 39 (4th Cir.1991)).
The injury sustained by the plaintiff seeking medical monitoring is "`the exposure itself and the concomitant need for medical testing.'" Bower, 206 W.Va. at 139, 522 S.E.2d at 430 (quoting Hansen v. Mountain Fuel Supply Co., 858 P.2d 970, 977 (Utah 1993) (citations omitted)). Stated otherwise,
"The `injury' that underlies a claim for medical monitoringjust as with any other cause of action sounding in tortis `the invasion of any legally protected interest.'" Bower v. Westinghouse Electric Corp., 206 W.Va. 133, 139, 522 S.E.2d 424, 430 (1999) quoting Restatement (Second) of Torts § 7(1) (1964). The specific invasion of a legally protected interest in a medical monitoring claim[ ] consists of "a significantly increased risk of contracting a particular disease relative to what would be the case in the absence of exposure." 206 W.Va. at 142, 522 S.E.2d at 433.
State ex rel. Chemtall Inc. v. Madden, 216 W.Va. 443, 455-56, 607 S.E.2d 772, 784-85 (2004). Accord Bandy v. Trigen-Biopower, Inc., No. 3:02-CV-459, 2006 WL 5321815, at *5 (E.D.Tenn. May 5, 2006) ("The de minimus `physical injury' of ingesting a harmful substance can sufficiently satisfy the physical injury or manifestation rule so as to justify *899 the award of ... medical monitoring." (citation omitted)); Barnes v. The American Tobacco Co., Inc., 989 F.Supp. 661, 665 (E.D.Pa. 1997) ("[T]he injury that a person claims under a medical monitoring cause of action is the cost of the medical care that will, one hopes, detect that injury.... This injury is similar to a claim for damages to a person that could be asserted in a traditional negligence or strict liability action." (internal quotations and citations omitted)); Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 225-26, 914 N.E.2d 891, 901 (2009) ("When competent medical testimony establishes that medical monitoring is necessary to detect the potential onset of a serious illness or disease due to physiological changes indicating a substantial increase in risk of harm from exposure to a known hazardous substance, the element of injury and damage will have been satisfied and the cost of that monitoring is recoverable in tort.").
A medical monitoring plaintiff is compensated for such injury, or made whole, by requiring the defendant responsible for the plaintiff's exposure to toxic substances to compensate the plaintiff for the expenses of the medical monitoring incurred by the plaintiff:
"It is difficult to dispute that an individual has an interest in avoiding expensive diagnostic examinations just as he or she has an interest in avoiding physical injury. When a defendant negligently invades this interest, the injury to which is neither speculative nor resistant to proof, it is elementary that the defendant should make the plaintiff whole by paying for the examinations."
Bower, 206 W.Va. at 139, 522 S.E.2d at 430 (quoting Friends for All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816, 826 (D.C.Cir.1984) (emphasis added) (footnote omitted)). See also Bower, 206 W.Va. at 142, 522 S.E.2d at 433 ("Liability for medical monitoring is predicated upon the defendant being legally responsible for exposing the plaintiff to a particular hazardous substance.").
Accordingly, "`the cost of medical surveillance is a compensable item of damages'" when the elements of a claim for medical monitoring have been satisfied. Bower, 206 W.Va. at 141, 522 S.E.2d at 432 (quoting Ayers v. Township of Jackson, 106 N.J. 557, 606, 525 A.2d 287, 312 (1987)). Accord Bower, 206 W.Va. at 142, 522 S.E.2d at 433 ("`[F]uture medical monitoring ... is ... a compensable item of damage when liability is established[.]'" (quoting Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965, 1007, 25 Cal.Rptr.2d 550, 578, 863 P.2d 795, 823 (1993) (en banc))). Cf. Bower, 206 W.Va. at 142, 522 S.E.2d at 433 ("Medical monitoring must be available in order to be a necessary, compensable item of damages.").

II. Purpose of Punitive Damages Award
Punitive damages are awarded to punish and deter defendants who have acted "`maliciously, wantonly, mischievously or with criminal indifference to civil obligations.'" Peters v. Rivers Edge Mining, Inc., 224 W.Va. 160, 190, 680 S.E.2d 791, 821 (2009) (quoting Syl. pt. 3, in part, Jopling v. Bluefield Water Works & Improvement Co., 70 W.Va. 670, 74 S.E. 943 (1912)). Accord Syl. pt. 1, O'Brien v. Snodgrass, 123 W.Va. 483, 16 S.E.2d 621 (1941) ("Punitive or exemplary damages are such as, in a proper case, a jury may allow against the defendant by way of punishment for wilfulness, wantonness, malice, or other like aggravation of his wrong to the plaintiff, over and above full compensation for all injuries directly or indirectly resulting from such wrong."); Syl. pt. 4, Mayer v. Frobe, 40 W.Va. 246, 22 S.E. 58 (1895) ("In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous."). Punitive damages are not designed to compensate an injured plaintiff for his/her actual loss; such compensation is achieved through compensatory, not punitive, damages. See Robin Jean Davis and Louis J. Palmer, Jr., Punitive Damages Law in West Virginia, at 4, available at http://www.state.wv.us/wvsca/PunitiveDamages2010.pdf (last visited Mar. 26, 2010).
In order to recover punitive damages from a defendant, a plaintiff must prove that the *900 defendant's wrongful conduct caused the plaintiff's injury and resultant damages. "`[T]he right to recover punitive damages in any case is not the cause of action itself, but a mere incident thereto.'" Davis & Palmer, Punitive Damages Law, at 7 (quoting Lyon v. Grasselli Chem. Co., 106 W.Va. 518, 521, 146 S.E. 57, 58 (1928)) (footnote omitted). Thus, a plaintiff must have sustained an injury and be awarded compensatory damages therefor before he/she may receive an award of punitive damages: "an award of compensatory damages is a necessary predicate for an award of punitive damages. That is, punitive damages may not be awarded by a jury, if the jury fails to award compensatory damages." Davis & Palmer, id., at 7 (footnotes omitted). This is so because "[p]unitive damages must bear a reasonable relationship to the potential of harm caused by the defendant's actions." Syl. pt. 1, in part, Garnes v. Fleming Landfill, Inc., 186 W.Va. 656, 413 S.E.2d 897 (1991) (overruling Wells v. Smith, 171 W.Va. 97, 297 S.E.2d 872 (1982), which allowed jury to award punitive damages without finding compensatory damages). However, "when compensatory damages are not large enough to convince a defendant or future defendants to take precautions" to avoid the misconduct that resulted in the plaintiff's injury, "[p]unitive damages are necessary... to discourage [the defendant's or future defendants'] future bad acts." Garnes, 186 W.Va. at 660-61, 413 S.E.2d at 901-02 (citation omitted).

III. Availability of Punitive Damages for Medical Monitoring
While many courts have recognized medical monitoring, either as a distinct cause of action or as a recoverable item of damages, few courts have definitively authorized an award of punitive damages in a medical monitoring claim. Despite this scant authority, support nevertheless exists for such an award.

A. West Virginia
Although we recognized a cause of action for medical monitoring in Bower, we did not determine whether punitive damages are available in connection with such a claim. Subsequent opinions have touched on the issue, but have not definitively ruled thereon. In our first Chemtall opinion, State ex rel. Chemtall Inc. v. Madden, 216 W.Va. 443, 607 S.E.2d 772 (2004), we observed that the "[p]etitioners reserve other substantive challenges... which are not addressed in this case, including the propriety of punitive damages" for medical monitoring. 216 W.Va. at 450 n. 3, 607 S.E.2d at 779 n. 3. Later, in our third Chemtall opinion, State ex rel. Chemtall, Inc. v. Madden, 221 W.Va. 415, 655 S.E.2d 161 (2007) (per curiam), we determined that deciding whether punitive damages are available for medical monitoring was premature in the context of that case insofar as a final verdict had not yet been rendered because the case had not yet gone to trial:
[W]e ... decline, at this early pre-trial stage, to address the petitioners' claim that punitive damages are not available in cases in which only medical monitoring damages are sought.... [W]e are convinced that appellate review of this issue is better left to the review of a verdict after complete development of all the facts and testimony and after a trial of all the issues.[6]
221 W.Va. at 421 & n. 5, 655 S.E.2d at 167 & n. 5 (footnote retained from original text). However, in his separate opinion to Chemtall III, Justice Benjamin suggested that "[p]unitive damages are not appropriate in an equitable medical monitoring class action" because the medical monitoring plaintiffs "have not asserted personal injury claims, as they have not suffered any actual, present physical injuries from their alleged exposure to [the defendants'] products." 221 W.Va. at 425, 655 S.E.2d at 171 (Benjamin, J., concurring, in part, and dissenting, in part). In reaching this conclusion, Justice Benjamin *901 rejected the definition of a medical monitoring injury discussed in Chemtall I, wherein we referenced the "`significantly increased risk of contracting a particular disease.'" 221 W.Va. at 425, 655 S.E.2d at 171 (Benjamin, J., concurring, in part, and dissenting, in part) (quoting Chemtall I, 216 W.Va. at 455, 607 S.E.2d at 784) (emphasis added by Justice Benjamin).

B. Other Jurisdictions
Other jurisdictions also have been reluctant to definitely determine whether punitive damages are available in a claim for medical monitoring. Only the United States District Court for the Eastern District of Pennsylvania has definitively spoken on this issue. In Carlough v. Amchem Products, Inc., 834 F.Supp. 1437 (E.D.Pa.1993), the court observed that "the exposure-only plaintiffs [therein] have alleged a cognizable claim for medical monitoring and punitive damages" and observed, further, that "it is not uncommon for plaintiffs to join claims for punitive damages with claims for medical monitoring." 834 F.Supp. at 1459-60 (footnote omitted) (citing Sterling v. Velsicol Chem. Corp., 855 F.2d 1188 (6th Cir.1988), modified on other grounds as stated in American & Foreign Ins. Co. v. General Elec. Co., 45 F.3d 135 (6th Cir.1995); Day v. NLO, Inc., 814 F.Supp. 646 (S.D.Ohio 1993); Cook v. Rockwell Int'l Corp., 755 F.Supp. 1468 (D.Colo.1991); In re Fernald Litig., No. C-1-85-149, 1989 WL 267039 (S.D.Ohio Sept. 29, 1989); Catasauqua Area Sch. Dis. v. Raymark Indus., Inc., 662 F.Supp. 64 (E.D.Pa.1987)).
More recently, this same court has, in the context of interpreting and applying Delaware state law, concluded that "the Delaware Supreme Court would permit a claim for medical monitoring." Guinan v. A.I. duPont Hosp. for Children, 597 F.Supp.2d 517, 538 (E.D.Pa.2009). However, the district court then deviated from its prior ruling in Carlough and determined that
[l]imiting the remedy [in medical monitoring cases] to compensatory damages and expressly excluding noneconomic and punitive damages serves as a disincentive to the hordes of plaintiffs' attorneys who the Supreme Court feared might be tempted to bring an onslaught of medical monitoring litigation. See Paoli I, [In re Paoli R.R. Yard PCB Litig., 916 F.2d 829,] 850 [(3d Cir.1990)] ("[A]n action for medical monitoring seeks to recover only the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm ....") (emphasis added); Friends for All Children, [Friends for All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816,] 826 [(D.C.Cir.1984)] (noting that "[i]n the absence of physical symptoms, emotional distress caused by potential risk may ... be thought too speculative to support recovery").
597 F.Supp.2d at 540 n. 10 (referencing Metro-North Commuter R.R. Co. v. Buckley, 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997)).
Subsequently, in Hess v. A.I. DuPont Hospital for Children, No. 08-0229, 2009 WL 595602 (E.D.Pa. Mar. 5, 2009), the district court again quoted this language from Paoli to the effect that "the remedy for a medical monitoring claim is `only the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm.'" 2009 WL 595602, at *13 (quoting In re Paoli R.R. Yard PCB Litig., 916 F.2d at 850) (footnote and additional citations omitted). The court then commented that, "[i]n Guinan I, [Guinan v. A.I. duPont Hospital for Children, 597 F.Supp.2d 517 (E.D.Pa.2009),] we interpreted this language to mean that punitive damages are not available with medical monitoring claims. [597 F.Supp.2d] at [540] n. 10." 2009 WL 595602, at *13 n. 9.[7]
Other jurisdictions, though not definitely allowing or disallowing punitive damages in medical monitoring, have nevertheless implicitly *902 allowed punitive damages to be recovered in medical monitoring cases. In each of these cases, the plaintiffs asserted claims seeking both medical monitoring costs and punitive damages. The majority of courts presented with such claims have permitted the punitive damages claims to proceed because the courts have not expressly found that punitive damages are improper in conjunction with a medical monitoring claim. However, these courts have not directly ruled upon the punitive damages issue, finding instead that punitive damages are more properly tried on an individual case-by-case basis rather than in a class action, either because the facts supporting a punitive damages award are too individualized or because the plaintiffs are residents of different states, each of which has different standards for the imposition of punitive damages. See In re Baycol Prods. Litig., 218 F.R.D. 197 (D.Minn.2003) (medical monitoring claims failed to satisfy requirements for class certification, and punitive damages not proper for class certification because different facts supported individual plaintiffs' claims for punitive damages and different states' laws governed punitive damages awards); Lewallen v. Medtronic USA, Inc., No. C 01-20395 RMW, 2002 WL 31300899 (N.D.Cal. Aug. 28, 2002) (punitive damages not proper for class certification because different facts supported individual plaintiffs' claims for punitive damages and different states' laws governed punitive damages awards); In re Telectronics Pacing Sys., Inc., 172 F.R.D. 271 (S.D.Ohio 1997) (punitive damages not proper for class certification because different states' laws governed punitive damages awards); Baker v. Wyeth-Ayerst Labs. Div., 338 Ark. 242, 251, 992 S.W.2d 797, 802 (1999) (medical monitoring claims failed to satisfy requirements for class certification, but acknowledging, regarding superiority inquiry, that "the asymptomatic plaintiffs also asked for punitive damages, which could justify the cost of individual litigation"). See also Hansen v. The American Tobacco Co., Inc., No. LR-C-96-881, 1999 WL 33659388 (E.D.Ark. July 21, 1999) (medical monitoring claims failed to satisfy requirements for class certification, thus not reaching issue of whether punitive damages are available for medical monitoring); Marin v. Brush Wellman, Inc., No. B208202, 2009 WL 2596259 (Cal.Ct.App. Aug. 24, 2009) (same); Wilson v. Brush Wellman, Inc., 103 Ohio St.3d 538, 817 N.E.2d 59 (2004) (same). Cf. Abbatiello v. Monsanto Co., 522 F.Supp.2d 524, 543 (S.D.N.Y.2007) (upholding plaintiffs' claims, including claim for medical monitoring, and concluding that plaintiffs' "allegations of [defendants'] willful and wanton misconduct can be asserted as part of an `underlying cause of action upon which a demand for punitive damages can be grounded'" (quoting Rocanova v. Equitable Life Assurance Soc'y of the U.S., 83 N.Y.2d 603, 616, 612 N.Y.S.2d 339, 344, 634 N.E.2d 940, 945 (1994))). But see Gallien v. Procter & Gamble Pharms., Inc., No. 09 Civ. 6903(JFK), 2010 WL 768937, at *5 (S.D.N.Y. Mar. 5, 2010) (denying punitive damages for medical monitoring because, under Louisiana law, statute must specifically authorize punitive damages and governing statute did not specifically authorize punitive damages in connection with medical monitoring claim); Trimble v. Asarco, Inc., 232 F.3d 946 (8th Cir.2000) (denying punitive damages for medical monitoring because neither medical monitoring nor punitive damages are cognizable claims under Nebraska law), abrogated on other grounds by Exxon Mobil Corp. v. Allapattah Servs. Inc., 545 U.S. 546, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005).
Still other courts have permitted plaintiffs to amend their complaints to add punitive damages claims. See, e.g., In re Harvey Term Litig., 872 So.2d 584 (La.Ct.App.2004) (permitting plaintiffs asserting claims for medical monitoring and property remediation to amend complaint to assert facts in support of claim for punitive damages); Foust v. Southeastern Pennsylvania Transp. Auth., 756 A.2d 112 (Pa.Commw.Ct.2000) (upholding plaintiffs' amended complaint which added class claims for medical monitoring, emotional distress, property damage, and punitive damages).

IV. Allowing Punitive Damages for Medical Monitoring is Consistent with Existing West Virginia Punitive Damages Law
Allowing punitive damages to be recovered in connection with a medical monitoring *903 claim is consistent with West Virginia punitive damages law. Apart from the wrongfulness of the defendant's conduct, a plaintiff seeking punitive damages must prove that the defendant's misconduct caused his/her injury, and the plaintiff must receive an award of compensatory damages for such injury. See Syl. pt. 1, Garnes v. Fleming Landfill, Inc., 186 W.Va. 656, 413 S.E.2d 897 (1991); Davis & Palmer, Punitive Damages Law, at 7.
In a claim for medical monitoring, both of these criteria are satisfied. First, we recognized in Bower that "`the exposure itself and the concomitant need for medical testing constitute the injury.'" Bower, 206 W.Va. at 139, 522 S.E.2d at 430 (quoting Hansen v. Mountain Fuel Supply Co., 858 P.2d at 977 (citations omitted)). Accord State ex rel. Chemtall Inc. v. Madden, 216 W.Va. at 455-56, 607 S.E.2d at 784-85 (discussing injury in medical monitoring claim as invasion of legally protected interest due to "`significantly increased risk of contracting a particular disease'" (quoting Bower, 206 W.Va. at 142, 522 S.E.2d at 433)). Second, a medical monitoring plaintiff is made whole when the defendant is required to pay for his/her medical examinations. Bower, 206 W.Va. at 139, 522 S.E.2d at 430. Thus, "[m]edical monitoring... [is a] compensable item of damages." Bower, 206 W.Va. at 142, 522 S.E.2d at 433. Accord Fried v. Sungard Recovery Servs., Inc., 925 F.Supp. 372, 374 (E.D.Pa. 1996) ("Under the medical monitoring case-law, a plaintiff will only be entitled to medical monitoring if he or she can prove, through reliable expert testimony, that surveillance to monitor the effects of exposure to toxic chemicals is reasonable and necessary. If a plaintiff can make such a showing, those future medical expenses are simply compensatory damages like any other medical expenses." (emphasis added) (internal quotations and citation omitted)); Cook v. Rockwell Int'l Corp., 778 F.Supp. 512, 514 (D.Colo.1991) ("`A medical monitoring claim compensates a plaintiff for diagnostic treatment, a tangible and quantifiable item of damage caused by a defendant's tortious conduct. Such relief is akin to future medical expenses.'" (quoting Cook v. Rockwell Int'l Corp., 755 F.Supp. 1468, 1478 (D.Colo. 1991))).
Moreover, recovery of punitive damages in connection with a claim for medical monitoring in which no present physical injury is manifest but continuous medical testing is needed to determine if and/or when such physical injury will manifest itself is consistent with our allowance of punitive damages in connection with a claim for intentional infliction of emotional distress that requires medical treatment. In Tudor v. Charleston Area Medical Center, Inc., 203 W.Va. 111, 506 S.E.2d 554 (1997), we recognized that an award for intentional infliction of emotional distress damages may have an inherently punitive component, particularly where there exists no present injury and no present treatment is required. However, where treatment is required, emotional distress damages are more akin to compensatory damages. Thus, an additional award of punitive damages is permissible and is not duplicative.
In cases where the jury is presented with an intentional infliction of emotional distress claim, without physical trauma or without concomitant medical or psychiatric proof of emotional or mental trauma, i.e. the plaintiff fails to exhibit either a serious physical or mental condition requiring medical treatment, psychiatric treatment, counseling or the like, any damages awarded by the jury for intentional infliction of emotional distress under these circumstances necessarily encompass punitive damages and, therefore, an additional award for punitive damages would constitute an impermissible double recovery. Where, however, the jury is presented with substantial and concrete evidence of a plaintiff's serious physical, emotional or psychiatric injury arising out of the intentional infliction of emotional distress, i.e. treatment for physical problems, depression, anxiety, or other emotional or mental problems, then any compensatory or special damages awarded would be in the nature of compensation to the injured plaintiff(s) for actual injury, rather than serving the function of punishing the defendant(s) and deterring such future conduct, a punitive damage award in such *904 cases would not constitute an impermissible double recovery.

Syl. pt. 14, in part, Tudor, 203 W.Va. 111, 506 S.E.2d 554 (emphasis added).
In a claim for medical monitoring, ongoing treatment, by way of testing, is required as it is in cases in which an emotional distress plaintiff requires ongoing medical care. Thus, an award for medical monitoring is compensatory in nature insofar as it reimburses the injured plaintiff for the cost of medical testing occasioned by the defendant's wrongful conduct such that an additional award of punitive damages would not be duplicative of the plaintiff's medical monitoring recovery. This reasoning is consistent with our recognition in Bower that no recovery may be had for medical monitoring where no testing is available for the plaintiff's potential injury. See Bower, 206 W.Va. at 142, 522 S.E.2d at 433 ("Medical monitoring must be available in order to be a necessary, compensable item of damages. `If no such test exists, then periodic monitoring is of no assistance and the cost of such monitoring is not available.'" (quoting Bourgeois v. A.P. Green Indus., Inc., 716 So.2d 355, 361 (La.1998), superseded by statute on other grounds as stated in Edwards v. State ex rel. Dep't of Health & Hosps. for Southeast Louisiana State Hosp. at Mandeville, La., 804 So.2d 886 (La.Ct.App.2001))).
Despite this jurisprudential foundation to support an award of punitive damages for medical monitoring, the majority, instead, has held, in Syllabus point 5, that "[p]unitive damages may not be awarded on a cause of action for medical monitoring." With this holding, the majority has essentially eviscerated any potential recovery of punitive damages not only for medical monitoring claims but also for claims of intentional infliction of emotional distress, effectively overruling Syllabus point 14 of Tudor. The holding announced by the majority today fails to distinguish between these two types of claims or to explain why a plaintiff who requires ongoing future medical treatment for emotional distress is entitled to an award of punitive damages but a plaintiff who requires ongoing future medical monitoring for a fatal illness is not entitled to such an award. Both plaintiffs were innocent bystanders of a defendant's tortious conduct, and, in both cases, the defendant's conduct was so egregious as to require the plaintiffs to require ongoing future medical care. Yet, the plaintiff receiving medical care to detect whether the defendant's conduct has caused him/her to develop a fatal illness is not entitled to punitive damages. This plaintiff could die as a result of the defendant's conduct, but this Court will not permit either this plaintiff, or his/her estate, to recover damages to punish a defendant who has acted "`maliciously, wantonly, mischievously or with criminal indifference to civil obligations.'" Peters v. Rivers Edge Mining, Inc., 224 W.Va. at 190, 680 S.E.2d at 821 (quoting Syl. pt. 3, in part, Jopling v. Bluefield Water Works, 70 W.Va. 670, 74 S.E. 943). Such a result is inconsistent, unfair, inequitable, unjust, and, in a nutshell, just plain wrong.
The net effect of the majority's holding on the principles recognized in Tudor will be twofold. First, every plaintiff seeking medical monitoring will necessarily add a claim for intentional infliction of emotional distress to ensure that he/she will be permitted to seek and recover an award of punitive damages. Second, every defendant who is currently embroiled in a lawsuit in which the plaintiff has advanced a claim for intentional infliction of emotional distress and has been awarded punitive damages has been put on alert to appeal the punitive damages award. These defendants will then knock on this Court's door to ask that they be excused from paying punitive damages because the analogous case of Perrine v. DuPont holds that punitive damages cannot be awarded for future medical care. Although I do not believe that this upheaval of our punitive damages precedent was intended by the majority of the Court when it rendered its decision in this case, such is the practical effect of this Court's holding. Therefore, until this Court is presented with the opportunity to revisit either its holding disallowing punitive damages for medical monitoring or its holding allowing punitive damages for intentional infliction of emotional distress, the availability of punitive damages remains uncertain and creates much confusion for members of the bench and the bar alike.

*905 V. Additional Considerations Supporting an Award of Punitive Damages for Medical Monitoring
In addition to this Court's punitive damages law and our prior decision in Tudor, additional considerations support the award of punitive damages in connection with a claim for medical monitoring: (1) procedural safeguards that prevent a duplicative, double recovery of punitive damages in a subsequent personal injury action and (2) this Court's allowance of punitive damages in other cases of first impression.

A. Effect of Medical Monitoring Punitive Damages on Subsequent Personal Injury Recovery
As we recognized in Tudor, a plaintiff may not twice recover punitive damages for the same injury inflicted by the same defendant. See Syl. pt. 14, Tudor, 203 W.Va. 111, 506 S.E.2d 554. However, a medical monitoring plaintiff who receives punitive damages and then later has a manifestation of the injury the monitoring is designed to detect, files suit for such physical injury,[8] and receives an award of compensatory and punitive damages could potentially receive such an impermissible double recovery. Several safeguards are in place, however, to ensure that the injured plaintiff's recovery of punitive damages is not duplicative.
First, the factors to be considered in awarding and reviewing an award of punitive damages requires a consideration of the actions the defendant has taken in mitigation of his/her damages. See generally Syl. pts. 3 & 4, Garnes, 186 W.Va. 656, 413 S.E.2d 897 (detailing factors for jury and judge to consider in awarding punitive damages). See also Davis & Palmer, Punitive Damages Law, at 40 (indicating that review of punitive damages award under Garnes requires "an examination of any mitigating evidence that would permit a reduction in the amount of a punitive damage award"). Therefore, a trial court presiding over a personal injury case in which the plaintiff has previously received punitive damages in his/her medical monitoring suit must consider such damages as a mitigating factor with respect to the amount of punitive damages that may be awarded in the subsequent personal injury case and may have to remit said award to prevent an improper double recovery. See generally Davis & Palmer, id., at 40.
Moreover, our holding in Tudor specifically directs trial courts to review awards of emotional distress damages and corresponding awards of punitive damages to ensure no impermissible double recovery has occurred:
Where a jury verdict encompasses damages for intentional infliction of emotional distress, absent physical trauma, as well as for punitive damages, it is incumbent upon the circuit court to review such jury verdicts closely and to determine whether all or a portion of the damages awarded by the jury for intentional infliction of emotional distress are duplicative of punitive damages such that some or all of an award for punitive damages would constitute an impermissible double recovery. If the circuit court determines that an impermissible double recovery has been awarded, it shall be the court's responsibility to correct the verdict.
Syl. pt. 15, Tudor, 203 W.Va. 111, 506 S.E.2d 554. A similar standard should be implemented in medical monitoring cases insofar as an award of medical monitoring damages has been observed to inherently contain a deterrence component: "`[T]here is a deterrence value in recognizing medical surveillance claimsallowing plaintiffs to recover the cost of this care deters irresponsible *906 discharge of toxic chemicals by defendants.'" Bower, 206 W.Va. at 140, 522 S.E.2d at 431 (quoting Potter, 6 Cal.4th at 1008, 25 Cal. Rptr.2d at 579, 863 P.2d at 824) (additional internal quotations and citations omitted). Such reviews for mitigating factors and duplicity would ensure that a plaintiff will not receive an improper double recover of punitive damages for medical monitoring.

B. Punitive Damages Permitted in Other Cases of First Impression
As support for its decision to deny punitive damages in a claim for medical monitoring, the majority explains that there is "scant authority on this issue." Maj. Op. at 881, 694 S.E.2d at 881. Many times throughout the history of this Court, causes of action and theories of recovery presenting matters of first impression have been embraced and adopted. Among these matters of first impression presented for the Court's consideration are numerous causes of action that we have adopted as the law in this State and for which we have permitted the recovery of punitive damages. See, e.g., Kessel v. Leavitt, 204 W.Va. 95, 511 S.E.2d 720 (1998) (tortious interference with parental relationship); Persinger v. Peabody Coal Co., 196 W.Va. 707, 474 S.E.2d 887 (1996) (employer's fraudulent misrepresentation of employee's Workers' Compensation claim); Shamblin v. Nationwide Mut. Ins. Co., 183 W.Va. 585, 396 S.E.2d 766 (1990) (insurer's failure to settle claim within policy limits); Hayseeds, Inc. v. State Farm Fire & Cas., 177 W.Va. 323, 352 S.E.2d 73 (1986) (insurer's failure to pay insured's claim), modified on other grounds by Miller v. Fluharty, 201 W.Va. 685, 500 S.E.2d 310 (1997); Harless v. First Nat'l Bank in Fairmont, 169 W.Va. 673, 289 S.E.2d 692 (1982) (retaliatory discharge); Sprouse v. Clay Communication, Inc., 158 W.Va. 427, 211 S.E.2d 674 (1975) (libel action by candidate for public office); Sutherland v. Kroger Co., 144 W.Va. 673, 110 S.E.2d 716 (1959) (illegal search by private individual). See also Tudor v. Charleston Area Med. Ctr., Inc., 203 W.Va. 111, 506 S.E.2d 554 (1997) (clarifying when punitive damages may be recovered for intentional infliction of emotional distress); Bullman v. D & R Lumber Co., 195 W.Va. 129, 464 S.E.2d 771 (1995) (permitting landowner to recover punitive damages, in addition to treble damages authorized by W. Va.Code § 61-3-48a, for unauthorized destruction or removal of timber and other growing plants). Cf. Cattrell Cos., Inc. v. Carlton, Inc., 217 W.Va. 1, 614 S.E.2d 1 (2005) (permitting imposition of sanctions for party's failure to attend deposition in violation of W. Va. R. Civ. P. 37(d)).
I am not convinced that simply because scant authority exists to support a principle of law that it should, for that reason, be rejected out of hand, particularly when it is well-grounded in this Court's jurisprudence.

VI. Conclusion
In the final analysis, an award of punitive damages to a plaintiff who has prevailed on a claim for medical monitoring is consistent with the punitive damages law of this State. A claim for medical monitoring satisfies the initial punitive damages prerequisites of an injury and an award of compensatory damages. Moreover, various safeguards are already in place to ensure that a plaintiff who has been awarded punitive damages in connection with his/her medical monitoring claim does not obtain an impermissible double recovery of punitive damages in his/her subsequent personal injury suit in which damages are sought for the injury detected by the medical monitoring.
Although it is a matter of first impression for this Court and is a fairly new theory of recovery nationwide, punitive damages are available for medical monitoring.
"I am not an advocate for frequent changes in laws and constitutions. But laws and institutions must go hand in hand with the progress of the human mind. As that becomes more developed, more enlightened, as new discoveries are made, new truths discovered and manners and opinions change, with the change of circumstances, institutions must advance also to keep pace with the times[.]"[[9]]
*907 (Footnote added). Recognition of the right to recover punitive damages for medical monitoring appreciates advances in law, medicine, environmental science, and other fields that enable a plaintiff who has been wrongfully exposed to toxic substances to receive appropriate medical care and to hold the offending defendant accountable for his/her injuries.
While I also "am not an advocate for frequent changes in laws,"[10] I am an advocate for changes in the law that are legally correct and that are supported by the facts and law of a case. In this case, it is inequitable to deny Ms. Perrine and the other Plaintiffs an award of punitive damages for DuPont's egregious conduct that necessitates medical monitoring where both the facts and the applicable law support such an award. Because the majority of the Court has determined otherwise, I respectfully dissent.
WORKMAN, Justice, concurring, in part, and dissenting, in part:
While I am in agreement with the thorough, well-researched, and well-reasoned majority opinion regarding the bulk of the issues resolved, I disagree with the majority's conclusion regarding the availability of punitive damages in a medical monitoring cause of action. The majority holds that "[p]unitive damages may not be awarded on a cause of action for medical monitoring." I strongly disagree with this holding as punitive damages should be available in a medical monitoring cause of action, but only when the defendant's conduct rises to the level of willful, wanton, and egregious conduct warranting such an award.
The majority reaches its decision by relying upon the reasoning of a separate opinion of Justice Benjamin to the per curiam opinion by the Court in State ex rel. Chemtall Inc. v. Madden, 221 W.Va. 415, 655 S.E.2d 161 (2007). In the Chemtall separate opinion, in a single paragraph that falls short of a complete analysis of the issue, Justice Benjamin concludes that in a medical monitoring class action, the plaintiffs "have not asserted personal injury claims, as they have not suffered any actual, present physical injuries from their alleged exposure to petitioners' products" and, therefore, because there are no compensatory damages awarded, and there is no physical injury, there can be no punitive damages awarded. Id. at 425, 655 S.E.2d at 171.
Contrary to the separate opinion in Chemtall, which serves as the sole basis of the majority's holding in the instant case, this Court in Bower v. Westinghouse Electric Corp., 206 W.Va. 133, 522 S.E.2d 424 (1999), set forth the specific elements[1] which must be proven in order to prevail in a medical monitoring cause of action:
In order to sustain a claim for medical monitoring expenses under West Virginia law, the plaintiff must prove that (1) he or she has, relative to the general population, been significantly exposed; (2) to a proven hazardous substance; (3) through the tortious conduct of the defendant; (4) as a proximate result of the exposure, plaintiff has suffered an increased risk of contracting a serious latent disease; (5) the increased risk of disease makes it reasonably necessary for the plaintiff to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of the exposure; and (6) monitoring procedures exist that make the early detection of a disease possible
Id. at Syl. Pt. 3.[2] As part of the Court's discussion regarding the "injury" sustained in a medical monitoring cause of action, the Court opined as follows:
*908 The "injury" that underlies a claim for medical monitoring-just as with any other cause of action sounding in tort-is "the invasion of any legally protected interest." Restatement (Second) of Torts § 7(1) (1964). As one of the first courts to grapple with this subject observed:
It is difficult to dispute that an individual has an interest in avoiding expensive diagnostic examinations just as he or she has an interest in avoiding physical injury. When a defendant negligently invades this interest, the injury to which is neither speculative nor resistant to proof, it is elementary that the defendant should make the plaintiff whole by paying for the examinations.

Friends for All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816, 826 (D.C.Cir. 1984) (footnote omitted). "Although the physical manifestations of an injury may not appear for years, the reality is that many of those exposed have suffered some legal detriment; the exposure itself and the concomitant need for medical testing constitute the injury." Hansen v. Mountain Fuel Supply, 858 P.2d 970, 977 (Utah 1993) (citations omitted). A number of courts have employed similar logic to sustain claims for medical monitoring costs. See, e.g., Bourgeois v. A.P. Green Indus., Inc., 716 So.2d 355, 359 (La.1998); Potter v. Firestone Tire and Rubber Co., 6 Cal.4th 965, 1005, 25 Cal.Rptr.2d 550, 578, 863 P.2d 795, 822-23 (1993) (in bank); Cook v. Rockwell Int'l Corp., 755 F.Supp. 1468, 1477 (D.Colo.1991); Ayers v. Township of Jackson, 106 N.J. 557, 601-2, 525 A.2d 287, 308 (1987).
The court in Friends for All Children gave the following often-quoted hypothetical to illustrate the soundness of permitting recovery for necessary diagnostic testing even in the absence of physical injury:
Jones is knocked down by a motorbike which Smith is riding through a red light. Jones lands on his head with some force. Understandably shaken, Jones enters a hospital where doctors recommend that he undergo a battery of tests to determine whether he has suffered any internal head injuries. The tests prove negative, but Jones sues Smith solely for what turns out to be the substantial cost of the diagnostic examinations.

Id. Thus, it logically follows that a plaintiff asserting a claim for medical monitoring costs is not required to prove present physical harm resulting from tortious exposure to toxic substances.
Nor is the plaintiff required to demonstrate the probable likelihood that a serious disease will result from the exposure. As the Third Circuit indicated in Paoli I, "the appropriate inquiry is not whether it is reasonably probable that plaintiffs will suffer [physical] harm in the future, but rather whether medical monitoring is, to a reasonable degree of medical certainty, necessary in order to diagnose properly the warning signs of disease." 916 F.2d at 851. See also 2 Dan B. Dobbs, Law of Remedies § 8.1(3), at 380 n. 30 (2d ed. 1993) ("diagnosis expenses-medical monitoring-may be both reasonable and reasonably certain to occur in the future, even if the disease it is intended to diagnose is not reasonably certain to occur").
Bower, 206 W.Va. at 139-40, 522 S.E.2d at 430-31. Subsequently, in State ex rel. Chemtall Inc. v. Madden, 216 W.Va. 443, 607 S.E.2d 772 (2004), the Court determined that the circuit court erred in its conclusion that the statute of limitations had not begun to run in that case. While the circuit court found that the plaintiffs had not suffered an injury, this Court disagreed and stated that
[t]he circuit court apparently reasoned that no statute of limitation applies to a medical monitoring claim because the cause of action has not yet accrued, i.e., there is not yet an injury. This is incorrect. "The `injury' that underlies a claim for medical monitoring-just as with any other cause of action sounding in tort-is `the invasion of any legally protected interest.'" Bower v. Westinghouse Electric Corp., 206 W.Va. 133, 139, 522 S.E.2d 424, 430 (1999) quoting Restatement (Second) of Torts § 7(1) (1964). The specific invasion of a legally protected interest in a medical monitoring claims consists of "a significantly increased risk of contracting a *909 particular disease relative to what would be the case in the absence of exposure." 206 W.Va. at 142, 522 S.E.2d at 433.
Chemtall, 216 W.Va. at 455-56, 607 S.E.2d at 784-85.
Consequently, there is support in West Virginia's jurisprudence to conclude that a valid medical monitoring claim does constitute an injury, just like any other tort. Further, when a plaintiff proves the necessary elements of a medical monitoring cause of action, the damages that are awarded are compensatory damages. As the Court stated in Bower,
a claim for medical monitoring is essentially "a claim for future damages." Ball v. Joy Tech., Inc., 958 F.2d 36, 39 (4th Cir. 1991). Consequently, we resort to elementary principles of tort law to determine whether medical monitoring is a proper subject of compensatory damages.
Since before the turn of the century, this jurisdiction sanctioned the recovery of future medical expenses where a plaintiff could prove with reasonable certainty that such costs would be incurred as a proximate consequence of a defendant's tortious conduct.
206 W.Va. at 139, 522 S.E.2d at 430.
When a plaintiff has sustained an injury and has been awarded compensatory damages in conjunction with his medical monitoring cause of action, his pursuit of punitive damages is warranted so long as the defendant's conduct is sufficiently willful and egregious to support such an award. The Court has long recognized that compensatory damages must be returned by a jury prior to an award of punitive damages and that "[p]unitive damages must bear a reasonable relationship to the potential of harm caused by the defendant's actions." Syl. Pt. 1, Garnes v. Fleming Landfill, Inc., 186 W.Va. 656, 413 S.E.2d 897 (1991). Further, the Court explained this procedure in syllabus point seven of Alkire v. First National Bank of Parsons, 197 W.Va. 122, 475 S.E.2d 122 (1996):
Our punitive damage jurisprudence includes a two-step paradigm: first, a determination of whether the conduct of an actor toward another person entitles that person to a punitive damage award under Mayer v. Frobe, 40 W.Va. 246, 22 S.E. 58 (1895); second, if a punitive damage award is justified, then a review is mandated to determine if the punitive damage award is excessive under Garnes v. Fleming Landfill, Inc., 186 W.Va. 656, 413 S.E.2d 897 (1991).
197 W.Va. 122, 475 S.E.2d 122.
To that end, the first inquiry necessarily focuses upon a defendant's conduct. In syllabus point four of Mayer v. Frobe, 40 W.Va. 246, 22 S.E. 58 (1895), the Court held that "[i]n actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous." The Court has further instructed in Peters v. Rivers Edge Mining, Inc., 224 W.Va. 160, 680 S.E.2d 791 (2009), that
"[t]o sustain a claim for punitive damages, the wrongful act must have been done maliciously, wantonly, mischievously, or with criminal indifference to civil obligations. A wrongful act, done under a bona fide claim of right, and without malice in any form, constitutes no basis for such damages." Syl. pt. 3, Jopling v. Bluefield Water Works & Improvement Co., 70 W.Va. 670, 74 S.E. 943 (1912).
224 W.Va. at 190, 680 S.E.2d at 821. It is also significant that the generally accepted law of this country is that "[p]unitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him [or her] for his outrageous conduct and to deter him and others like him from similar conduct in the future." Restatement (Second) of Torts § 908(1) (1979).
Thus, medical monitoring cases, just like any other action in tort, should be susceptible to an award of punitive damages if and only if the conduct of the defendant or defendants is willful, wanton, reckless, and done knowingly in disregard of the right to human health. Just as in other types of cases, the right to an award of punitive damages should be available only when a defendant is guilty of extreme and egregious bad conduct. It is *910 the exception, not the rule, as the level of bad conduct on the part of a defendant must be very high in order to meet the punitive standard.
* * *
Turning to the issue of whether punitive damages were justified in the instant case, it has long been held that "factual findings made by the trial court are given great deference by this Court and will not be overturned unless they are clearly erroneous." CMC Enterprise, Inc. v. Ken Lowe Management Co., 206 W.Va. 414, 418, 525 S.E.2d 295, 299 (1999). In this case, the circuit court's February 25, 2008, thorough and lengthy order provided a mountain of factual findings detailing DuPont's wanton, reckless, and willful conduct justifying the underlying punitive damages award.
As long ago as 1919, Grasselli, which later merged with and became a subsidiary of DuPont, commissioned a study of the surrounding communities to investigate the effects of smelter emissions. The resulting study, Report of Investigation of Conditions Affecting the Growth of Plants and Animals in the Vicinity of the Meadowbrook Zinc Works of the Grasselli Chemical Company, concluded that livestock, plants, and soil in the area were being adversely impacted by the smelter emissions. As the circuit court explained,
[s]pecifically, the report noted that emissions from the smelter were having deleterious effects, such as blight to surrounding pasture grass, fruit trees and other vegetation and sick and dying livestock, on properties within three miles of the plant in all directions and within five miles in a north northeast and northeast direction. Clearly the plant's emissions were a threat to the health and safety of the surrounding community. The investigators predicted that the effects from the continued operation of the smelter would be felt at increasingly greater distances and would `become apparent as far north as Shinnston and probably for a considerable distance beyond.'
The circuit court found that in spite of the dire warnings contained in the 1919 study, Grasselli and DuPont continued to operate the plant for another thirty years, full-time, with the on-site waste pile "dramatically increasing" as emissions into the surrounding communities were significant. The circuit court also pointed to the release of arsenic, which was identified as a component of smoke from smelters, and its known effects on human health. Likewise, it recognized the fact that both Grasselli and DuPont had technical expertise in a variety of areas which would have allowed them to fully understand their own processes and what the effects of the waste and emissions would be on the environment, animals, humans, and the surrounding areas.
In spite of complaints by neighbors about the pollution and contamination as early as 1914, and in spite of an expert witness who confirmed the existence of arsenic in the zinc dust as well as on the neighboring properties,[3] Grasselli and DuPont ignored reasonable solutions to deal with the dangerous emissions. For example, in 1927, Grasselli considered installing a Cottrell electrostatic precipitator system to control emissions, a technology being used at other smelters across the company; however, as the circuit court explains, "Grasselli rejected it because it did not appear profitable nor would it pay for itself, [and, instead,] Grasselli and DuPont simply continued depositing emissions on neighboring properties and building its mountain of waste." The circuit court pointed out that: "Despite this knowledge of emissions and a way to control them, Grasselli elected to simply continue production and fight the lawsuits with a public relations campaign that included threatening the community with a loss of jobs."
While DuPont purchased the smelter and Grasselli became a division of DuPont, the existing management did not change and the Grasselli-DuPont smelter continued business as usual. Throughout the years, DuPont installed new furnaces allowing for greater and more efficient production; yet it chose *911 not to bother to install emission control or other pollution devices. Rather, in spite of the ongoing lawsuits and the 1919 report, supra, the circuit court enunciates that DuPont "produced at maximum capacity, dumping the waste behind and beside the plant [even though it] was well aware that it was polluting its neighbor's property."
The circuit court also declared that in late 1949 or early 1950, DuPont ordered and performed a company-wide pollution survey and that "[t]he documents suggest that DuPont was aware of its need to implement and update air and water pollution controls but that certain divisions either could not or would not request the funds necessary to implement the controls." Moreover, as of 1950, DuPont was only spending $8,200.00 per year for air pollution control at the smelter, while internal documents estimated the cost of future air pollution control necessary to bring the smelter in conformance with governmental standards to be $325,000.00. The circuit court notes, "[d]uring its ownership, despite its policy encouraging the abatement of air pollution and despite the dangerous emissions being deposited on its neighbors' lands, DuPont took no steps to control the pile or institute emissions controls at the smelter." The circuit court further found that:
Rather than making the necessary projected investment of $325,000, DuPont elected to sell the plant, knowingly leaving behind a plant that had been emitting toxic metals throughout the surrounding community for over 40 years and leaving behind a burning mountain of waste that would continue to pollute the surrounding communities with dangerous heavy metals. Without so much as a warning to the residents or the dangers raining down on them, DuPont sold the plant and did not return to Spelter until 1979 or 1980.
The circuit court also discussed DuPont's "inactive site-review" in response to federal legislation wherein it was attempting to inventory sites that might be hazardous. One area of interest was the safety of a playground adjacent to the smeltera playground separated from the plant and waste pile only by a chain link fence. The proximity of the playground to the smelter raised questions among the DuPont management about the safety of the site as evidenced by an internal memorandum wherein it asked:
Was any waste containing cadmium and/or arsenic deposited on the property converted to the playground? We have no information from which to answer this question. Therefore, I recommend that we contact The Meadowbrook Corporation to determine any information they may have on past waste disposal practices at the site. It would be appropriate to simultaneously inform the Board of Education of our interest.
The circuit court states that there is no record of DuPont actually contacting The Meadowbrook Corporation or taking any action to warn the residents of the dangers posed by the contaminants from the smelter. The circuit court further explained that:
Although at least two DuPont scientists recognized that the playground had been built over residue from the smelter, DuPont ultimately took no steps to identify the contents of the residue or to even look beyond the chain-link fence. Instead, DuPont's Real Estate Division was instructed to `monitor the school playground adjacent to our formerly owned plant in Spelter, West Virginia (now owned by Meadowbrook Corporation) at least once a year to confirm that it is in continued use as a play area by the local population.' Any further steps to minimize the risk would have required DuPont perform a comprehensive sampling program. Not only did DuPont fail to perform a comprehensive sampling program of the site, DuPont did not bother to follow up on its scientists' recommendation that the site be examined on an annual basis or even to contact The Meadowbrook Corporation to alert it of risks involved with the waste.
As recognized by the circuit court's findings, DuPont did not take any further action at the site, including the playground, until 1996 when regulators from the EPA put DuPont on notice of its potential environmental liability. DuPont received an EPA "Imminent Hazard" letter notifying it of its potential environmental liability for the Spelter *912 site. As the circuit court explained, DuPont began to be concerned that the Spelter site would be listed on the National Priority List of the EPA and be declared a Superfund site, and in spite of its acknowledgment that "offsite soils data indicates elevated levels of Zn, As and Pb in residential backyards," DuPont responded with a policy of containment, "trying to limit any remediation to on-site remediation, and `managing the regulatory process' to stay off the National Priority List and `managing public relations ...' to prevent potential legal, tort and/or public issues."
DuPont's internal emails reflect its knowledge of the waste pile, observing that it was "irresistible to children" and a common recreation area, and that the waste from the pile was discharging heaving metals into the West Fork river. In spite of such knowledge, the circuit court found that DuPont's plan for avoiding costly remediation, according to the director of the DuPont division responsible for environmental liability and remediation, was "to do as little as possible... and the site may just go away."
The circuit court also included citation to numerous DuPont internal emails that reflected its knowledge that heavy metals had leaked from the site to the surrounding areas. It further pointed out that governmental regulatory agencies also told DuPont that there was off-site contamination. For example, in 1996, the EPA told DuPont that "a threat to public health or welfare or the environment exists at the Spelter Smelter Site." The EPA recommended that the site be considered "an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance at/or from the Site." The EPA stated that "initial data indicates significant offsite exposure either by runoff or wind borne emissions" and specifically instructed DuPont to "establish adequate site security to eliminate the potential for trespassing." Despite this instruction, DuPont failed to secure the site for several more years.
The circuit court order also determined that the EPA was not the only agency that informed DuPont of the offsite health risks. In fact, the DEP informed DuPont that "[e]ach day, large quantities of heavy metal particulates and metal fumes are exhausted into the Spelter community atmosphere." The DEP further informed DuPont that residential wells had significantly elevated levels of arsenic, cadmium and lead. As the circuit court explains, "instead of taking action to remediate the class area, DuPont used the well-water tests as an opportunity to continue to tell the residents of the class area that there was nothing about which to be concerned."
The circuit court also detailed DuPont's special concern and attempt to avoid having the site listed by the EPA on the National Priorities List, which would cause greater costs and the loss of control of the site. As the circuit court explained, "DuPont was confident in its ability to influence and control the actions of the West Virginia DEP, primarily because of its connections with the DEP...." Throughout this process, DuPont continued to stress the need to "manage the regulatory process" to "stay off NPL" as DuPont affirmatively reached out to the DEP feeling it could "reach relatively quick agreement with DEP" and "give them the environmental victory that they need." As DuPont concluded, having the site in the hands of the DEP would "get us working towards the clearly lowest cost and protective [to DuPont] option." DuPont stated that "state control, using voluntary, risk-based remediation would potentially save tens of millions of $."
In its continued quest to ignore off-site contamination and to stay off the EPA's National Priorities List, DuPont worked a plan to enroll the Spelter smelter in the West Virginia "Voluntary" Remediation Program, wherein DuPont's obligation was simply to investigate and remediate "the site." By definition, the "site" included only the actual smelter property and did not include any property outside the boundary of the smelter. DuPont then hired licensed remediation specialists who, according to the circuit court, "would ignore their obligation to the community and protect DuPont's desire to keep the off-site property from being remediated or even tested." DuPont sought licensed remediation specialists who understood DuPont's *913 point of view, were loyal, and would "stay on the reservation." The circuit court concluded that one such specialist's "company was selected, at least in part, because he had previously `affirmed his loyalty to DuPont.'" DuPont questioned whether [the specialist] was "willing to stretch his neck out for DuPont?", while DuPont's in-house counsel opined that he had "every reason to preserve his relationship with DuPont, I see no risk of him going off our view of the reservation."
The circuit court then outlined DuPont's selection of contractors who were willing to manipulate the data in an effort to stay on-site with any remediation efforts. For example, the circuit court said,
[i]n fact, so determined was DuPont to guard against the possibility of off-site testing (and any resulting remediation) that when one of DuPont's contractors collected a soil sample from off-site, he was told by DuPont manager, Sathya Yalvigi, in no uncertain terms that the soil sample should not be analyzed. The soil sample remains in DuPont's possession to this day.
The circuit court also described DuPont's strategy to limit remediation to on-site as dovetailing nicely "with a corporate strategy that called for limiting and controlling information." The circuit court found that DuPont accomplished its corporate strategy of limiting public interest, in part, with misleading newsletters, and manipulation and control of regulatory agencies. It said that DuPont's strategy was called "Connecting the Dots" and was a corporate policy of containment to shield DuPont from the "Plaintiffs' bar, local environmental & environmental justice activists, community advocates, media... Government Agencies ... [and] national/international environmental." DuPont constructed a team whose primary objective was to "minimize the potential for issues/dots to be connected" meaning to minimize the dissemination of information and, ultimately, to thwart toxic tort claims. The circuit court explained that "Connecting the Dots" is, literally, a power point slide show used during a DuPont meeting to discuss management of environmental trouble-spots at various plant sites. DuPont adopted such a policy to avoid tort liability, avoid cleaning up its environmental mess, and to maximize its profits.
The circuit court specifically found that DuPont prevented class members from connecting the dots by "limiting the information it gave to the class, providing with half-truths and omitting important information [and that] in its quest to contain its liability for remediation, DuPont misled the community concerning the potential dangers of contamination." The circuit court explained:
"For example, in 2001, DuPont began disseminating public information, in the form of a newsletter, stating that smelter emissions did not pose any off-site risk. DuPont's newsletter stated that "[t]he current sampling data and risk assessment indicate that there is no current risk to the Spelter community from off-site releases." DuPont's newsletter goes on to state that "properties in the Town of Spelter have not been impacted by the site and that the site should not diminish property values." As support for its position, DuPont relied upon a letter from DEP that had been conceived by DuPont's internal team in charge of managing the Spelter smelter site."
The circuit court further detailed DuPont's 2001 response to a notice from the DEP that the groundwater near the smelter had been contaminated with high levels of arsenic, cadmium and lead and the smelter was the cause of the contamination. DuPont, through its consultants, told the Spelter community residents that their wells needed to be capped because they had "not [been] properly abandoned in accordance with current guidelines and rules put in place by the West Virginia Bureau for Public Health, Office of Environmental Health Services and the Harrison County Health Department." As the circuit court points out, "[u]sing this catastrophe as a public relations event, DuPont touted the well-capping `as a service to the Spelter community and at no cost to you....' DuPont, however, neglected to mention the real reason for the capping was that it had contaminated the groundwater with unacceptable levels of arsenic, cadmium and lead."
The circuit court further explained that DuPont devised talking points for its employees *914 answering questions about capping the wells and that its answers were evasive and misleading, designed to keep people from learning about the real risks associated with the potential exposure to arsenic, cadmium and lead." The circuit court outlined numerous talking points devised by DuPont for employees to use when speaking with anyone regarding the plant. The circuit court also provided examples of DuPont "affirmatively [lying] to the media and the residents of the class area." For example, DuPont stated to the residents of the class area, "[w]e have no evidence that health problems could be caused by the site." Moreover, in a community newsletter, DuPont told the residents that "[t]he current sampling data and risk assessment indicate that there is no current risk to the Spelter community from off-site releases."
Based on this extensive record, the circuit court found that the evidence supported the underlying verdict relating to punitive damages. It explained that the jury found that DuPont intentionally acted with disregard to a known risk with the high probability that harm would follow, and that DuPont knew or should have known of the risks attendant to its conduct. The circuit court further concluded:
Despite this knowledge and the obvious needs to abate the air pollution, DuPont made no effort to implement any air pollution controls. Instead, DuPont simply continued smelting zinc at full-capacity. Finally, when it appeared that DuPont could no longer avoid allocating money for air pollution controls, DuPont sold the smelter and left town. At a minimum, DuPont's conduct of knowingly disposing of huge piles of zinc tailing containing toxic wastes on its property and consciously discharging those same toxins into the air from its smoke stacks rises to the level of intentional, wanton, and reckless conduct.
In its meticulously detailed order, the circuit court found that DuPont was aware of the health hazards of arsenic, cadmium and lead, deliberately misinformed the community residents, refused to inform the members of the class of the offsite contamination and the threats to their health, and continuously refused to address the off-site contamination issue. The circuit court outlined a pattern of behavior throughout a ninety-year period that was unconscionable. In consideration of all of the above, there was certainly a multitude of facts and circumstances justifying the underlying punitive damages award.
Upon review of the circuit court's order and the findings of fact therein, it is abundantly clear that the court did not abuse its discretion in determining that the conduct of the defendants in the instant case warranted the award of punitive damages that was made by the jury.

* * *
Perhaps most importantly, as recognized in the Restatement of Torts, supra, and extensive case law across the country, one of the primary purposes of punitive damages is to send a message to those who willfully, flagrantly, and knowledgeably harm others that, as a matter of public policy, such conduct will not be condoned in an organized, civilized society. However, in a case where there is not yet evidence of actual physical injury, there is concern that a punitive damages award could be characterized as a "windfall" for such plaintiffs who have not yet exhibited physical injury.
Recognizing that medical monitoring claims are unique from typical tort cases, in that actual physical injury may not yet be present, it may be time to consider whether in a medical monitoring case, punitive damages, or a part thereof, should be directed into a fund to remediate and correct similar damages and/or to hold in trust for plaintiffs who actually do ultimately suffer significant physical injury as a result of the defendant's conduct. As the Court reasoned in Dardinger v. Anthem Blue Cross and Blue Shield, 98 Ohio St.3d 77, 781 N.E.2d 121 (2002):
There is a philosophical void between the reasons we award punitive damages and how the damages are distributed. The community makes the statement, while the plaintiff reaps the monetary award. Numerous states have formalized through legislation a mechanical means to divide a punitive damages award between the plaintiff and the state. In some states, the state's portion goes to a special fund, in *915 others, to the general fund. Annotation (1993), 16 A.L.R. 5th 129. In Ohio, punitive damages are an outgrowth of the common law. Roberts v. Mason (1859), 10 Ohio St. 277, 1859 WL 78; Saberton v. Greenwald (1946), 146 Ohio St. 414, 32 O.O. 454, 66 N.E.2d 224; Preston v. Murty (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174. Therefore, Ohio's courts have a central role to play in the distribution of punitive damages. Punitive damages awards should not be subject to bright-line division but instead should be considered on a case-by-case basis, with those awards making the most significant societal statements being the most likely candidates for alternative distribution.
781 N.E.2d at 145-46 (directing that a portion of punitive damages go to a state institution and specifically a cancer research fund at Ohio State University).
In holding that punitive damages are never available in a medical monitoring claim, the majority has removed a very strong deterrent to the type of unconscionable conduct that would treat the most basic human right to health and life as if it were meaningless. The people of West Virginia should have a fundamental right to be free from having toxic substances, which the depositor thereof has knowledge are likely to cause serious illness and death, rained upon them in a manner that can be characterized as callous, ruthless, wanton, willful, or reckless. As this Court recognized as early as 1895, this type of gross indifference to civil obligations affecting the rights of others should be subject to an assessment of punitive damages. Mayer v. Frobe, 40 W.Va. at 247, 22 S.E. at 58, Syl. Pt. 4. Now that the majority has removed the potential for punitive damages from a medical monitoring claim, there is no deterrent to the type of willful, wanton, and egregious conduct demonstrated by the defendants in this case. Thus, any concern about sanctions for knowingly engaging in conduct that threatens human life has become a much smaller factor in the equation used for determining the profit margin for that activity.
KETCHUM, J., dissenting, in part, and concurring on the award of a new trial and the ruling that punitive damages are not recoverable in medical monitoring claims:

A. Judgment Should Be Granted in Favor of DuPont
I dissent from the majority's opinion, and believe that a judgment should be entered in favor of DuPont because the plaintiffs failed to prove the required elements of West Virginia's medical monitoring and property damage law. It is easy to enrage a jury against a large multi-national corporation. Nevertheless, our Constitution requires that plaintiffs must prove each of the elements of their case before the case can be submitted to the jury for its considerationand the plaintiffs simply failed to prove their case. At the very least, DuPont should be granted a new trial on all issues, because of the continuous insertions of inadmissible evidence by the plaintiffs' attorneys, and their use of closing arguments prohibited by our law.[1]
I also dissent from the majority's opinion with regard to the issue concerning the Grasselli deeds.

1. Retained Experts are Like Eggs
Retained expert witnesses are like eggs. You can buy them by the dozenthey are just more expensive.
Plaintiffs' soil scientist, Kirk Brown, testified that the dust containing lead, cadmium and arsenic from DuPont's smelter caused cancer and other diseases. The bill for his services up to the date of the trial was $910,000.00. A bill had not been calculated for his trial preparation and attendance during trial.
Dr. Brown was the only expert witness who testified that the smelter dust caused various types of cancer and other diseases.[2] *916 Without Dr. Brown's testimony, admitted over DuPont's objection, the plaintiffs had no proof that DuPont's dust caused harm to humans. The plaintiffs relied solely upon this retained soil scientist from Texas to prove that DuPont's dust caused cancer and other serious diseases. None of plaintiffs' other witnesses, including Dr. Werntz from West Virginia University who simply relied upon Dr. Brown's findings, gave independent opinions that the dust from the smelter caused cancer, or other diseases to humans, described by Dr. Brown.
The problem is that Dr. Brown had no education, training, or experience in medicine or human toxicology. He is a soil scientist with a degree in agronomy. The plaintiffs contended he was qualified to give medical opinions because he worked with the Environmental Protection Agency on a risk assessment study involving metals. This is a half truth. He worked on an EPA risk assessment study of the metal uptake of plants from the soil which had nothing to do with the effects of metals on humans.
The jury trial was held 30 miles from our flagship educational institution, West Virginia University. Yet, plaintiffs did not call any of its medical doctors, epidemiologist or toxicologists to research or opine whether the dust from DuPont's smelter caused disease in humans. To the contrary, it is undisputed that no human in the area of the smelter has gotten sick or has had a disease from DuPont's dust during the 100 years of the smelter's existence.
Dr. Brown was plainly not qualified to give human toxicology and medical opinions. The trial court held that the jury should hear his opinion, and it was their job to evaluate his credentials and testimony. This is only partially correct. The judge must first determine if the expert is qualified to opine in a particular area. This man had no medical or human toxicology qualifications. West Virginia Rule of Evidence 702 protects all parties from unqualified evidence, even giant multi-national corporations.
Under the plaintiffs' logic, the local shoeshine boy who played with an erector set as a child can opine on quantum physics because it is the jury which evaluates the tendered expert's qualifications. Usually, giant multi-national corporations who have fed and clothed our families for a century take it in the ear using this logic. Rule 702 prohibits unqualified expert testimony.
In Watson v. Inco Alloys, 209 W.Va. 234, 545 S.E.2d 294 (2001), Justice Davis teaches that, before the jury gets to pass on the qualifications of expert witnesses, the circuit judge must determine if the proposed expert "meets the minimal educational or experiential qualifications" to render an expert opinion. Second, the trial judge must determine if the expert's area of expertise covers the particular area as to which the expert will opine. The plaintiffs' proposed expert had no qualifications or experience in medicine or human toxicology. Yet, the trial court let Dr. Brown opine and allowed the jury to consider his unqualified testimony.
Justice Davis also teaches that, if the proposed testimony involves scientific evidence, the court must be a gatekeeper and have an in-camera hearing to determine if the expert's testimony will be reliable by considering its underlying scientific methodology. Dr. Brown said that he is a scientist and that he conducted a scientific risk assessment study, i.e., the causal relationship between DuPont's dust and cancer and other diseases in humans, as concluded by his scientific risk assessment analysis. Yet, the circuit court did not act as a gatekeeper and take evidence at an in camera hearing to determine if his methodology was scientifically reliable, as required by Watson.
The majority opinion does not mention that other courts have held that Dr. Brown has no qualifications to testify about human toxicology and other medical issues. In a well-reasoned opinion, the federal judge in Palmer v. Asarco, Inc., 2007 WL 2302584 at *8-9 (N.D.Okla. Aug. 7, 2007) ruled that Dr. Brown could only testify about soil issues but *917 not about medicine or human toxicology. The federal court stated:
Dr. Brown clearly crosses into the realm of toxicology and medical causation. He states that "lead in the soil and house dust is the major source of contamination contributing to the elevated blood levels in children living in Picher and Cardin." ... While Dr. Brown can testify how lead dust is transported from one place to another, the actual ingestion and elevation of blood levels is outside of his expertise. Toxicology is generally described as the study of how substances are absorbed into the body and the effect of substances on the human body.
(emphasis added).
This soil scientist should not have been allowed to opine as to diseases caused by DuPont's dust. The trial court essentially allowed Dr. Brown to become an "uber-juror." This being the only testimony on this pivotal point, the plaintiffs failed to meet their burden of proof. DuPont is entitled to have judgment entered in its favor.

2. West Virginia's Medical Monitoring Requirements Were Disregarded
Plaintiffs presented no evidence to prove the relative comparison between plaintiffs' exposure to a hazardous substance and the exposure of the general population as required by Bower v. Westinghouse, 206 W.Va. 133, 522 S.E.2d 424 (1999).
Syllabus Point 3 of Bower requires that the plaintiff prove six specific elements to sustain a medical monitoring claim. First, it requires that "a plaintiff must prove that (1) he or she has, relative to the general population, been significantly exposed; (2) to a proven hazardous substance[.]" (Emphasis added). In this action, there is no proof of plaintiffs' significant exposure to toxic materials relative to the general population.
The plaintiffs' attorneys evidently did not read Bower. They began incorrectly outlining the elements of Bower in their opening statement and said that they would prove those incorrect elements. The "comparison to the general population" was never mentioned as part of element (1) of Bower. In fact, there was absolutely no evidence presented during the entire trial to support the requirement that plaintiffs had significant exposure greater than the general population. Even Dr. Brown did not make this comparison. To the contrary, he testified that the exposure to lead outside the class areas was as great or greater than within the class area.
Finally, at the instruction conference concerning the medical monitoring charge to the jury, the lawyers for both sides suddenly announced that the term "relative to the general population" in element (1) of Bower was mistakenly omitted from the trial court's instruction. The instruction was corrected to state that the plaintiffs must prove that they had, "relative to the general population, been significantly exposed to a hazardous substance."
There is one huge problem. There was no evidence to support this corrected instruction, and no additional evidence was taken. There was no evidence of plaintiffs' being substantially exposed relative to the general population.
To make matters worse, the Phase II medical monitoring verdict form was not corrected to conform to the amended Bower instruction. The verdict form merely required the jury find the plaintiffs had significant exposure, and had a need for medical examinations "different from what would be prescribed in the absence of the exposure." The verdict form did not require a finding that the plaintiffs were significantly exposed in relative comparison to the general population. See, Rhodes v. E.I. DuPont De Nemours, 253 F.R.D. 365 (S.D.W.Va.2008) (discussing Bower).
Accordingly, DuPont is entitled to a judgment in its favor on medical monitoring.

3. Our Medical Monitoring Law Should Be Revisited
Every person in the Kanawha and Ohio Valleys has been exposed to chemicals and toxic substances in our air. The Kanawha Valley was known as the chemical valley for decades. The factories along the Ohio River have belched thick dust for over a century. The air is now cleaner because of government regulations, not damage lawsuits. *918 Nevertheless, every person in these industrial hubs has a medical monitoring lawsuit against the manufacturers and chemical plants because they have been significantly exposed to toxic air which necessarily increases their risk of disease. In West Virginia, all of these people are allowed to institute a medical monitoring lawsuit although they have not incurred an injury or disease. Our medical monitoring law does not require these plaintiffs to have been injured or diseased by their exposure.
Medical monitoring class action lawsuits will continue to mount if plaintiffs who are not sick or injured are allowed to pursue benefits for the mere possibility of future harm. We must rely on government regulation to police the emission of toxic substances, not damage lawsuits of uninjured plaintiffs. Damage suits by non-diseased and uninjured persons will only drive our remaining factories out of the State.
The present case against Du Pont is a good example of non-diseased, uninjured persons who will receive medical monitoring damage benefits. A named plaintiff, who lived near the smelter and represents the class, had her blood tested in order to establish that she had an abnormal level of lead in her blood caused by the emissions from the smelter. However, the testing showed that the lead level in her blood was normal. Yet, she will be entitled to medical monitoring benefits. In addition, there have not been any reports of sickness or disease in humans caused by the smelter emissions in the 100 years of its operation. Even though there is no evidence of sickness or disease, Du Pont will pay approximately $130,000,000 to medically monitor the non-diseased plaintiffs.
There is no doubt there will be a flood of additional medical monitoring lawsuits for uninjured plaintiffs against West Virginia's manufactures and businesses. The plaintiffs' lawyers told the jury:
When this is over, we're going to move to just another part of West Virginia and do the same thing [.]
If we do not modify or abolish our medical monitoring law, the plaintiffs' lawyers from the Du Pont case will wreak enormous economic harm on West Virginia's economy. They will collect millions in fees and return to their out-of-state residences leaving the West Virginia economy in shambles. It reminds me of the out-of-state coal barons who raped our coal resources in the early 1900's and used the untaxed money from our coal to live opulent lifestyles in far away states. The lawyer fees in the Du Pont case, for our new out-of-state coal barons, may be over $100,000,000.
Our law, until medical monitoring, did not provide a cause of action for the mere possibility of future harm, not yet realized. We should, at least, modify the medical monitoring elements to require that plaintiffs prove a present physical injury (or present disease) caused by the manufacturer or business. This will provide a clear standard as to when a plaintiff has a meritorious cause of action and will eliminate damages for a mere possible future harm. This is only fair. In this case, Du Pont will pay $130,000,000 for medical monitoring where no actual harm has occurred. We should not allow an asymptomatic plaintiff to recover damages by way of medical monitoring for the possibility of contracting a disease in the unpredictable future.
The recent trend has been for courts to reject the adoption of the medical monitoring cause of action. See, Herbert L. Zarov, et al, A Medical Monitoring Claim for Asymptomatic Plaintiffs: Should Illinois take the plunge?, 12 DePaul J. Health Care L 1 (2009). In my view, we should at least require a plaintiff to have a present physical injury or illness before seeking medical monitoring damages. See, Henry v. Dow Chemical, 473 Mich. 63, 701 N.W.2d 684 (2005); Paz v. Brush Engineered Materials, 949 So.2d 1 (Miss.2007); Metro-North Commuter Railroad v. Buckley, 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997).

4. No Punitive Damages Should Be Awarded
I totally agree that no punitive damages can be recovered in medical monitoring actions. However, I totally disagree that any punitive damages should have been awarded in the property damage portion of this action. There was no evidence of actual malice on *919 the part of Du Pont which warrants punitive damages.
In West Virginia, punitive damages are an outgrowth of a confusing hodgepodge of our common law. Some of our cases indicate that punitives can be awarded for intentional, wilful or wanton conduct. Other cases indicate that punitives can be recovered for negligence which is gross, reckless or wanton. See, Hensley v. Erie Insurance Co., 168 W.Va. 172, 283 S.E.2d 227 (1981). Our trial judges are bemused when they attempt to instruct a jury in an action involving punitive damages. At trial, the lawyers present the judges with case law containing contradictory language dating back to the 1800s when our Court could not decide whether the purpose of punitive damages was to compensate victims for anguish or to punish the misconduct of defendants. See, Pegram v. Stortz, 31 W.Va. 220, 6 S.E. 485 (1888); Mayer v. Frobe, 40 W.Va. 246, 22 S.E. 58 (1895).
We should overrule all our previous cases defining the evidence required for a jury to award punitive damages and adopt a concise, simple rule defining the burden of proof required to establish a punitive damage claim. We need to clarify this confusing area of the law because our Legislature has not followed the lead of other states in codifying the law of punitive damages. See, for example, Ohio Revised Code § 2315.21. Therefore, our Court should, at least, modify three elements of our punitive damage law:

(a) Burden of Proof
The purpose of punitive damages is not to compensate a plaintiff but to punish and deter egregious conduct. Punitive damages are actually a civil fine or penalty. Therefore, the plaintiff should be required to prove, by clear and convincing evidence, that the defendant's actions or omissions demonstrate a conscious wrongdoing with actual malice.
Actual malice should be defined as: (1) "the state of mind under which the defendant's conduct is characterized by hatred, ill will or a spirit of revenge or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." Preston v. Murty, 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987).[3] Because "state of mind" is difficult to prove, actual malice can be inferred from the defendant's conduct and the surrounding circumstances. Burns v. Prudential Securities, Inc., 167 Ohio App.3d 809, 857 N.E.2d 621 (2006).

(b) Bifurcation of Punitives
In a West Virginia punitive damage action, the plaintiff is entitled to admit evidence of the defendant's financial condition. The defendant's wealth is then improperly used as a weapon to induce the jury to find for the plaintiff on the issue of liability. Kircher and Wiseman, Punitive Damages: Law and Practice, 2nd ed., supra, § 12:11. Therefore, either party, upon motion, should be entitled to have the punitive damage phase of a jury trial bifurcated.
I suggest that we adopt the Texas approach. The jury first hears the evidence relevant to liability for actual damages, the amount of actual damages, and liability for punitive damages. If the jury finds in the plaintiffs favor on the punitive-liability issue, the same jury hears the evidence on punitive damages and determines the amount of the punitive award, considering the totality of the evidence presented at both stages of the *920 trial. Transportation Insurance Co. v. Moriel, 879 S.W.2d 10 (Texas 1994).

(c) Distribution of Punitive Award
In West Virginia, before punitive damages may be awarded, the jury must fully compensate the plaintiff for his or her actual damages. The jury can then punish, or "fine," the defendant, and the plaintiff receives a monetary windfall by way of punitive damages. Therefore, after the jury, made up of citizens of the community, fines the defendant, the plaintiff reaps the reward.
Many states have enacted laws to correct this unfairness. The punitives awarded (fine) are divided between the state and the plaintiff. Courts in other states, as an arm of their common law, have on a case-by-case basis distributed the punitive award to make a significant societal statement, while considering the plaintiffs effort in obtaining the punitive award. Dardinger v. Anthem Blue Cross & Blue Shield, 98 Ohio St.3d 77, 781 N.E.2d 121 (2002).
I suggest that our Court adopt a similar rule concerning punitive damages in order to prevent a monetary windfall to the plaintiff. The distribution of a punitive award should be as follows: First, the trial court should deduct litigation expenses, including attorney fees. The amount of attorney fees should be determined by the contract between the plaintiff and his or her lawyer. Any contingency fee agreed to in the contract should be approved as long as the contingency percentage is reasonable. Second, the trial court should determine the amount of the remaining award that should go to the plaintiff considering the plaintiffs effort in obtaining the award. Third, the balance should be paid to a societal good that can rationally off-set the harm done by the defendant. For example, in a toxic tort incident causing cancer, a fund could be established at the Marshall University School of Medicine's Joan Edwards Cancer Center for cancer research.
Of course, guidelines for our circuit courts to follow would have to be established for the distribution of punitive awards. In addition, consideration of the various methods of dividing the award between expenses and fees, the plaintiffs entitlement and societal good would need to be studied. Nevertheless, a change is needed to correct the unfairness in this State's current law concerning punitive damages.

5. Rule 404(b) Evidence Was Improperly Allowed
Several weeks before trial, DuPont filed a motion in limine to preclude the plaintiffs from introducing evidence of other alleged wrongs or bad acts concerning unrelated chemicals, plants and locales, including DuPont's use of the chemical C8 at its Parkersburg, West Virginia, plant. Rule 404(b) of the West Virginia Rules of Evidence was cited by defendants in objecting to this unrelated "bad acts" evidence. However, the circuit court denied the motion with leave to revisit the admissibility of such evidence at trial.
In Phase I of the trial concerning general liability, the plaintiffs were permitted to play for the jury the videotaped deposition they took of Kathleen H. Forte, the vice-president of public affairs for DuPont. The day before the videotape was played for the jury, DuPont filed a number of objections concerning the Forte deposition video which referenced Rule 404(b), and argued that the videotape contained inflammatory questions asked by plaintiffs' counsel concerning DuPont's activities at other sites, including Parkersburg. As watched at trial, Forte was shown a map and was asked by plaintiffs' counsel about "other areas throughout the country where DuPont was involved with contamination sites." Forte stated that she knew that two were contamination sites but indicated that she was unfamiliar with the other eight locations presented to her. In addition, Forte was asked about the existence of medical monitoring at DuPont facilities in Parkersburg, West Virginia, and Pompton, New Jersey, and then asked why there was no medical monitoring at the remaining sites. The plaintiffs' lawyer also asserted at the videotaped depositionbut never provedthat the C8 produced at Parkersburg was inserted by DuPont at unsafe levels into the drinking water and that C8 caused cancer.
After the videotape was played for the jury, DuPont moved for the trial court to exclude Forte's testimony, or, in the alternative, *921 for a limiting instruction, citing Rule 404(b). The following day, DuPont filed a written request for a limiting instruction. Thereafter, during the consideration of the Phase I jury instructions, DuPont renewed its request for a Rule 404(b) limiting instruction.
The circuit court did not conduct an in camera hearing concerning the accuracy of the "other sites" contamination assertions or the similarity of alleged contamination at other sites to the Spelter site. The circuit court also did not give the jury a limiting instruction concerning Ms. Forte's testimony. Our cases plainly hold that Rule 404(b) requires that the trial court, in camera, find that the other bad acts actually occurred and that the defendant committed them before this evidence is presented to the jury. Taylor v. Cabell Huntington, 208 W.Va. 128, 538 S.E.2d 719 (2000).
Moreover, contrary to the assertions of the plaintiffs, the questioning of Ms. Forte did not constitute impeachment. After all, it was the plaintiffs' attorney's direct examination of Ms. Forte, and the video deposition contained numerous unproven assertions by plaintiffs' counsel. These unproven, badgering assertions that DuPont was guilty of bad acts at other sites were unknown to witness Forte. Nevertheless, the unproven, badgering assertions continued. The questions of Ms. Forte were inflammatory and failed to impeach anything she said. See Arnoldt v. Ashland Oil, 186 W.Va. 394, 407, 412 S.E.2d 795, 808 (1991) (a party is not free to introduce otherwise inadmissible evidence under the guise of impeachment).
An in camera hearing required by Rule 404(b) should have been conducted to determine whether the lawyers' "other site" contamination assertions were accurate and whether DuPont committed those acts. State v. Taylor, 215 W.Va. 74, 593 S.E.2d 645 (2004). Plainly stated, the jury was allowed to consider lawyers' assertions that were never proven. If this was our rule of law when I was in private practice, I would never have lost a case!
Phase II of the trial concerned medical monitoring, and DuPont's Rule 404(b) objection in that phase concerned plaintiffs' closing argument. At the end of Phase II, plaintiffs' counsel stated that DuPont, in the face of increasing penalties, had adopted a "riskbased analysis" with regard to the communities in which it does business which places profit above public health concerns. There was no proof on this point. In closing, plaintiffs' counsel referred to bad acts in the oil, tobacco and pharmaceutical industries. Citing Rule 404(b), DuPont moved for a mistrial. The circuit court denied the motion.
Phase IV concerned punitive damages, and DuPont raised Rule 404(b) objections prior to opening statements. The circuit court conducted an inadequate in camera hearing. The court took no evidence other than reviewing some documents. No witnesses were called. At the beginning of the hearing, the circuit court indicated that it did not know what the evidence was going to be. Yet the trial judge heard from no witnesses. The matters in question included whether C8 levels at Parkersburg had been shown to cause death in monkeys and whether a pregnant DuPont employee at the Parkersburg location had sustained a "neural tube defect." Although these assertions were made by plaintiffs' lawyers, there was no evidence presented to support the lawyers' assertions.
At the conclusion of the in camera hearing, devoid of testimony except for lawyer assertions, the circuit court ruled that the plaintiffs had shown sufficient similarities between Parkersburg and Spelter to admit the assertions at trial. As stated by the circuit court, the issue did not concern the merits of whether C8 had caused harm. Instead, the issue concerned whether DuPont had engaged in a similar pattern of withholding information from the public at both Parkersburg and Spelter. Again, there was no evidence presented to prove this assertion was accurate as required by Rule 404(b).
The circuit court held: "[T]he facts complained of as drawn the parallels ... have been established ... that under 401, 402, 403 analysis, that one, they are admissible evidence, and two, ... the probative value is not outweighed by the prejudice and will be allowed." Yet, no evidence was presented to support this ruling, only lawyer assertions.
*922 The trial resumed and the plaintiffs focused upon DuPont's Washington plant near Parkersburg, West Virginia, as much as upon the Spelter facility. No scientific evidence was submitted as a foundation for the plaintiffs' lawyers' assertions concerning whether C8 had caused death in monkeys or whether there was a connection between the Parkersburg facility and the medical condition of the pregnant Parkersburg employee.
Although the required in camera evidentiary hearing was not conducted on the accuracy of the alleged contamination at other sites, or its similarity to Spelter, the plaintiffs' lawyers continually commented on and argued about other "bad acts." These unproven comments included: (1) suggestions of contamination and medical monitoring at other DuPont facilities, (2) references to C8, a different chemical from arsenic, cadmium or lead, (3) an assertion that DuPont sent a misleading report to the Environmental Protection Agency concerning cancer in children and (4) an assertion that DuPont utilized a risk-based analysis to systematically advance financial concerns over public health issues.
It is clear that reversible error occurred and a new trial should have been granted: (1) for the failure to conduct a meaningful Rule 404(b) in camera hearing during any of the four phases of the trial, (2) because of the unproven badgering assertions made by plaintiffs' lawyer while questioning Forte, and (3) because of the unproven assertions in the plaintiffs' opening statements and closing arguments.

6. Plaintiffs' Closing Arguments Bore No Relation to the Facts
Phase IV of the trial concerned punitive damages. During closing arguments, a number of unproven, inflammatory, "other bad act" comments and assertions were made by plaintiffs' counsel to the jury. Those comments and assertions included: (1) suggesting that the Mississippi River will receive harmful arsenic particles from the Spelter site; (2) comparing arsenic, cadmium and lead to fallout from a nuclear bomb; (3) referring numerous times to the atrocity of mountaintop mining; (4) referring to the Parkersburg site and C8 in terms of birth defects and animal studies; (5) suggesting that DuPont managers are carpetbaggers engaged in "raping the natural resources of this area;" (6) telling the jury, in conjunction with spurious videos shown during closing argument, that DuPont is like a burglar breaking into "your house" and stealing your health and quality of life; and (7) calling DuPont a renegade corporation.
For example, with regard to the reference to carpetbaggers engaged in "raping the natural resources of this area"a statement which had nothing to do with the issues before the juryplaintiffs' counsel asserted:
And when you tell them that with a number, you won't have people blowing tops off of mountains, and you won't have people polluting your rivers, and you won't have these carpetbaggers coming into this townthat's the only way I know how to describe itand raping the natural resources of this area.[4]
As to the non-evidentiary burglary videos shown during the plaintiffs' closing argument, DuPont argued:
Your honor, we saw a video of a masked burglar breaking into a house. We then saw a video of a man in jail sticking his hands out from the bars. Those videos were not in evidence. They are highly inflammatory, prejudicial. They were intended, obviously, to whip the jury up. Those videos, which were never disclosed to us, never put into evidence, never shown to your Honor, have no place in a punitive *923 damages trial, in our view, and they were obviously put up for one reason and one reason only, and your Honor, I think it may just work. Those videos aloneand I've made other arguments that we think, standing alone, suggest a mistrial is warrantedthose videos alone should have never been played. And were obviously intended to inflame the jury.
The circuit court denied Du Pont's motions for a mistrial. In its subsequent motion for a new trial, DuPont again alleged due process and Rule 404(b) violations, as well as error concerning inflammatory arguments by plaintiffs' counsel. The motion for a new trial was denied by order entered on February 25, 2008.
Rule 23.04(b) of the West Virginia Trial Court Rules provides in part:
Counsel may not comment upon any evidence ruled out, nor misquote the evidence, nor make statements of fact dehors the record, nor contend before the jury for any theory of the case that has been overruled. Counsel shall not be interrupted in argument by opposing counsel, except as may be necessary to bring to the court's attention objection to any statement to the jury made by opposing counsel and to obtain a ruling on such objection, (emphasis added).
The comments and assertions of plaintiffs' counsel, set forth above, during closing argument warrant a new trial. As stated in Polaroid Corp. v. Casselman, 213 F.Supp. 379, 381 (S.D.N.Y.1962):
A lawsuit is not a game but a search for the truth. The ends of justice are served, not by giving one side a vested right to exhaust the other, but by affording both an equal opportunity to a full and fair adjudication on the merits.

7. Property Damage Remediation Violated West Virginia Law
Phase III specifically concerned property damage, and the jury returned a verdict in favor of the plaintiffs in the amount of $55,537,522.25 for soil and structural remediation. The jury determined that the plaintiffs, who were property owners, were entitled to reasonable costs and expenses for the remediation of their properties. Specifically the jury found that the plaintiffs were entitled to remediation damages with regard to: (1) soil, (2) residences, (3) mobile homes and (4) commercial structures. Although the jury returned no damages for "annoyance and inconvenience associated with `loss of use' during the repair period," the jury found that the plaintiffs were entitled to damages for the reasonable costs of "management, overhead, profit and contingencies associated with the implementation of the remediation."
As set forth on the Phase III verdict form, the $55,537,522.25 consisted of the following components as determined by the jury:
1. Soil remediation: $5,652,977.43 (Zone 1A);
2. Residential remediation: $5,961,752.51 (Zone 1); $8,732,368.95 (Zone 2); $12,970,954.25 (Zone 3);
3. Mobile home remediation: $755,185.79 (Zone 1); $1,170,619.64 (Zone 2); $852,287.09 (Zone 3);
4. Commercial structure remediation: $65,410.77 (Zone 1); $200,830.88 (Zone 2); $749,777.42 (Zone 3); and
5. Management, overhead, profit and contingencies: $18,425,357.52.
In West Virginia, the measure of damages to real property is the cost of repair. However, if the damage cannot be repaired, or if the cost of the repair exceeds the market value of the property, then the measure of damages is the diminished value of the property. Syllabus Point 2 of Jarrett v. E.L. Harper & Son, Inc., 160 W.Va. 399, 235 S.E.2d 362 (1977), holds:
When realty is injured the owner may recover the cost of repairing it, plus his expenses stemming from the injury, including loss of use during the repair period. If the injury cannot be repaired or the cost of repair would exceed the property's market value, then the owner may recover its lost value, plus his expenses stemming from the injury including loss of use during the time he has been deprived of his property.
The measure of damages is much the same with regard to personal property. Syllabus *924 Point 7 of Cato v. Silling, 137 W.Va. 694, 73 S.E.2d 731 (1952), holds:
As a general rule the proper measure of damages for injury to personal property is the difference between the fair market value of the property immediately before the injury and the fair market value immediately after the injury, plus necessary reasonable expenses incurred by the owner in connection with the injury. When, however, injured personal property can be restored by repairs to the condition which existed before the injury and the cost of such repairs is less than the diminution of the market value due to the injury, the measure of damages may be the amount required to restore such property to its previous condition.
Nevertheless, West Virginia's law on diminished value as a measure of damages was never considered. Instead, as evidenced by the Phase III verdict form, the actual cost of remediation was the standard given to the jury. That is because the plaintiffs abandoned West Virginia's diminished value measure of damages during the trial.
In denying DuPont's motion for a new trial, the circuit court concluded:
During trial, plaintiffs withdrew its Diminution of Value claim and, instead, pursued only remediation for the class properties. DuPont contends plaintiffs' decision to abandon their diminution claim unfairly prejudiced DuPont because it had been prepared to defend against diminution. The Court finds DuPont was not prejudiced. DuPont was faced with the same property damage remedy, i.e., remediation, that plaintiffs had sought since the inception of the lawsuit, (emphasis added)
As a result of the court not following the law of property damage in West Virginia some property owners will receive more remediation money than the value of their building. Many of the structures in the class area were not examined by plaintiffs' expert for their structural integrity because plaintiffs' experts only sampled homes in the class area to prove remediation damages. Some of the structures to be remediated were abandoned, dilapidated and unlivable, having little value. Nevertheless, the owners of these run-down structures will now receive money for new light fixtures, new carpet, new air conditioning, new ceilings, new double-hung insulated windows, new kitchen ranges and new furniture. Some structures had a dirt basement floor. Dr. Brown testified that to remediate a basement dirt floor, there needed to be a new concrete basement poured.
DuPont is entitled to a new trial on the amount of property damage using the correct standard for property damage. In addition, no property owner should be awarded damages on a sampling of another persons' property. Even in a class action, each plaintiffs damages must generally be actually proven rather than awarding money based on a random sampling. See, e.g., Babineau v. Federal Express Corp., 576 F.3d 1183 (11th Cir. 2009); B.W.I. Custom Kitchen v. Owens-Illinois, Inc., 191 Cal.App.3d 1341, 235 Cal. Rptr. 228 (1987) ("Injury or `fact of damage,' which must be proven on classwide basis in antitrust action, is separate and distinct from issuance of actual damages." Most class actions contemplate individual proof of actual damages.) But see, Long v. Trans World Airlines, Inc., 761 F.Supp. 1320, 1326 (N.D.Ill.1991) ("courts have approved various methods of discovering and determining damages in class actions on the basis of classwide, rather than individualized proof of damages, and the use of statistics and representative samples are one such legitimate method."); Windham v. American Brands, Inc., 565 F.2d 59, 68 (4th Cir.1977) (if compensatory damages are capable of formula calculations, no manageability problem exists even though individual claims may exist).

8. The Circuit Court Erroneously Excluded All Evidence of Class Representative Lenora Perrine's Normal Blood Lead Test
In 2005, a lead class representative, Lenora Perrine, who had lived very near the Spelter plant site for decades, had a blood-lead test to determine if the smelter's emissions had caused an abnormal elevation of lead in her blood. The test showed that she had a normal blood-lead level, below any level of concern. The trial court refused to allow DuPont to present this evidence to the *925 jury. This evidence would have directly refuted plaintiffs' expert, Dr. Brown, who claimed that, despite DuPont's twenty-million dollar remediation of the closed plant site, hazardous exposure to contaminants was still ongoing in the class area. It would have refuted the unproven assertions and arguments by the plaintiffs' lawyers that this 80-year-old woman, who lived near the smelter, suffered bodily and mental injury.
First, the court barred DuPont from introducing the testimony of Mrs. Perrine's treating physician, Dr. Haeley Harman. Dr. Harman would have explained that her staff gave Mrs. Perrine a blood-lead test in 2005 and that Mrs. Perrine's blood-lead level was normal.
Second, the court precluded DuPont from asking Mrs. Perrine any questions about her blood-lead test even though Mrs. Perrine had testified on direct that she was terribly worried about elevated lead levels.
Next, the court prohibited DuPont from eliciting any testimony about Mrs. Perrine's blood-lead level from DuPont's expert toxicologist, Dr. Rodricks. Dr. Rodricks would have testified that Mrs. Perrine's blood-lead test showed her blood-lead level to be "very, very much below (a) level of concern." The court precluded Dr. Rodricks' testimony on this issue even though, only the day before, plaintiffs had conceded that such evidence could be admissible through DuPont's expert.
Even when plaintiffs conceded that Mrs. Perrine's blood-lead test was admissible, the circuit court ruled it inadmissible. Plaintiffs' expert Dr. Werntz asserted that blood-lead testing in the class area supported the theory of ongoing lead exposure in the class area though Plaintiffs submitted no test results to substantiate his assertion. Yet when DuPont sought to refute this assertion with Mrs. Perrine's actual blood-lead measurement, the circuit court again excluded the evidence.[5]
In a case involving claims of health hazards due to lead exposure, the measurement of lead in a plaintiffs body is not just relevant, it is crucial. The Perrine blood-lead test would have fatally undermined Dr. Brown's theory of "ongoing" exposure. According to that theory, Mrs. Perrine's test should have shown "significantly elevated" lead levels, not normal ones.
Had Mrs. Perrine been an individual litigant seeking to vindicate only her own claims based on alleged excessive lead exposure, it is inconceivable that this blood-lead test would have been excluded. But here the court excluded the evidence using the class-action form as a justification, ruling that the test results "can't be offered for any extrapolation purposes that can be applied class-wide." In other words, because the evidence related only to a lead plaintiff, Mrs. Perrine, the circuit court deemed it inadmissible. The court's exclusion of evidence central to the claim of a leading class representative turns the class-action concept on its head.
Mrs. Perrine was a lead class representative in this case, and she testified in that capacity. The fact that she showed no signs of exposure (much less significant exposure) counts against any award of class-wide relief. See, Avery v. State Farm Mut. Auto. Ins. Co., 216 Ill.2d 100, 139, 296 Ill.Dec. 448, 835 N.E.2d 801, 827 (2005) ("It is well settled that a class cannot be certified unless the named plaintiffs have a cause of action."). Fundamental to a class action is that the class representative is "typical" of and serves as a proxy for the absent class members, permitting the jury to evaluate the class's claims by evaluating the class representative's claims. Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 318 (4th Cir.2006). (A class action "allows a representative party to prosecute his own claims and the claims of those who present similar issues."); Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 1:1, at 2 (4th ed. 2002) (Class actions are "[r]epresentative suits on behalf of others similarly situated."). A class action does not allow the class representative to *926 avoid being confronted with the weaknesses in her own case.
Mrs. Perrine's normal blood-lead test would have directly refuted Brown's testimony that the community "continued to put people at risk," and that "it was not safe to live in Spelter". If any of this were true, then Mrs. Perrine's blood-lead levels would have been significantly elevated, not normal.
Mrs. Perrine's blood-lead test is relevant regardless of whether it can be "extrapolated" to the whole class. Plaintiffs cite no authority to the contrary. The class's case depended on the class representatives' case. Thorn v. Jefferson-Pilot Life Ins. Co., supra; Avery v. State Farm Mut. Auto. Ins. Co., 216 Ill.2d 100, 139, 296 Ill.Dec. 448, 835 N.E.2d 801, 827 (2005). Mrs. Perrine was a lead class representative. DuPont had a "right... to challenge the allegations of individual plaintiffs" and a "right to raise individual defenses against each class member." McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 232 (2nd Cir.2008); see also, Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 192 (3d Cir.2001) ("[Defendants have the right to raise individual defenses against each class member."); Guillory v. Am. Tobacco Co., 2001 WL 290603, at *8 (N.D.Ill. Mar. 20, 2001) ("[I]f defendants were not able to individually probe into the peculiarities of each class member's case, the result would be that they would be denied the opportunity to prepare a defense.").
DuPont is entitled to a new trial because the blood test results on Ms. Perrine were relevant. DuPont's request for its admission into evidence was proper.

9. The Summary Judgment Concerning the Grasselli Deeds
The circuit court found that the real estate in the chain of title from the original Grasselli deeds covered 40% of the class area. Although the entire class area needed remediation, the trial court held that the buildings and land in the area covered by the Grasselli deeds will not be remediated. Therefore, 40% of the land and buildings near the smelter will remain unsafe.
The circuit court ruled that various releases and easements found within the Grasselli deeds, which allow discharges from the smelter to be deposited upon the plaintiffs' lands, are binding and will be enforced. In my opinion, however, the releases in the Grasselli deeds violate the public policy of this State with regard to the welfare of the residential and small business owners within the class area. The releases and easements in the Grasselli deeds should be set aside, and, therefore, I respectfully dissent.
There are a number of reasons why the releases and easements in the Grasselli deeds, executed in the 1930s, are unenforceable in terms of the welfare of the public. As discussed below, those reasons include: (1) the allowance of unlimited, continuous emission deposits upon the parcels in question, (2) the interference with efforts to remediate nonexcluded properties, (3) the excluded parcels as a secondary source of contamination in the class area, (4) the patent ambiguity in the deeds surrounding the term easement and (5) the potential limitation of judicial authority to review covenants and agreements in deference to administrative agencies. Any of those reasons alone, or in combination, warrant the setting aside of the releases and easements.
The Grasselli Chemical Company, the original owner and operator of the smelter, using horizontal retorts or furnaces in the zinc extraction process, began the practice of depositing zinc residue or tailings at an on-site location which ultimately became the 50 acre waste pile. Production under Grasselli took place from 1911 until 1928 when DuPont acquired the facility. During the Grasselli years, local farmers complained about a decline in crop and livestock productivity and filed a number of lawsuits seeking recovery of damages caused by "fumes, gases and dust" emitted from the smelter. No illness in humans was reported. The Bear and Morgan Report, commissioned by Grasselli in 1919, concluded that dust and fumes from the smelter had negatively impacted plants and livestock in the Spelter community. Following the 1928 acquisition, DuPont and Grasselli settled the claims and lawsuits of the farmers and other property owners in the community.
*927 As part of the settlement, certain predecessors-in-title to a number of the plaintiffs in the Property Class executed deeds in the 1930s granting Grasselli, and its successors, releases and easements with regard to emissions from the facility. Specifically, the Grasselli deeds released all claims concerning various off-site properties, and the productivity thereof, arising from the "past, present or future" operation of the plant or any substances discharged therefrom. Moreover, the deeds conveyed to Grasselli, and its successors, a perpetual right or easement for the discharge of substances over and onto the off-site properties. According to the circuit court, parcels subject to the Grasselli deeds comprise approximately 40% of the land in the class area.
The following provisions are representative of the releases and easements found in the Grasselli deeds:
[T]he said party of the first part does hereby remise, release and forever discharge said parties of the second part [the Grasselli Chemical Company, its successors, etc.], and each of them, and the successors and assigns of them and each of them, of and from all actions, causes of action, suits, liabilities, damages, claims, debts and/or demands, in law or equity, which said party of the first part ... shall or may have against said parties of the second part ... for or by reason of any and all injuries, damages and/or losses of every kind whatsoever, to said land of said party of the first part, the productivity and/or products of said land ... which have been caused, arisen or resulted, or are caused, arise or result [or] hereafter may or shall be caused, arisen or result from, by reason or out of said plant or the past, present or future existence, construction, maintenance or operation of said plant, or any substance or substances in the past, present or future produced, discharged, emanating, cast, precipitated or escaping therefrom. * * *
The substance or substances hereinbefore and elsewhere in this deed mentioned do and shall include and extend to any and all solids, liquids, smokes, dust, precipitates, gases, fumes, vapors and other matters and things which have been, are or hereafter may or shall be produced, discharged, emanated, cast or precipitated, or did, do or shall escape, by or from said plant in, about or by reason of the manufacture, smelting, extraction or production of zinc or any product thereof[.] * * *
[The] party of the first part does hereby grant and convey to said The Grasselli Chemical Company, a Delaware corporation as aforesaid, and its successors and assigns forever, the full free and perpetual right to construct, maintain, operate and use the said plant ... to carry on the manufacturing, smelting, extracting and/or producing operation aforesaid, and to produce, discharge, emanate, cast, precipitate and cause or permit to escape the aforesaid substance or substances therefrom and over, on and/or onto said land of said party of the first part or any property or thing, real, personal or mixed, therein or thereon, without any compensation except the above recited consideration already received as aforesaid ... said party of the first part, for himself, and the heirs, personal representatives and assigns of him, hereby releasing any and all such actions, causes of action, suits, liabilities, damages, claims, debts or demands. * * *
Said party of the first part, for himself, and the heirs, personal representatives and assigns of him, covenants and agrees that all of the grants, releases, rights, easements, restrictions, covenants and agreements in or by this deed made, granted, created or imposed shall run with said land and the title thereto and shall bind said land, said party of the first part, and the heirs, personal representatives and assigns of him, and every subsequent owner, possessor or occupant of said land, or any part thereof, and shall inure to the benefit of said parties of the second part and each of them, and the successors and assigns of them and each of them forever.
In July 2007, DuPont filed for summary judgment which included the following averment concerning the Grasselli deeds: "The claims of numerous individual plaintiffs are barred by the operation of releases and easements granted to the Grasselli Chemical *928 Company and its successors and assigns which expressly allow for the discharge of the products and by-products of the smelter's operations over and onto their lands." The plaintiffs responded by asserting that the releases and easements do not bar the property damage claims: (1) because the extent of the potential contamination and damage was beyond the contemplation of the original landowners and (2) because the releases and easements, ostensibly allowing off-site emissions of contaminated materials, violate public policy.
In nearly identical orders entered on September 14, 2007, and September 20, 2007, the circuit court granted DuPont's motion for summary judgment with regard to the Grasselli deeds. The circuit court noted that the deeds resulted from the settlement of prior claims and lawsuits. The circuit court relied upon the express language of the deeds and concluded, without elaboration, that the releases and easements set forth therein are "binding and enforceable" upon those plaintiffs who are successors-in-title to the original grantors. The damage claims of those plaintiffs were, therefore, dismissed.
In relying upon the express language of the Grasselli deeds, the summary judgment orders do not address whether the import of the releases and easements was beyond the contemplation of the original parties or whether the releases and easements constitute a transgression of public policy. Instead, the circuit court indicated that the releases and easements are unambiguous and are, therefore, binding and enforceable.
I agree that the releases and easements are unambiguous to the extent of the redundancy employed in those provisions to bind the successors of both the original landowners and the Grasselli Chemical Company. As long recognized, "[w]here the intent of the parties is clearly expressed in definite and unambiguous language on the face of the deed itself, the court is required to give effect to such language and, ordinarily, will not resort to parole or extrinsic evidence." Pocahontas Land Corporation v. Evans, 175 W.Va. 304, 308, 332 S.E.2d 604, 609 (1985); Carr v. Michael Motors, Inc., 210 W.Va. 240, 245, 557 S.E.2d 294, 299 (2001); Henderson v. Coombs, 192 W.Va. 581, 585, 453 S.E.2d 415, 419 (1994). See also, 4A M. J., Contracts § 40 (Matthew Bender & Co. 2007) (observing that, if the written contract is unequivocal, the court is not at liberty to search for its meaning beyond the instrument itself).
Nevertheless, with regard to the extent of the deposit of substances allowed upon the excluded parcels, a patent ambiguity appears in the language of the Grasselli deeds surrounding the term easement. Although the Grasselli deeds speak of easements and releases, those terms are distinguishable. An easement is commonly associated with a right to cross or use land in a manner not inconsistent with the general use of the land by the owner. The Grasselli deeds, however, allow substances to be deposited upon the entirety of the surface of each parcel, in perpetuity, since, obviously, the deposits cannot be limited to a particular area of the property. Consequently, in the Grasselli deeds, easement can only be defined as encompassing 100% of the surface (plus all other items of property thereon, "real, personal or mixed") of each excluded parcel, to the detriment of the general use of the land by the owner. In that regard, the term easement in the Grasselli deeds is a misnomer or, at the very least, evidences an ambiguity regarding the extent of the emission deposits contemplated by the original parties.
The language of the releases and easements violate public policy. In Cordle v. General Hugh Mercer Corp., 174 W.Va. 321, 325 S.E.2d 111 (1984), this Court observed that a determination of the existence of public policy in West Virginia is a question of law to be resolved by the court in light of the particular circumstances of each case, public policy embodying the principle that no person can lawfully do that which has a "tendency to be injurious to the public or against public good." 174 W.Va. at 325, 325 S.E.2d at 114. See, Mitchell v. Broadnax, 208 W.Va. 36, 45, 537 S.E.2d 882, 891 (2000) (decision of a public policy issue is a legal query, but such a determination is made on a case-by-case basis).
DuPont asserts that upholding the summary judgment orders would vindicate public *929 policy because the releases and easements: (1) resulted from the original parties' freedom of contract and (2) resulted from the settlement of claims and lawsuits which is favored and encouraged in the law. The plaintiffs contend, however, that those considerations must give way to a greater public policy of halting the unrestricted, continuous migration of hazardous materials from a facility, such as the Spelter plant, onto the soil and the residential and commercial structures of an adjacent community.
Manifestly, the principles set forth by DuPont are not absolute. Syllabus Point 3 of Wellington Power Corporation v. CNA Surety Corporation, 217 W.Va. 33, 614 S.E.2d 680 (2005), holds: "This State's public policy favors freedom of contract which is the precept that a contract shall be enforced except when it violates a principle of even greater importance to the general public." See, 15 Corbin on Contracts § 79.1 (Matthew Bender & Co. 2003) (suggesting that the freedom of contract is not superior to the general welfare of the public). Moreover, in Syllabus Point 1 of Sanders v. Roselawn Memorial Gardens, 152 W.Va. 91, 159 S.E.2d 784 (1968), this Court said: "The law favors and encourages the resolution of controversies by contracts of compromise and settlement rather than by litigation; and it is the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy." Syllabus Point 8, Certain Underwriters at Lloyd's London v. Pinnoak Resources, 223 W.Va. 336, 674 S.E.2d 197 (2008); Syllabus Point 4, Horkulic v. Galloway, 222 W.Va. 450, 665 S.E.2d 284 (2008); Syllabus Point 3, Berardi v. Meadowbrook Mall Company, 212 W.Va. 377, 572 S.E.2d 900 (2002).
The Grasselli deeds, made in the 1930s, released Grasselli and its successors from all claims for losses of every kind caused by the past, present or future operation of the plant or caused by any substance, in the past, present or future, emanating from the plant. Although the term substances is defined in the deeds as relating to the smelting of zinc ore, the by-products arsenic, cadmium and lead are not mentioned. The deeds further grant Grasselli and its successors the "free and perpetual right" to discharge, or permit to escape, the substances onto the lands of the grantors. Finally, the deeds provide that the releases and easements "shall run with the land" and "shall bind said land" to the benefit of Grasselli and its successors. No reference is made to any standard of conduct on the part of the operators of the smelter facility. Nor is any restriction placed upon the volume of material allowed to migrate to the off-site properties. As long as the emissions relate to smelting, the servient estates are subject to any amount or combination of emission deposits, including arsenic, cadmium and lead, upon a daily basis, in perpetuity.
In such circumstances, public policy concerns with regard to the present and future outlook of the class area arise with blinding clarity. Certainly, the economic development of the region is a matter within the authority of the Legislature. Nevertheless, the binding of the excluded parcels to exposure to hazardous substances for all the future through the Grasselli releases and easements, and the long-term impact of that exposure upon the entire class area, is a factor which may be judicially considered in the circumstances of this action in determining public policy.
Smelting activities at the plant began in 1911 and continued until the facility closed in 2001. The last operator, Diamond, continued the practice of depositing residue containing arsenic, cadmium and lead onto the exposed waste pile. Ultimately, the waste pile covered 50 acres, was 100 feet in height and reached the bank of the West Fork River. The February 1996 internal memorandum of the Environmental Protection Agency noted that the town of Spelter "lies in the downwind footprint of the unprotected site soils and tailings pile." In September 1997, the Environmental Protection Agency issued an Administrative Order finding that the actual or threatened release of hazardous substances, including arsenic, cadmium and lead, from the smelter posed a risk to public health and the environment and that responsive action was required to abate the problem. The subsequent application of Diamond and DuPont for participation in the West *930 Virginia Voluntary Remediation Program stated that the 50 acre waste or tailings pile was the primary source of contamination at the smelter facility. While DuPont has gone to great lengths to remediate the plant site, administrative orders entered by the regulatory agencies in that regard did not require remediation of the off-site properties.
To now engage in remediation activities in the class area while 40% of that area is excluded because of the Grasselli releases and easements will, no doubt, be counterproductive, especially since the excluded, unremediated properties potentially constitute a secondary source of contaminant migration, further endangering the community environment. Remediation efforts will have to avoid the excluded parcels, and, after remediation is completed, natural weathering processes will likely migrate hazardous substances throughout the remediated area. There is an old saying to the effect that an elephant is nothing more than a horse designed by a committee. That is the result of excluding some properties in the class area while randomly remediating others.
In determining this aspect of the class action, the public policy asserted by the plaintiffs against the validity of the Grasselli releases and easements does not depend upon whether the substances were negligently or recklessly deposited upon the off-site properties or whether there was actual harm to the public. The standard for determining public policy in the circumstances herein is the magnitude of the threat to the welfare of the public and the tendency of the otherwise valid exculpatory provisions in the Grasselli deeds to be injurious to the public or against the public good. See, Cordle, supra, 174 W.Va. at 325, 325 S.E.2d at 114.[6] Certainly, the greater the risk to the welfare of the public, the more compelling the rationale for invalidating unrestricted releases and easements which allow the migration of hazardous substances upon servient properties.
Nor should this Court defer to the federal Environmental Protection Agency or the West Virginia Department of Environmental Protection to vindicate public policy. The remediation orders issued by those agencies, to date, concern only the immediate smelter facility and not the off-site properties. Moreover, the responsibility of plant operators in terms of government regulation did not vest until decades after the emissions began and the waste pile was created. In any event, the challenge of the plaintiffs to the Grasselli releases and easements, and DuPont's defense thereof, are grounded in the law of contracts. The validity of the Grasselli deeds, therefore, is for the courts to decide.
The language of the releases and easements in the Grasselli deeds, in conjunction with the circumstances surrounding the operations at the smelter facility, warrant the conclusion that the releases and easements violate the public policy of this State as a matter of law with regard to the welfare of the entire class area. Accordingly, the summary judgment orders entered on September 14, 2007, and September 20, 2007, should be reversed, and the claims of the members of the Property Class, heretofore excluded, should be reinstated.

B. Concurrence
I agree with the majority on the award of a new trial on the statute of limitations issue and the holding that no punitive damages are available in medical monitoring cases.
However, while I agree that DuPont is entitled to a new trial on the statute of limitation issue, a new trial on this question alone will hardly make up for the numerous prejudicial errors throughout the trial.
PER CURIAM:

On Petition for Rehearing

(Filed June 2, 2010)
On March 26, 2010, this Court issued an opinion in this case which affirmed the lower *931 court's judgment in part, conditionally affirmed in part, and reversed in part. DuPont filed a petition for rehearing on April 23, 2010, seeking to have this Court reconsider the disposition of the punitive damages allocation for medical monitoring.[1] As pointed out in the majority opinion, the verdict form in this case did not allocate punitive damages between the Plaintiffs' property damage claims and their medical monitoring claims. The majority opinion, after finding that punitive damages could not be awarded for medical monitoring, allocated forty percent of the punitive damages for medical monitoring and thereafter reduced the punitive damages by forty percent.[2] In the petition for rehearing DuPont contends that this Court should have allocated seventy percent of the punitive damages for medical monitoring. In support of its argument DuPont presents essentially two contentions: (1) this Court should not have considered statements made during oral argument regarding the allocation of forty percent of the punitive damages for medical monitoring, and (2) that evidence exists which shows that seventy percent of the punitive damages should have been awarded for medical monitoring. We will address both contentions separately.

1. Representations Made During Oral Argument
During oral arguments, this Court specifically asked counsel for Plaintiffs whether the trial court made an allocation of the punitive damages between the property damage claims and the medical monitoring claims. This question was asked for two reasons. First, the record submitted to this Court did not contain any reference to an allocation of punitive damages between the property damage claims and the medical monitoring claims. Second, and most importantly, the question was asked because one of DuPont's assignments of error concerned whether or not punitive damages could be awarded for medical monitoring.
Counsel for Plaintiffs informed this Court, in response to our direct question, that the trial court allocated forty percent of the punitive damages for medical monitoring. After counsel for Plaintiffs informed this Court of how the trial court ruled on the issue of the allocation of punitive damages, counsel for DuPont closed out its argument without challenging the representations made by Plaintiffs' counsel. That is, DuPont failed to inform the Court that it disagreed with Plaintiffs' counsel's response to our question.
In its petition for rehearing, DuPont contends, for the first time, that "[t]he Circuit Court made no such allocation[.]" Assuming that DuPont is correct in representing to this Court that the circuit court did not make such an allocation, well settled principles of appellate procedure indicate that "a rehearing on an appeal can be granted only for purposes of correcting errors that the court has made, and the party seeking a rehearing cannot assign as error points or arguments that could have been raised before the appeal was resolved." In re Leslie H., 369 Ill.App.3d 854, 308 Ill.Dec. 445, 861 N.E.2d 1010, 1015 (2006).[3]See also SouthTrust Bank v. Copeland One, L.L.C., 886 So.2d 38, 43 (Ala.2003) ("Matters not argued... on original submission cannot be raised for the first time on application for rehearing."); Pacific Bell Wireless, LLC v. Public Utils. Comm'n of California, 140 Cal.App.4th 718, 746, 44 Cal.Rptr.3d 733, 754 (Cal.Ct.App. 2006) ("Arguments cannot be raised for the first time in a petition for rehearing."); Massey v. Conseco Servs., L.L.C., 886 N.E.2d 581, 582 (Ind.Ct.App.2008) ("[On petition for rehearing] Massey waived this issue by failing to raise it on appeal."); Kinzenbaw v. Director of Revenue, 62 S.W.3d 49, 54 n. 9 *932 (Mo.2001) ("Issues raised for the first time in a motion for rehearing will not be considered."). It has been correctly noted that "[t]he purpose of a petition for rehearing is not to present points which lawyers for the losing parties have overlooked[.]" Kennedy v. South Carolina Ret. Sys., 349 S.C. 531, 564 S.E.2d 322, 322 (2001) (quotations and citation omitted).
"There are sound reasons for requiring a party to present all known arguments or claims to an appellate court before its decision is rendered." Northern Indiana Commuter Transp. Dist. v. Chicago SouthShore & S. Bend R.R., 685 N.E.2d 680, 687 (Ind. 1997). "One of the reasons for the rule is to prevent a party from appealing in a piecemeal manner. The rule also keeps a party from shifting its position. The basic purposes are to promote the finality of appellate courts' decisions and to conserve judicial time." Kentner v. Gulf Ins. Co., 298 Or. 69, 689 P.2d 955, 957 (1984) (citations omitted). See also OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P., 234 S.W.3d 726, 747 (Tex.Ct.App.2007) ("A motion for rehearing does not afford a party an opportunity to raise new issues after the case has been briefed, argued, and decided on other grounds, unless the error is fundamental. Fundamental error exists in those rare instances in which the record shows the court lacked jurisdiction or that the public interest is directly and adversely affected as that interest is declared in the statutes or the Constitution[.]") (internal quotations and citations omitted). As more fully discussed in the next section, as a result of DuPont's silence during oral argument, it has waived its right to contest the issue of an allocation of punitive damages by the circuit court. See Butch v. State Comp. Comm'r, 112 W.Va. 493, 498, 165 S.E. 672, 674 (1932) ("The petition for rehearing now states the fact to be that the letter containing the protest was actually filed with the commissioner on April 28th. We cannot now consider a different state of facts from what was shown on the submission of the case.").
In addition to contending that the circuit court did not make an allocation for punitive damages, DuPont argues that this Court could not consider the statements of Plaintiffs' counsel during oral argument because "statements by counsel during argument do not constitute evidence." This contention by DuPont shows a lack of understanding of the purpose of appellate oral argument and the discretionary weight that is given to argument of counsel.
"Oral arguments before the appellate court are intended to aid the court in understanding the points raised and discussed in the briefs filed by the parties." Security Dev. & Inv. Co. v. Ben O'Callaghan Co., 125 Ga.App. 526, 188 S.E.2d 238, 244 (1972) (quotations and citation omitted). "Indeed, courts routinely rely on counsel's statements during oral argument and rely on these representations when deciding cases." Matthews v. State, 165 S.W.3d 104, 110 (Tex.Ct.App.2005) (quotations and citation omitted). Moreover, "[o]ral concessions developed during oral argument before [an appellate] court may properly be used even where the trial record is silent." Staples v. Palten, 214 Conn. 195, 571 A.2d 97, 101 n. 1 (1990). See also Village Saloon, Inc. v. Division of Alcoholic Beverages & Tobacco, Dep't. of Bus. Regulation, 463 So.2d 278, 281 (Fla.Dist.Ct.App.1984) ("Though the record is silent on the matter, it was represented during oral argument that a preliminary hearing was held as scheduled on November 16, without achieving any satisfactory resolution of the charges."); Hoover v. Allied Van Lines, Inc., 2005 WL 1277952, at *2 (Kan.Ct.App.2005) ("As the record on appeal was silent as to why the district court relied upon § 14704(e) rather than § 14708(d), we asked the parties during oral argument for an explanation. Neither party had an explanation."); State v. Hunter, 1984 WL 3984, at *1 (Ohio Ct.App.1984) ("During oral argument on appeal counsel did indicate that an in camera inspection of the tape was had, although the record is silent on this point.").
Although it is rare, this Court has disposed of cases based upon representations made by the parties during oral argument, which are not contained in the record. A case on point is State v. Board of Canvassers of Nicholas County, 106 W.Va. 544, 146 S.E. 378 (1929). The decision in Smith involved a petition for *933 a writ of mandamus. The petition was filed by Ray Lambert seeking to have this Court compel the board of canvassers to reconvene and to properly count certain ballots, and to declare him the winner of a majority of all the votes cast for the office of sheriff of Nicholas County. During oral argument in the case, the parties stated that this Court should assume that Mr. Lambert received 3,733 votes and that his opponent received 3,745 votes, exclusive of ballots to which there were objections. Based upon the representations the parties made at oral argument, this Court issued the requested writ. The opinion in Smith concluded that, based upon "the figures hereinbefore agreed to [at oral argument], we find that [the opponent] has received a total of 3,795 votes and [Mr.] Lambert 3,795 votes." Smith, 106 W.Va. at 554, 146 S.E. at 383. After this Court issued the opinion in Smith, Mr. Lambert filed a petition for rehearing. The basis for the rehearing was that Mr. Lambert "discovered that his counsel were mistaken when they stipulated with opposing counsel at the bar of this court that the court should assume that [the opponent] had 3,745 votes and [Mr.] Lambert 3,733 votes ...; that, as a matter of fact, ... [the opponent] had 3,744 votes and [Mr.] Lambert 3,733." Smith, 106 W.Va. at 554, 146 S.E. at 383. In summarily rejecting the petition for rehearing, this Court stated that Mr. Lambert "has pointed out nothing in the decision to indicate that there should be a rehearing of the case. Nor are we of opinion that the alleged mistake in the [opponent's] total ... affords basis for rehearing." Smith, 106 W.Va. at 554, 146 S.E. at 383. See also In re Skyelan H., 219 W.Va. 661, 664, 639 S.E.2d 753, 756 (2006) ("On the basis of the parties' statements during oral argument, we ... reverse the circuit court's decisions and remand the case.").
Thus, it is clear that this Court may rely on representations made by counsel during oral argument regarding an issue that is not addressed in the record on appeal.

2. Evidence Showing That Seventy Percent of the Punitive Damages Should Be Awarded for Medical Monitoring
The petition for rehearing points out that, while this case was pending before this Court, and prior to oral arguments, the parties conducted proceedings before a special master to address the issue of the allocation of punitive damages. Specifically, DuPont contends that on August 29, 2008, Plaintiffs' counsel authored a letter suggesting that seventy percent of the punitive damages should be allocated for the medical monitoring claims. According to DuPont, the special master adopted this recommendation in a report rendered on November 25, 2008. For the reasons set out below, we find this nonbinding evidence to be untimely.[4]
DuPont readily admits that the special master's report was submitted to the circuit court on November 25, 2008. From that date to the date of oral arguments in this case, April 7, 2009, DuPont was aware of the special master's recommendation that seventy percent of the punitive damages should be allocated for the medical monitoring claims. Even though DuPont had knowledge of the report long before the date of oral arguments, DuPont failed to file a motion with this Court to supplement the record with the report. Further, DuPont had such knowledge at the time this Court specifically asked Plaintiffs' counsel whether the trial court had made an allocation of the punitive damages award. After Plaintiffs' counsel represented to this Court that forty percent of the punitive damages was allocated to the medical monitoring claims, DuPont failed to challenge that assertion during rebuttal by informing this Court that no such allocation was made, and that a special master had adopted the suggestion of Plaintiffs' counsel that seventy percent of the punitive damages be awarded for the medical monitoring claims.
It has been correctly observed that, when a party is familiar with an issue in a case prior to appellate argument yet asserts for *934 the first time in a petition for rehearing that the issue was not correctly represented on appeal, the failure of the party "to make ... mention of the subject until after it had lost the case ..., if deliberate, is a breach of duty to the court and, if inadvertent, is still inexcusable." Carr v. F. T. C., 302 F.2d 688, 692 (1st Cir.1962). See also Hurst v. Gulf Oil Corp., 254 F.2d 287, 288 (5th Cir.1958) ("The first ground urged in support of the petition for rehearing is that the Court `erred in deciding this case under the laws of Texas....' Unless our recollection of the oral argument is faulty, no question as to the stipulation [that Texas law applied] was then raised and there was no insistence on the law of New Mexico. This ground of the petition for rehearing comes too late."). A longstanding legal maxim adhered to by this Court is that "[t]he law aids those who are diligent, not those who sleep upon their rights." Dimon v. Mansy, 198 W.Va. 40, 48, 479 S.E.2d 339, 347 (1996) (internal quotations and citation omitted). "We have explained this principle of law to mean that when attorneys are careless, and [do] not attend to their interests in court ..., they must suffer the consequences of their folly." Law v. Monongahela Power Co., 210 W.Va. 549, 561, 558 S.E.2d 349, 361 (2001) (Davis, J., dissenting) (internal quotations and citation omitted). See also Hanlon v. Logan County Bd. of Educ., 201 W.Va. 305, 315, 496 S.E.2d 447, 457 (1997) ("Long standing case law and procedural requirements in this State mandate that a party must alert a tribunal as to perceived defects at the time such defects occur[.]"); State ex rel. Cooper v. Caperton, 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996) ("The rule in West Virginia is that parties must speak clearly in ... court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace.").
Further, "counsel cannot remain silent [on an issue raised during oral arguments] and then for the first time on [a petition for rehearing] spring out an objection that[,] if made [during oral arguments,] would have given [this Court] an opportunity to correct the alleged error." State v. Lease, 196 W.Va. 318, 323, 472 S.E.2d 59, 64 (1996). This Court has consistently held that "silence may operate as a waiver of objections to error and irregularities[.]" State v. Grimmer, 162 W.Va. 588, 595, 251 S.E.2d 780, 785 (1979), overruled on other grounds by State v. Petry, 166 W.Va. 153, 273 S.E.2d 346 (1980). This raise or waive rule is designed "to prevent a party from obtaining an unfair advantage by failing to give [a] court an opportunity to rule on the objection and thereby correct potential error." Wimer v. Hinkle, 180 W.Va. 660, 663, 379 S.E.2d 383, 386 (1989). There is another salutary justification for the raise or waive rule. That is, "[i]t prevents a party from making a tactical decision to refrain from objecting and, subsequently, should the case turn sour, assigning error (or even worse, planting an error and nurturing the seed as a guarantee against a bad result)." State v. LaRock, 196 W.Va. 294, 316, 470 S.E.2d 613, 635 (1996). Although the raise or waive rule is usually invoked for errors or irregularities at the trial court level, the rule has equal force and application at the appellate level. As pointed out by the Ninth Circuit Court of Appeals, "[o]rdinarily, arguments not timely presented are deemed waived[, and t]his general doctrine of waiver applies to arguments raised for the first time in a petition for rehearing." Narang v. Gonzales, 138 Fed.Appx. 26, 27 (9th Cir.2005) (internal quotations and citation omitted). See also Noonan v. Staples, Inc., 561 F.3d 4, 6 (1st Cir.2009) ("That Staples did not timely raise the issue is also made clear by the fact that it has not, until now [(on a petition for rehearing en banc)], filed the notice required for a challenge to the constitutionality of a state statute. The issue is waived, and the fact that the issue raises constitutional concerns does not save the waiver."); Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1173 n. 35 (9th Cir.2009) ("On petition for rehearing en banc, MBNA raises for the first time an argument that allowing private enforcement of California Civil Code section 1785.25(a) is inconsistent with the purpose of the FCRA and thus is preempted under both FCRA § 1681t(a) and ordinary conflict preemption provisions. MBNA did not advance this contention before us initially, so the argument is waived."); United States v. Pipkins, 412 F.3d 1251, 1253 (11th Cir.2005) ("We have a long-standing *935 rule that we will not consider issues that were argued for the first time in a petition for rehearing, and we adhere to that rule today."); Keating v. F.E.R.C., 927 F.2d 616, 625-26 (D.C.Cir.1991) ("It was not until the instant petition for rehearing that California raised for the first time a claim that the Corps permit is not a permit `with respect to the construction of a[] facility' within the meaning of the statute. Because California failed to raise this argument until its petition for rehearing, the argument is waived and we decline to reopen the matter now.").
Petition for rehearing denied.
NOTES
[1] It should be noted that DuPont sought the involvement of this Court prior to the granting of these appeals. In State ex rel. E.I. DuPont de Nemours & Company v. Bedell, et al., no. 070762, this Court, on March 15, 2007, refused DuPont's petition to prohibit the disclosure of documents said to be the subject of qualified immunity and privilege. In addition, in State ex rel. E.I. DuPont de Nemours and Company v. Bedell, et al., no. 072095, this Court, on June 27, 2007, refused DuPont's petition to prohibit continuing the litigation as a class action.
[2] As acknowledged during the submission of these appeals, the high quality of the briefs and oral argument presented to this Court by counsel in this complex and difficult matter is appreciated. Also appreciated is the careful preparation and indexing of the record by the Office of the Circuit Clerk of Harrison County.
[3] As explained in the body of this opinion, if the jury determines that the Plaintiffs did not have the requisite knowledge more than two years prior to filing their cause of action, then the judgment in favor of the Plaintiffs, as modified by this opinion, stands. If, however, the jury determines that the Plaintiffs had the requisite knowledge more than two years prior to filing their cause of action, then the trial court must set aside the verdict and render judgment in favor of DuPont.
[4] See infra note 15 for a comment regarding the filing of two separate summary judgment orders.
[5] "Tailings" have been described as "the material left over from the process of separating the valuable minerals from the worthless portion of. . . ore." In re NovaGold Res. Inc. Sec. Litig., 629 F.Supp.2d 272, 277 (S.D.N.Y.2009). Thus, the term "zinc tailings" refers to the residue produced in the process of zinc smelting.
[6] Two such cases reached this Court. In Bartlett v. Grasselli Chemical Co., 92 W.Va. 445, 115 S.E. 451 (1922), this Court reversed a $15,000 judgment for injury to the agricultural, residential and market value of a farm, caused by emissions from the smelter, and remanded the action for a new trial. Subsequently, in Lyon v. Grasselli Chemical Co., 106 W.Va. 518, 146 S.E. 57 (1928), this Court affirmed a $2,000 judgment against Grasselli for injury to the fertility and productivity of the landowner's soil.
[7] The Bear and Morgan Report states "[n]othing was observed to indicate any injury to health of human beings which may have been caused by the `fumes.' Housewives complain that they have more housecleaning to do on account of the `dirt' that settles on their lace curtains, etc."
[8] A retort is defined as "a vessel in which substances are subjected to distillation or decomposition by heat and which may be made in various forms and of various materials for different uses." Webster's Third New Int'l Dictionary 1939 (unabr. ed. 1966).
[9] It should be noted that the smelter facility was also known as the Meadowbrook facility. As indicated by the circuit court, the name "Meadowbrook" has been associated with both Matthiessen (as a subsidiary of that company) and Diamond (as merging with Diamond). In any event, Meadowbrook Corporation and Matthiessen & Hegeler Zinc Company, Inc., although named as appellees herein, are dissolved corporations and are not involved in these consolidated appeals.
[10] Indicating that the ages of the children were twenty-three months to fifteen years, the ATSDR Report stated that "[t]he blood lead concentrations ranged from non-detectable to 12 TΦg/dL [micrograms per deciliter]. Only one individual had a blood lead level (12 TΦg/dL) in excess of 10 TΦg/dL." The report suggested retesting for children with blood lead levels of 10 to 14 TΦg/dL.
[11] See also Title 60 West Virginia Code of State Regulations, Series 3, entitled "Voluntary Remediation and Redevelopment Rule," initially effective in 1997, and, in addition, the West Virginia Voluntary Remediation and Redevelopment Act Guidance Manual issued by the West Virginia Division of Environmental Protection.
[12] In this regard, W. Va.Code § 22-22-8 (1996) (Repl. Vol. 2009) provides:

After signing a voluntary remediation agreement, the person undertaking remediation shall prepare and submit the appropriate work plans and reports to the director. The director shall review and evaluate the work plans and reports for accuracy, quality and completeness. The director may approve a voluntary remediation work plan or report or disapprove and notify the person of additional information needed to obtain approval.
Moreover, W. Va.Code § 22-22-7(b) (1996) (Repl. Vol. 2009) provides that "[a]ny voluntary remediation agreement approved by the director shall provide for the services of a licensed remediation specialist for supervision of all activities described in the agreement." The phrase "licensed remediation specialist" is defined in W. Va.Code § 22-22-2(n) (1996) (Repl. Vol. 2009), as "a person certified by the director . . . as qualified to perform professional services and to supervise the remediation of contaminated sites."
[13] The other named defendants included: (1) Meadowbrook Corp., (2) Matthiessen & Hegeler Zinc Co., Inc., (3) Nuzum Trucking Co. and (4) Joseph Paushel. Those defendants are not involved in the consolidated appeals before this Court. As previously stated, Meadowbrook Corp. and Matthiessen & Hegeler Zinc Co., Inc., although named as appellees herein, are dissolved corporations.
[14] As set forth in the September 14, 2006, order, the five-by-seven mile area designated for the property class included the following Harrison County communities: (1) Spelter, (2) Erie, (3) Hepzibah, (4) Lambert's Run, (5) Meadowbrook, (6) Gypsy, (7) Seminole, (8) Lumberport and (9) Smith Chapel.
[15] The circuit court entered two separate summary judgment orders addressing, inter alia, the Grasselli deeds and the statute of limitations. One order was entered on September 14, 2007, and contains the circuit court's findings of fact. A subsequent order, entered on September 20, 2007, focuses on the circuit court's conclusions of law. We take this opportunity to point out that we do not approve of the practice of having separate orders setting out findings of fact and conclusions of law.
[16] As set forth on the Phase III verdict form, the $55,537,522.25 consisted of the following components as determined by the jury:

1. soil remediation: $5,652,977.43 (Zone 1A);
2. residential remediation: $5,961,752.51 (Zone 1); $8,732,368.95 (Zone 2); $12,970,954.25 (Zone 3);
3. mobile home remediation: $755,185.79 (Zone 1); $1,170,619.64 (Zone 2); $852,287.09 (Zone 3);
4. commercial structure remediation: $65,410.77 (Zone 1); $200,830.88 (Zone 2); $749,777.42 (Zone 3); and
5. management, overhead, profit and contingencies: $18,425,357.52.
[17] Although Diamond assigned to the Plaintiffs its claim for indemnification, the circuit court's award of costs and expenses was made directly to Diamond and not the Plaintiffs. Insofar as Diamond was a beneficiary of the summary judgment order, Diamond has standing to file a brief, separate from the Plaintiffs' brief, on the indemnification issue in this Court.
[18] In Syllabus point 1 of Valloric v. Dravo Corp., 178 W.Va. 14, 357 S.E.2d 207 (1987), this Court distinguished express indemnity, based upon a written agreement, from implied indemnity, arising out of equitable principles and the relationship of the parties. See also Valloric, 178 W.Va. at 17 & 18 n. 5, 357 S.E.2d at 210 & 211 n. 5. Accord VanKirk v. Green Constr. Co., 195 W.Va. 714, 721 n. 12, 466 S.E.2d 782, 789 n. 12 (1995); City Nat'l Bank of Charleston v. Wells, 181 W.Va. 763, 774, 384 S.E.2d 374, 385 (1989).
[19] DuPont also asserts that the "ENVIRONMENTAL AND SALE AGREEMENT" fails to provide indemnification to Diamond because the Agreement is limited to the off-site migration of contaminants through soil and water, whereas the Plaintiffs' claims are primarily based upon airborne emissions from the smelter facility. In that regard, paragraphs 5 and 6 of the Agreement state that DuPont shall indemnify or release Diamond with regard to liabilities related to the off-site migration of "soil, sediment, groundwater or surface water." Airborne emissions are not mentioned.

The Plaintiffs and Diamond respond by asserting that there is ample evidence in the record to show that the contamination from the facility followed a number of pathways, such as through the West Fork River, to reach off-site locations. Moreover, the second amended complaint alleges, inter alia, that hazardous substances were simply "released" from the facility. Thus, the Plaintiffs contend that their claims were not based upon airborne emissions alone. In any event, this Court notes that paragraphs 5 and 6 of the "ENVIRONMENTAL AND SALE AGREEMENT" specifically state that DuPont's responsibility "includ[es], but [is] not limited to," migration through soil and water. Consequently, this Court concludes that DuPont's assertion, that the Agreement does not apply to airborne emissions, is unconvincing.
[20] See supra note 15 for a comment regarding the entry of two separate summary judgment orders.
[21] This aspect of the action does not concern medical monitoring. Although DuPont asserted in its summary judgment motion that the Grasselli deeds precluded all claims asserted by the property owners subject thereto, the circuit court ruled that the deeds did not bar the affected plaintiffs' medical monitoring claims. This ruling by the circuit court has not been appealed.
[22] For a definition of the term "tailings," see note 5 supra.
[23] As previously indicated, the circuit court, in this action, found that DuPont's acquisition of Grasselli in 1928 constituted a consolidation or merger and that DuPont assumed successor liability for Grasselli's conduct concerning the smelter facility.
[24] See supra note 15 for a comment regarding the entry of two separate summary judgment orders.
[25] As previously noted, the circuit court ruled that the deeds did not preclude the Plaintiffs' medical monitoring claims.
[26] The term "substances" is defined in the deeds as

any and all solids, liquids, smokes, dust, precipitates, gases, fumes, vapors and other matters and things which have been, are or hereafter may or shall be produced, discharged, emanated, cast or precipitated, or did, do or shall escape, by or from said plant in, about or by reason of the manufacture, smelting, extraction or production of zinc or any product thereof.
[27] Ms. Murphy was injured when the guide operating her raft attempted to rescue another raft, which was also owned by the defendant North American River Runners, Inc., that had become trapped among rocks in the rapids. Murphy v. North Am. River Runners, Inc., 186 W.Va. 310, 313-14, 412 S.E.2d 504, 507-08 (1991). Ms. Murphy's guide attempted to dislodge the ensnared raft by intentionally bumping the raft with the raft upon which Ms. Murphy was riding. Id. The force of the bump threw Ms. Murphy out of her raft causing her injury. Id.
[28] Likewise, the other cases cited by the Plaintiffs involve pre-injury agreements. See Tudor v. Charleston Area Med. Ctr., Inc., 203 W.Va. 111, 506 S.E.2d 554 (1997) (pertaining to pre-injury release signed by job applicant allowing prospective employer to obtain employment information from prior employer); Johnson v. Junior Pocahontas Coal Co., Inc., 160 W.Va. 261, 234 S.E.2d 309 (1977) (involving pre-injury exceptions and reservations contained in deed whereby plaintiffs acquired their property); Stamp v. Windsor Power House Coal Co., 154 W.Va. 578, 177 S.E.2d 146 (1970) (discussing enforceability of pre-injury conveyances of coal seams that waive the right to subjacent support of the surface); Continental Coal Co. v. Connellsville By-Prod. Coal Co., 104 W.Va. 44, 138 S.E. 737 (1927) (addressing pre-injury provision in title papers conveying coal seam). But see Rose v. Oneida Coal Co., Inc., 180 W.Va. 182, 375 S.E.2d 814 (1988) (enforcing pre-injury reserve in severance deed granting right to mine coal without liability for injury to surface in claim by surface owner alleging willful, negligent and wanton conduct).
[29] The term "reckless" is "[characterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless; rash." Black's Law Dictionary 1276 (7th ed. 1999). In the context of the Grasselli deeds, "harm" refers only to harm to the land and personal property of the Plaintiffs whose land is subject to the Grasselli easements. As noted above, the circuit court concluded that the Grasselli deeds did not preclude the Plaintiffs' medical monitoring claims, and this ruling has not been appealed. See supra note 21.
[30] "Wanton misconduct" refers to "[a]n act, or a failure to act when there is a duty to do so, in reckless disregard of another's rights, coupled with the knowledge that injury will probably result." Black's Law Dictionary 1014 (7th ed. 1999).
[31] See, e.g., Wright v. Sony Pictures Entm't, Inc., 394 F.Supp.2d 27 (D.D.C.2005) (pre-injury contestant release form for participation in "Wheel of Fortune" game show); American Motorist Ins. Co. v. Morris Goldman Real Estate Corp., 277 F.Supp.2d 304 (S.D.N.Y.2003) (pre-injury waiver of subrogation clause contained in lease agreement); Western Alliance Ins. Co. v. Wells Fargo Alarm Servs., Inc., 965 F.Supp. 271 (D.Conn. 1997) (pre-injury release in contract for security/alarm system); Wolfgang v. Mid-Am. Motorsports, Inc., 898 F.Supp. 783 (D.Kan. 1995) (preinjury release related to automobile racing); In re Sikes, 184 B.R. 742 (Bkrtcy.M.D.Tenn.1995) (pre-injury personal guarantee pertaining to construction loan); Public Serv. Enter. Group, Inc. v. Philadelphia Elec. Co., 722 F.Supp. 184 (D.N.J. 1989) (pre-injury release in owners agreement); Airfreight Exp. Ltd. v. Evergreen Air Ctr., Inc., 215 Ariz. 103, 158 P.3d 232 (Ariz.Ct.App.2007) (settlement agreement operating as pre-injury release because it purportedly released intentional injuries involving the quality of future repairs to an airplane); City of Santa Barbara v. Superior Court, 41 Cal.4th 747, 161 P.3d 1095, 62 Cal. Rptr.3d 527 (2007) (pre-injury release in camp application form); U.S. Fire Ins. Co. v. Sonitrol Mgmt. Corp., 192 P.3d 543 (Colo.Ct.App.2008) (pre-injury release in contract for burglar and fire alarm services); Chadwick v. Colt Ross Outfitters, Inc., 100 P.3d 465 (Colo.2004) (pre-injury release agreement for hunting expedition); Moore v. Waller, 930 A.2d 176 (D.C.2007) (pre-injury release of liability signed when plaintiff joined fitness center); McFann v. Sky Warriors, Inc., 268 Ga.App. 750, 603 S.E.2d 7 (2004) (pre-injury release in instructor agreement); Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship, 115 Hawai'i 201, 166 P.3d 961 (2007) (pre-injury purchase agreement); Falkner v. Hinckley Parachute Ctr., Inc., 178 Ill.App.3d 597, 533 N.E.2d 941, 127 Ill.Dec. 859 (1989) (pre-injury release in training agreement); State Group Indus. (USA) Ltd. v. Murphy & Assocs. Indus. Servs., Inc., 878 N.E.2d 475 (Ind.Ct.App. 2007) (pre-injury contract provision exempting a party from liability); Adloo v. H.T. Brown Real Estate, Inc., 344 Md. 254, 686 A.2d 298 (1996) (pre-injury release in real estate listing contract); Ball v. Waldoch Sports, Inc., No. C0-03-227, 2003 WL 22039946 (Minn.Ct.App. Sept. 2, 2003) (pre-injury release signed by participant as condition of participating in snowmobile grass drag race); Conant v. Rodriguez, 113 N.M. 513, 828 P.2d 425 (N.M.Ct.App.1992) (release not executed as part of a settlement, appears to have been a pre-injury release), criticized by Baker v. Bhajan, 117 N.M. 278, 281 n. 1, 871 P.2d 374, 377 n. 1 (1994) ("[T]he Court of Appeals may have implied that releases which purport to grant a release of liability for willful or reckless conduct are invalid. This proposition is too broad. `It is universally held that in the right circumstances one can consent to certain actions that otherwise would be intentional torts. This is true of defamation....' Smith v. Holley, 827 S.W.2d 433, 438 (Tex.Ct.App.1992). ..."); Smith v. Golden Triangle Raceway, 708 S.W.2d 574 (Tex.Ct.App. 1986) (pre-injury release required in order to gain access to raceway pit area); Finch v. Southside Lincoln-Mercury, Inc., 274 Wis.2d 719, 685 N.W.2d 154 (Wis.Ct.App.2004) (pre-injury clauses in two dealership facility leases). The Plaintiffs have also cited In re Cunningham, 365 B.R. 352 (Bkrtcy.D.Mass.2007), in support of their broad argument that courts will not enforce, on public policy grounds, exculpatory provisions that attempt to absolve a party of its wanton, reckless or intentional conduct. Cunningham does not support this principle of law. While the Cunningham court did recognize this general principle, it went on to distinguish the agreement before it on the ground that the agreement "was made during the course of litigation, was in the nature of an agreement for judgment, and was enforced by the Superior Court. ..." Cunningham, 365 B.R. at 365. Ultimately, the Cunningham court concluded that the exculpatory agreement at issue therein, which excused liability for harm caused intentionally, was binding.
[32] Furthermore, we are being asked to retroactively impose a standard of conduct on a facility that is no longer in operation. We note that, if the Spelter Smelter was still operating today, and the landowners subject to the Grasselli deeds wished to rely on current public policy in order to have the agreements declared void in order to halt the continued pollution of their land, we might reach a different result. This is so because we would then be imposing current public policy in order to stop current conduct. Here, however, the conduct has already ceased, and the Plaintiffs merely seek monetary compensation for damage to their land. This would be a duplication of the compensation paid by Grasselli in the 1930s in exchange for the releases and easements granted in the Grasselli deeds. Because those releases and easements were designated to run with the land and were duly recorded, subsequent purchasers of the land were on notice of their existence. Thus, any adverse impact on the value of the land should have been accounted for in the price paid by subsequent purchasers of that land.
[33] We additionally acknowledge the Plaintiffs' assertion that forty percent of the land involved in this action is subject to the Grasselli deeds, and the failure to remediate that land would lead to re-contamination of surrounding remediated land. However, addressing this issue would require the Court to deal in the abstract. It is not proper for this Court to resolve an issue that is dependent upon speculative future events, and we decline to do so in this instance.
[34] See W. Va.Code § 55-2-12 (1959) (Repl. Vol. 2008) ("Every personal action for which no limitation is otherwise prescribed shall be brought: (a) Within two years next after the right to bring the same shall have accrued, if it be for damage to property; (b) within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries; and (c) within one year next after the right to bring the same shall have accrued if it be for any other matter of such nature that, in case a party die, it could not have been brought at common law by or against his personal representative.").
[35] The 1997 article further reported that the lead, arsenic and cadmium were finding their way into ground water and the West Fork River, and that "air borne particles have the potential to harm people through inhalation or ingestion."
[36] DuPont averred that numerous plaintiffs had acknowledged seeing these and other articles.
[37] See supra note 15 for a comment regarding the entry of two separate summary judgment orders.
[38] Furthermore, DuPont repeatedly mischaracterizes the ruling of the circuit court as being sua sponte. Because the circuit court was presented with a motion for summary judgment, i.e. DuPont's motion, its decision was not sua sponte.
[39] The Plaintiffs also contend that federal law controls the commencement of the statute of limitations. The circuit court concluded, in its order of September 20, 2007, that "[t]he record before the Court, however, reveals that Plaintiffs lacked knowledge sufficient to trigger the running of the statute under either Syllabus Point 4 of Gaither [v. City Hospital, Inc., 199 W.Va. 706, 487 S.E.2d 901 (1997)], or the provisions of 42 U.S.C. § 9658(a)(1) until December 2003  approximately six months prior to the commencement of this action. ..." (Emphasis added).

With regard to the statute of limitations, the federal Comprehensive Environmental Response Compensation and Liability Act (hereinafter referred to as "CERCLA"), 42 U.S.C. § 9601, et seq., provides that,
[i]n the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.
42 U.S.C. § 9658(a)(1) (1986) (2006 ed.). CERCLA defines the "federally required commencement date," in relevant part, as "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A). We perceive no practical difference between this federal standard and the West Virginia standard for the commencement of the statute of limitations period under the discovery rule as set out in Syllabus point 4 of Gaither v. City Hospital, Inc., 199 W.Va. 706, 487 S.E.2d 901 (1997). Accordingly, applying 42 U.S.C. § 9658(a)(1), we conclude that West Virginia law applies to the determination of when the statute of limitations commenced in this action.
[40] See, e.g., Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1054 (Ala. 1987) (per curiam) (affirming conditionally).
[41] See Rule 23(c)(4) of the West Virginia Rules of Civil Procedure, which authorizes subclasses.
[42] This Court has explained that, "[b]efore certifying a class pursuant to Rule 23 of the West Virginia Rules of Civil Procedure, it is imperative that the class be identified with sufficient specificity so that it is administratively feasible for the court to ascertain whether a particular individual is a member." Syl. pt. 3, State ex rel. Metropolitan Life Ins. Co. v. Starcher, 196 W.Va. 519, 474 S.E.2d 186 (1996). Moreover, "[t]o demonstrate the existence of a class pursuant to Rule 23 of the West Virginia Rules of Civil Procedure, it is not required that each class member be identified, but only that the class can be objectively defined." Syl. pt. 2, in part, Id. Based upon the circuit court's definition of the property class quoted above, we conclude that this class was adequately defined.
[43] The order specified that

[t]he initial proposed class area includes the following communities within Harrison County, West Virginia, and all other private real property lying closer to the Spelter Smelter facility than one or more of these communities: Spelter, Erie, Hepzibah, Lambert's Run, Meadowbrook, Gypsy, Seminole, Lumberport, Smith Chapel, and as further modified to include additional impacted areas as described in Plaintiffs' air model.
[44] Based upon the circuit court's definition of the medical monitoring class quoted above, we conclude that this class was adequately defined. See supra note 42 for a discussion of the requirement for a properly identified class.
[45] Because this Court's denial of a petition for writ of prohibition is not a decision on the merits, DuPont is not barred from raising this issue again on appeal. See State ex rel. Miller v. Stone, 216 W.Va. 379, 382 n. 3, 607 S.E.2d 485, 488 n. 3 (2004) (per curiam) ("[T]his Court's rejection of an application for appeal or a petition for an extraordinary writ generally is not an indication that we find the lower court's judgment correct unless we specifically state as much.").
[46] It has been further clarified that,

"[t]he party who seeks to establish the propriety of a class action has the burden of proving that the prerequisites of Rule 23 of the West Virginia Rules of Civil Procedure have been satisfied." Syllabus Point 6, Jefferson County Board of Education v. Jefferson County Education Association, 183 W.Va. 15, 393 S.E.2d 653 (1990).
Syl. pt. 4, In re West Virginia Rezulin Litig., 214 W.Va. 52, 585 S.E.2d 52 (2003).
[47] Rule 23(a) of the West Virginia Rules of Civil Procedure states:

Prerequisites to a class action.  One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
[48] "Traditionally, this Court has utilized decisions of federal courts when interpreting and applying our Rules of Civil Procedure." Kiser v. Caudill, 215 W.Va. 403, 410 n. 4, 599 S.E.2d 826, 833 n. 4 (2004) (citations omitted). See also Love v. Georgia Pac. Corp., 214 W.Va. 484, 488 n. 2, 590 S.E.2d 677, 681 n. 2 (2003) (per curiam) (Davis, J., dissenting) ("Due to the similarities between our Rules of Civil Procedure and the Federal Rules, we often look to decisions of the Federal Courts interpreting their rules as persuasive authority on how to apply our own rules." (citation omitted)); Lawyer Disciplinary Bd. v. Cunningham, 195 W.Va. 27, 33 n. 11, 464 S.E.2d 181, 187 n. 11 (1995) ("[W]e follow our usual practice of giving substantial weight to federal cases in determining the meaning and scope of our rules of civil procedure." (citation omitted)).
[49] Rule 23(b) of the West Virginia Rules of Civil Procedure states,

Class actions maintainable.  An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
(1) The prosecution of separate actions by or against individual members of the class would create a risk of
(A) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
(B) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
(3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.
[50] Other courts have found certification proper under Rule 23(b)(3) for both equitable and legal claims. See, e.g., Black v. Rhone-Poulenc, Inc., 173 F.R.D. 156 (S.D.W.Va.1996) (certifying equitable claim and monetary claim, including punitive damages, under Rule 23(b)(3)); In re Three Mile Island Litig., 87 F.R.D. 433 (M.D.Pa.1980) (certifying property damage and medical monitoring claims under Rule 23(b)(3)); Pruitt v. Allied Chem. Corp., 85 F.R.D. 100 (E.D.Va.1980) (certifying claims for injunctive and monetary relief under Rule 23(b)(3)).
[51] DuPont argues that the classes should have been decertified for two reasons. First, DuPont contends that the circuit court certified the property class for the remedy of diminished value only, but that during trial the evidence went to remediation. This argument is without merit as the circuit court's order clearly stated that it was certifying the class for diminished value and for "[c]ommon administration of any remediation program. ..." Second, DuPont contends that the trial court should have decertified the medical monitoring class because the evidence failed to show significant exposure. We reject this argument because the record clearly demonstrates that the evidence established significant widespread exposure of the medical monitoring class to the contaminants. Moreover, while DuPont attempted to present evidence establishing insufficient exposure, the jury simply was not persuaded by DuPont's evidence. See infra Section III. F. of this opinion for further discussion of the sufficiency of the medical monitoring evidence.
[52] West Virginia Rule of Evidence 404(b) states:

Other crimes, wrongs, or acts.  Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.
[53] Due to the manner in which we resolve this issue, it is not necessary for this Court to determine whether the deposition evidence at issue was in fact 404(b) evidence.
[54] Likewise, DuPont's allegation that the circuit erred in failing to exclude, on Rule 404(b) grounds, evidence presented during the Plaintiffs' cross-examination of DuPont's expert witness Dr. Joseph Rodricks was not preserved. DuPont's counsel objected to the Plaintiffs' questioning of Dr. Rodricks as follows:

MR. HALL: We're here because he's talking about Parkersburg, your Honor. It has absolutely nothing to do with this case. He's suggesting to the jury that I somehow travel around with Doctor Rodricks and Doctor Rodricks has some role here.
It's beyond the bounds  it has nothing to do with this lawsuit, and it's okay on cross to go after people, but there's always the same goal here, to inject these issues that don't have anything to do with  they are prejudicial, and we object to it.
This objection is simply inadequate to alert the trial court that defense counsel is objecting on Rule 404(b) grounds. There was no mention of Rule 404(b), of "[o]ther crimes, wrongs, or acts," or any request that the trial court conduct a hearing pursuant to State v. McGinnis.
[55] Furthermore, we note that DuPont's brief makes only general allegations about the 404(b) evidence that was introduced at the punitive damages phase, without identifying any of the documents or explaining why the circuit court erred in admitting them. DuPont's representation simply does not permit this Court to perform a specific review of each piece of evidence that was introduced. Thus, we once again admonish that, "`[j]udges are not like pigs, hunting for truffles,' State v. Honaker, 193 W.Va. 51, 56 n. 4, 454 S.E.2d 96, 101 n. 4 (1994) (internal quotations and citations omitted), and neither are the members of this Honorable Court." State ex rel. Brooks v. Zakaib, 214 W.Va. 253, 267, 588 S.E.2d 418, 432 (2003).
[56] DuPont has also asserted that the circuit court erred by allowing the Plaintiffs' counsel to present Rule 404(b) evidence during the Phase II closing argument. Notably, Rule 404(b) is an evidentiary rule. This Court has made clear that closing arguments are not evidence:

Every trial judge knows, as every trial lawyer knows, and every appellate court judge should know, that the statements of counsel in an argument are not evidence but are merely the expression of his individual views, and that jurors almost without exception during the trial of a case are so informed or instructed by counsel and the court.
Crum v. Ward, 146 W.Va. 421, 457, 122 S.E.2d 18, 38 (1961) (Haymond, President, dissenting). See also West Virginia Fire & Cas. Co. v. Mathews, 209 W.Va. 107, 112 n. 5, 543 S.E.2d 664, 669 n. 5 (2000) (per curiam) ("Statements made by lawyers do not constitute evidence in a case." (citing Crum v. Ward)). Accordingly, Rule 404(b) does not apply to closing arguments.
[57] Rule 702 of the West Virginia Rules of Evidence states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."
[58] Dr. Brown testified that he had retired and presently served as a professor emeritus for Texas A & M University.
[59] Phase I was the general liability phase of the trial.
[60] We further observe that other courts have applied an abuse of discretion standard when reviewing verdict forms. See Malone v. Reliastar Life Ins. Co., 558 F.3d 683, 692 (7th Cir.2009) ("We review a district court's formulation of questions on a special verdict form for an abuse of discretion." (citation omitted)); Klein v. Sears Roebuck & Co., 773 F.2d 1421, 1427-28 (4th Cir. 1985) (finding "no abuse of discretion in the selection of the verdict form or in the jury's instruction"); J.T.A. Factors, Inc. v. Philcon Servs., Inc., 820 So.2d 367, 371 (Fla.Ct.App. 2002) ("The form of the verdict to be used, however, lies within the sound discretion of the trial court."); People v. Battle, 393 Ill.App.3d 302, 313, 332 Ill.Dec. 299, 309, 912 N.E.2d 786, 796 (2009) ("A court reviews a trial court's decision regarding instructions and verdict forms using an abuse of discretion standard." (citation omitted)); South Carolina Dep't of Transp. v. First Carolina Corp. of S.C., 372 S.C. 295, 300, 641 S.E.2d 903, 906 (2007) ("The trial judge has the discretion to determine how a case is submitted to the jury." (citation omitted)).
[61] There are exceptions to a trial court's discretion with regard to verdict forms, in circumstances where the trial court's action is mandatory. See Barefoot v. Sundale Nursing Home, 193 W.Va. 475, 491, 457 S.E.2d 152, 168 (1995) ("In West Virginia, there appear to be three [exceptions] to the general rule that special verdicts and/or special interrogatories are within the complete discretion of the trial court. The first is where special interrogatories are compelled by statute. ... The second is in cases involving multiple causes of action where at least one of the causes of action is not supported by sufficient evidence to make it a legitimate jury issue. The third [exception] involves punitive damage cases." (footnote omitted) (internal quotations and citations omitted)). See generally Franklin D. Cleckley, Robin J. Davis, & Louis J. Palmer, Jr., Litigation Handbook on West Virginia Rules of Civil Procedure § 49[2], at 1014 (3d ed. 2008) (identifying three exceptions to trial court's discretion as to verdict forms). None of these exceptions apply in the instant case.
[62] DuPont avers that the circuit court rejected its proposed verdict form which would have required the jury to find that arsenic, cadmium, or lead created an "unreasonable risk of harm," and the instruction it offered, which was also refused by the trial court, would have explained that only "materially]" increased levels of arsenic, cadmium or lead create an unreasonable risk of harm.
[63] DuPont attempts to assign error with regard to other jury instruction issues, but DuPont has inadequately briefed these issues, and, therefore, they will not be addressed. Likewise, DuPont has also attempted to raise what is essentially a challenge to the sufficiency of the evidence pertaining to the property damage claims. We find this issue was also inadequately briefed. See Cooper v. City of Charleston, 218 W.Va. 279, 290, 624 S.E.2d 716, 727 (2005) (per curiam) ("`Although we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing but are not supported with pertinent authority, are not considered on appeal.'" (citations omitted)); Farmer v. Knight, 207 W.Va. 716, 722, 536 S.E.2d 140, 146 (2000) (per curiam) ("`It is ... well settled ... that casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal.'" (quoting State v. Lilly, 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995))); Tiernan v. Charleston Area Med. Ctr., Inc., 203 W.Va. 135, 140 n. 10, 506 S.E.2d 578, 583 n. 10 (1998) ("Issues not raised on appeal or merely mentioned in passing are deemed waived." (citation omitted)); State Dep't Of Health & Human Res. v. Robert Morris N., 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995) ("`[a] skeletal "argument," really nothing more than an assertion, does not preserve a claim....'" (citation omitted)). See also Albright v. White, 202 W.Va. 292, 298 n. 9, 503 S.E.2d 860, 866 n. 9 (1998) (refusing to address issues on appeal that had not been adequately briefed); Ohio Cellular RSA Ltd. P'ship v. Board of Pub. Works of W. Va., 198 W.Va. 416, 424 n. 11, 481 S.E.2d 722, 730 n. 11 (1996) (same).
[64] The jury found that class members have a significantly increased risk of skin cancer and bladder cancer from exposure to arsenic from the smelter; a significantly increased risk of lung cancer and kidney cancer from exposure to arsenic, cadmium, or lead from the smelter; a significantly increased risk of decreased renal function and renal failure from exposure to cadmium or lead from the smelter; and a significantly increased risk of stomach cancer, plumbism (lead poising), and neurocognitive injury, from exposure to lead from the smelter.
[65] ATSDR is an acronym for the Agency for Toxic Substances and Disease Registry.
[66] DuPont has asserted two additional errors pertaining to Medical Monitoring; however, we find these arguments to be without merit. First, DuPont contends that the circuit court erroneously included CT scans in the medical monitoring plan. DuPont asserts, as a basis for this argument, that the CT scans should have been rejected based upon DuPont's evidence that the CT scans presented more of a cancer risk to the class members than their exposure to arsenic, cadmium, and lead from the smelter. The Plaintiffs, on the other hand, tendered evidence that the CT scans are a reasonable option that will be given only at the election of the individual members of the medical monitoring class in consultation with their respective physicians. Notably, this Court has previously disapproved of the argument that medical monitoring should be rejected due to its risk of harm. See Bower v. Westinghouse Elec. Corp., 206 W.Va. 133, 142, 522 S.E.2d 424, 433 (1999) ("This Court is not entirely in accord with the statement in Hansen [v. Mountain Fuel Supply, 858 P.2d 970, 977 (Utah 1993)], to the effect that ... `if a reasonable physician would not prescribe ... [medical monitoring] for a particular plaintiff because the benefits of monitoring would be outweighed by the costs, which may include, ... risk of harm to the patient, then recovery would not be allowed.' 858 P.2d at 980; ... Moreover, the requirement that diagnostic testing must be medically advisable does not necessarily preclude the situation where such a determination is based, at least in part, upon the subjective desires of a plaintiff for information concerning the state of his or her health."). Furthermore, this Court observes that, while DuPont has attacked the use of CT scans as outside the tests that "a qualified physician would prescribe" (citing Bower, 206 W.Va. at 142, 522 S.E.2d at 433), DuPont has failed to suggest any alternative whatsoever. In other words, DuPont suggests that there is no medical monitoring remedy for the harm it has caused to the Plaintiffs. We reject this unsupported argument. Likewise, DuPont assigns error to the forty-year duration of the medical monitoring plan adopted by the circuit court, asserting that forty years is well beyond the latency period (the time between chemical exposure and disease onset) of the diseases involved in the case sub judice. On the contrary, the Plaintiffs submitted evidence that the majority of the cancers for which the Plaintiffs are at risk have a latency period of forty years. Dr. Charles Werntz, who developed the medical monitoring program adopted by the circuit court, also testified that, while he recognized that some of the conditions had varying latency periods, he applied one duration to the entire program in the interest of simplicity. Moreover, the Plaintiffs allege that DuPont failed to offer at trial any evidence to support an alternative duration being sufficient, and we note that DuPont has similarly failed to direct this Court's attention to any such evidence. Thus, due to DuPont's utter lack of evidence suggesting alternatives to CT scans and the forty-year duration of the medical monitoring program, we find the program adopted by the trial court to be reasonable.
[67] In Boyd v. Goffoli, 216 W.Va. 552, 608 S.E.2d 169 (2004), this Court closely reviewed the United States Supreme Court decision in State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).
[68] In State Farm Mutual Automobile Insurance Co. v. Campbell, the United States Supreme Court observed that "[a] State cannot punish a defendant for conduct that may have been lawful where it occurred." 538 U.S. 408, 421, 123 S.Ct. 1513, 1522, 155 L.Ed.2d 585. However, the Court went on to explain that

[l]awful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff. A jury must be instructed, furthermore, that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred.
Id., 538 U.S. at 422, 123 S.Ct. at 1522-23, 155 L.Ed.2d 585 (citation omitted).
[69] In Philip Morris USA v. Williams, the United States Supreme Court explained:

In our view, the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, i.e., injury that it inflicts upon those who are, essentially, strangers to the litigation. ...
. . . .
Respondent argues that she is free to show harm to other victims because it is relevant to a different part of the punitive damages constitutional equation, namely, reprehensibility. That is to say, harm to others shows more reprehensible conduct. Philip Morris, in turn, does not deny that a plaintiff may show harm to others in order to demonstrate reprehensibility. Nor do we. Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible-although counsel may argue in a particular case that conduct resulting in no harm to others nonetheless posed a grave risk to the public, or the converse. Yet for the reasons given above, a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties.
549 U.S. 346, 353 & 355, 127 S.Ct. 1057, 1063-64, 166 L.Ed.2d 940 (2007) (emphasis added).
[70] This portion of the Plaintiffs' opening statement pertained to DuPont's conduct in Parkersburg. The quoted text was preceded by the following comments:

Do you see any parallels between what happened right here in Spelter? What we're going to show you is that this is conduct that  it's only being offered  and just to be very clear, it's only being offered  Parkersburg's not on trial. What they did in Parkersburg is not on trial.
But to show the conduct, the continuing conduct, what does it take for this corporation to get it? ...
[71] The demonstrative aids used by defense counsel were a cartoon that made reference to suing a doctor, and a document entitled "Dr. Setser Can't Win" that included three statements asserting that Dr. Setser would be sued by the plaintiff's counsel regardless of what course of treatment he provided. This document was displayed to the jury during defense counsel's closing arguments. See Jones v. Setser, 224 W.Va. 483, 487, 686 S.E.2d 623, 627 (2009) (per curiam).
[72] In support of this argument, DuPont cites Bower v. Westinghouse Elec. Corp., 206 W.Va. 133, 522 S.E.2d 424 (1999).
[73] In support of this argument, the Plaintiffs cite State ex rel. Chemtall Inc. v. Madden, 216 W.Va. 443, 607 S.E.2d 772 (2004).
[74] The Court did, however, make the following observation in a footnote:

At least one court has recognized that "it is not uncommon for plaintiffs to join claims for punitive damages with claims for medical monitoring." Carlough v. Amchem Products, Inc., 834 F.Supp. 1437, 1460 (E.D.Pa.1993), citing Day v. NLO, Inc., 814 F.Supp. 646 (S.D.Ohio 1993); Cook v. Rockwell Int'l Corp., 755 F.Supp. 1468 (D.Colo.1991); Catasauqua Area School Dist. v. Raymark Indus., Inc., 662 F.Supp. 64 (E.D.Pa.1987); Sterling v. Velsicol Chem. Corp., 855 F.2d 1188 (6th Cir.1988).
State ex rel. Chemtall Inc. v. Madden, 221 W.Va. 415, 421 n. 5, 655 S.E.2d 161, 167 n. 5 (2007) (per curiam). As explained in the discussion that follows, a careful reading of the cases cited in the foregoing quote reveals that they do not support allowing punitive damages for medical monitoring claims.
[75] The case cited by Carlough, In re Fernald Litigation, No. C-1-85-149, 1989 WL 267039 (S.D.Ohio Sept. 29, 1989), does not actually support the decision, because In re Fernald failed to state whether the advisory jury's punitive damages award was for medical monitoring and/or the claim for diminution in the value of property. Further, Carlough cited to four other cases for support; however, all of those cases involved medical monitoring claims brought along with other causes of action. See Sterling v. Velsicol Chem. Corp., 855 F.2d 1188 (6th Cir.1988) (claims for property damage and medical monitoring); Day v. NLO, Inc., 814 F.Supp. 646 (S.D.Ohio 1993) (claims for emotional distress, property damage and medical monitoring); Cook v. Rockwell Int'l Corp., 755 F.Supp. 1468 (D.Colo.1991) (claims for intentional infliction of emotional distress, misrepresentation and medical monitoring); Catasauqua Area Sch. Dist. v. Raymark Indus., Inc., 662 F.Supp. 64 (E.D.Pa. 1987) (case actually dismissed punitive damage claim) (ultimately all claims in the case were dismissed (see Catasauqua Area Sch. Dist. v. Eagle-Picher Indus., Inc., No. CIV. A. 85-3743, 1988 WL 102689 (E.D.Pa. Sept. 28, 1988))).
[76] We have been unable to locate, in the voluminous record submitted in connection with this appeal, any order or apportionment by the trial court, either written or delivered orally. However, because neither party disputed the apportionment as represented to this Court during oral argument, we will accept that figure. In addition, we note that neither party has assigned any error to the trial court's apportionment of punitive damages between the medical monitoring and property claims.
[77] For a thorough discussion of punitive damages law in West Virginia, see Robin J. Davis, Louis J. Palmer, Jr., PUNITIVE DAMAGES LAW IN WEST VIRGINIA, http://www.state.wv.us/wvsca/PunitiveDamages2010.pdf.
[78] In its order denying DuPont's motion for a new trial, the circuit court explained that

DuPont argues the jury should not have been permitted to hear evidence of DuPont's efforts to obtain favorable administrative action. The Court rejects DuPont's invocation of the Noerr-Pennington doctrine in the circumstances of this case.
Plaintiffs' causes of action arose from DuPont's contamination of the communities surrounding the Spelter smelter and DuPont's refusal to remove the contamination from surrounding properties. DuPont defended against claims of off-site contamination and the lack of off-site remediation by pointing to regulatory agencies that purportedly approved of a remediation restricted to the smelter property and contending that the regulatory agencies' approval of the remediation plan is evidence of no unreasonable contamination to the surrounding communities. DuPont may not rely on regulatory agencies' findings as a defense and, at the same time, preclude Plaintiffs from presenting evidence of DuPont's purported manipulation of those same agencies.
The Noerr-Pennington doctrine and the West Virginia Constitution prevent a party from predicating a cause of action upon a party's mere attempt to influence government. Although the Noerr-Pennington doctrine and West Virginia's Constitution provide a qualified immunity from suit to parties attempting to influence or encourage government action, neither the doctrine nor the Constitution precludes evidence of such activity if the evidence is probative and not unfairly prejudicial. DuPont's reliance on regulatory decisions as a defense makes DuPont's communications with the agency relevant. In the instant action, the Court admitted evidence of DuPont's communications with regulatory agencies because such communications confirmed the existence and the magnitude of the contamination, were admissions made by a party opponent, rebutted DuPont's claims that there is no off-site contamination and no need for remediation, and rebutted DuPont's defense/reliance on regulatory agencies' findings of no unreasonable risk of off-site contamination.
"[T]he Noerr-Pennington doctrine, . . . was established in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)." State v. Berrill, 196 W.Va. 578, 582, 474 S.E.2d 508, 512 (1996).
[79] See generally Cleckley, Davis, & Palmer, Jr., Litigation Handbook on West Virginia Rules of Civil Procedure § 59(a), at 196 (3d ed. Cum. Supp.2010) ("It should be clearly understood that the factors under syllabus points 3 and 4 of Garnes impose two types of review: (1) an examination of the aggravating evidence that supports the amount of a punitive damage award, and (2) an examination of any mitigating evidence that would permit a reduction in the amount of a punitive damage award.").
[80] We note that at least one witness's testimony is inconsistent as to whether the $300 million figure represented the difference between off-site remediation as opposed to on-site remediation. The witness, Mr. Sathya Yalvigi, initially agreed that the $300 million figure represented the estimated cost of off-site remediation, then later during the same examination, Mr. Yalvigi seemed to suggest that the $300 million was related to on-site remediation. The circuit court interpreted the evidence as indicating that the $300 million represented the amount of DuPont's savings for avoiding off-site remediation.
[81] Citing State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585.
[82] DuPont cites Exxon Shipping Co. v. Baker, ___ U.S. ___, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008). Notably, Exxon Shipping is a maritime case that has no application to the instant action.
[83] As we previously noted, Exxon Shipping Co. v. Baker is a maritime case that has no application to the instant action. See supra note 82.
[84] References pertaining to medical monitoring have been omitted due to this Court's conclusion that punitive damages are not properly awarded in connection with claims for medical monitoring.
[85] We have observed that in its "Motion to Vacate or Reduce Punitive Damages Award" filed in the circuit court, DuPont did argue that it had faced two recent lawsuits arising from the operation of the Spelter smelter. However, having failed to repeat this argument to this Court, DuPont has waived the same. See Syl. pt. 6, Addair v. Bryant, 168 W.Va. 306, 284 S.E.2d 374 (1981) ("Assignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived.").
[86] For information regarding the Grasselli lawsuits, see supra Sections I.A. and III.A.2 of this opinion.
[87] As we have previously advised, "[i]n short, `[j]udges are not like pigs, hunting for truffles,' State v. Honaker, 193 W.Va. 51, 56 n. 4, 454 S.E.2d 96, 101 n. 4 (1994) (internal quotations and citations omitted), and neither are the members of this Honorable Court." State ex rel. Brooks v. Zakaib, 214 W.Va. 253, 267, 588 S.E.2d 418, 432 (2003).
[88] The Plaintiffs have not challenged DuPont's assertions that it performed onsite remediation and spent approximately $20 million in doing so. Therefore, we accept these facts as accurate. Moreover, we wish to point out that this opinion relies on that figure exclusively. That is, when this case is remanded, DuPont is precluded from attempting to increase the amount for onsite remediation.
[89] While we find that, in this particular case, a reduction in the amount of punitive damages equal to the amount that DuPont has spent to remediate the smelter site is warranted, we do not suggest that such a reduction should always be granted when a defendant has performed remediation, or that, when granted, such a reduction should match a defendant's remediation costs on a dollar-for-dollar basis. These determinations must be made on a case-by-case basis.
[90] We wish to clarify that remittitur is not required when a court reduces a punitive damages award to the 5:1 ratio required by TXO Production Corp. v. Alliance Resources Corp., 187 W.Va. 457, 419 S.E.2d 870 (1992). See Vandevender v. Sheetz, Inc., 200 W.Va. 591, 490 S.E.2d 678 (1997) (per curiam) (reversing punitive damages award, for claim of unlawful termination/failure to rehire, with ratio of 7:1, and reducing said award so that ratio equaled 5:1).
[91] We note that, where there are no civil or criminal penalties that would be imposed for comparable misconduct, this guidepost would be irrelevant.
[92] DuPont cites Taylor v. Culloden Public Service District, 214 W.Va. 639, 642-43 n. 10, 591 S.E.2d 197, 200-01 n. 10 (2003).
[93] For instance, the conduct involved in the instant case occurred over a long period of time, while the conduct that occurred in the examples cited by DuPont appear to have involved isolated events.
[94] DuPont also relies on Exxon Shipping Co. v. Baker, in support of its argument. However, as we have previously noted, Exxon is a maritime case that has no application to the instant action. See supra note 82.
[95] We point out that DuPont also suggests that a lower ratio may be warranted in some cases; however, we note that State Farm held that "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." State Farm Mut. Auto. Ins. Co. v. Campbell 538 U.S. 408, 425, 123 S.Ct. 1513, 1524, 155 L.Ed.2d 585 (2003). Based upon this language and our prior analysis, DuPont's conduct in this case warrants the amount of punitive damages approved of in this opinion.
[96] DuPont also contends that the circuit court erroneously allowed the jury to punish DuPont for its constitutionally protected communications with government officials. We reject this argument based upon the manner in which it was addressed by the trial court, as set out, supra, in footnote 78, which is found in Section III.G.4.a. of this opinion.
[1] 2007 WL 2302584, at *5 & *10.
[2] 2007 WL 2302584, at *9 & * 10.
[3] 2007 WL 2302584, at *7.
[4] 2007 WL 2302584, at *9.
[5] The elements of a medical monitoring claim are set forth in Syllabus point 3 of Bower v. Westinghouse Electric Corporation, 206 W.Va. 133, 522 S.E.2d 424 (1999):

In order to sustain a claim for medical monitoring expenses under West Virginia law, the plaintiff must prove that (1) he or she has, relative to the general population, been significantly exposed; (2) to a proven hazardous substance; (3) through the tortious conduct of the defendant; (4) as a proximate result of the exposure, plaintiff has suffered an increased risk of contracting a serious latent disease; (5) the increased risk of disease makes it reasonably necessary for the plaintiff to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of the exposure; and (6) monitoring procedures exist that make the early detection of a disease possible.
[6] At least one court has recognized that "it is not uncommon for plaintiffs to join claims for punitive damages with claims for medical monitoring." Carlough v. Amchem Products, Inc., 834 F.Supp. 1437, 1460 (E.D.Pa.1993), citing Day v. NLO, Inc., 814 F.Supp. 646 (S.D.Ohio 1993); Cook v. Rockwell Int'l Corp., 755 F.Supp. 1468 (D.Colo. 1991); Catasauqua Area School Dist. v. Raymark Indus., Inc., 662 F.Supp. 64 (E.D.Pa. 1987); Sterling v. Velsicol Chem. Corp., 855 F.2d 1188 (6th Cir. 1988)[, modified on other grounds as stated in American & Foreign Ins. Co. v. General Elec. Co., 45 F.3d 135 (6th Cir.1995)].
[7] It is curious, though, that such a definitive statement that punitive damages are not available for medical monitoring has been made in both Guinan and Hess based not upon fairly recent authority but based instead upon an interpretation of language contained in a 1990 opinion from the United States Court of Appeals for the Third Circuit in Paoli. Even more puzzling is the fact that the Carlough court also had the benefit of this same opinion language when it issued its decision in 1993 finding punitive damages to be recoverable in connection with medical monitoring.
[8] In Donovan v. Philip Morris USA, Inc., the Supreme Court of Massachusetts explained why a plaintiff, who previously had been awarded damages for medical monitoring, is permitted to later assert a personal injury claim against the same defendant when the injury or disease that the medical monitoring had been awarded to detect becomes manifest:

[T]he single controversy rule would not apply [to a claim for personal injuries following recovery on a claim for medical monitoring to detect such personal injuries] because the subsequent cause of action would not accrue until the disease is manifested.... [W]e conclude that, in the context of toxic torts, the single controversy rule does not bar a subsequent action for negligence if one of these plaintiffs actually contracts cancer.
455 Mass. 215, 227, 914 N.E.2d 891, 902 (2009) (citing Ayers v. Jackson, 106 N.J. 557, 583-84, 525 A.2d 287, 300 (1987)).
[9] State ex rel. City of Martinsburg v. Sanders, 219 W.Va. 228, 235, 632 S.E.2d 914, 921 (2006) (Starcher, J., dissenting) (quoting Thomas Jefferson Memorial, National Mall & Memorial Parks, Washington, District of Columbia, at Southeast Interior Wall (redacted from Letter from Thomas Jefferson to Samuel Kercheval, July 12, 1816)).
[10] Id.
[1] Contrary to frequently-made public assertions, there are substantial criteria set forth in Bower that must be met before a medical monitoring claim can succeed.
[2] A majority of states now recognize medical monitoring claims. However, there is a split in those that recognize the claim in the absence of a present physical injury and those that recognize the claim when accompanied by a physical injury. Joseph K. Hetrick and Allison M. Brown, Cause of Action for Medical Monitoring Relating to the Use of Medical Devices and Prescription Drugs, 34 COA2d 249, §§ 7 and 8 (2007).
[3] This expert testified as a part of a 1919 lawsuit initiated by the surrounding residents of the Spelter smelter site.
[1] I want to preface the dissenting portion of my opinion by emphasizing that none of my remarks are directed at my colleagues or the trial judge. My colleagues spent hundreds of hours pouring through the briefs, the record and the trial transcripts. Nevertheless, I believe they are mistaken.
[2] Lead, arsenic and cadmium appear naturally in our environment. Dr. Brown conceded in his testimony that levels of arsenic in West Virginia's forests exceed the safe levels that the EPA mandates at our work sites. Nevertheless, Dr. Brown opined that it was not safe to live in the Town of Spelter. He ignored the undisputed fact that not one instance of disease in humans had been reported in the town in the 100 years since the establishment of the smelter.
[3] An example of a defendant proceeding in conscious disregard for the rights and safety of other persons may be found in the law concerning driving while intoxicated. As stated in John J. Kircher and Christine M. Wiseman, Punitive Damages: Law and Practice, 2nd ed., § 5:03 (West Group 2000):

The jurisdictions that view driving while intoxicated as sufficient, in and of itself, to warrant imposition of punitive damages strongly emphasize the fact that the defendant knowingly ingested a substance which would seriously affect the ability to drive safely, posing a clear danger to others encountered on the highway. Thus, the conscious choice to drive after drinking to intoxication is viewed as sufficient antisocial conduct for the imposition of the punitive sanction. In a California case, for example, the court * * * held that one who voluntarily continues to consume alcoholic beverages to the point of intoxication, while knowing that a motor vehicle will later be operated, may be held to have exhibited conscious disregard for the safety of others.
Accordingly, such behavior would be sufficient to demonstrate the malice required for an award of punitive damages.
[4] Speaking of carpetbaggers, one of plaintiffs' counsel, Robert F. Kennedy, Jr., in his punitive damage closing argument, said that he helped the plaintiffs in this case because his father Bobby Kennedyhad toured West Virginia and found "the poorest people" that was a result "of injustice and [] because of abuse of power." After touring West Virginia, Bobby Kennedy said to his children at the dinner table, "I hope that when you children grow up, that you'll do something to remediate that injustice." My research indicates that his father, Bobby Kennedy, toured West Virginia campaigning for his brother John in the 1960 presidential primary. I suggest counsel read Allen H. Loughry, II, "John F. Kennedy's 1960 Primary Election and a Culture of Corruption in Southern West Virginia," Don't Buy Another Vote, I Won't Pay For A Landslide, (McClain Printing Co., 2006) at 3-27.
[5] Plaintiffs say that DuPont, not Dr. Werntz, opened the door. But DuPont asked Dr. Werntz: "You would expect, wouldn't you, if you took blood lead tests of people who lived in the class area, in light of that ongoing exposure that you say is happening, their blood leads would be elevated?" Dr. Werntz responded: "Yes, and that was what was found." Dr. Werntz, not DuPont, opened the door when he went beyond answering the question by providing non-responsive (and misleading) testimony that blood-lead tests of class members were elevated.
[6] It should be noted that W.Va.Code, 22-22-7(d) [1996], of the West Virginia Voluntary Remediation and Redevelopment Act states: "No voluntary remediation agreement may be modified or amended, unless the amendment or modification is reduced to writing and mutually agreed upon by the parties to the agreement: Provided, That when the director determines that there is an imminent threat to the public, he or she may unilaterally modify or amend the agreement[.]" (Emphasis added).
[1] DuPont also raised an issue in its petition for rehearing that involves the remand trial on the issue of statute of limitations. Insofar as the issue raised by DuPont on this matter is beyond the scope of the issues decided in the original opinion, we decline to address the matter.
[2] Punitive damages were further reduced for other reasons not relevant to the petition for rehearing.
[3] Rule 24(a) of our Rules of Appellate Procedure states, in part, that a "petition [for rehearing] shall state particularly the points of law or fact which in the opinion of the petitioner the Court has overlooked or misapprehended[.]"
[4] We characterize the special master's report as nonbinding for two reasons. First, DuPont has not alleged that the circuit court adopted the special master's recommendation. Second, the report expressly stated that "no action of the Parties or the [Trial] Court is being requested by this Report until the date that all appeals are resolved or this case is settled among the Parties."